## VIRGINIA & WEST VIRGINIA COAL CO. v. CHARLES.

### (District Court, W. D. Virginia. July 14, 1917.)

1. SEALS ⬤⇒6—COPY OF DEEDS—INDICATION OF SEAL.

    In view of Code Va. 1904, § 2841, declaring that a scroll affixed by way of a seal by a natural person has the same force as a seal, a copy of a deed written on a typewriting machine, which showed the signature of the grantor, followed by parenthesis marks, is prima facie evidence that the original instrument had a scroll used by way of seal, and that the deed book so shows, though there was merely a blank between the two marks.

2. ACKNOWLEDGMENT ⬤⇒16—OFFICERS—COMMISSIONER IN CHANCERY OF COUNTY COURTS.

    The provision of Code Va. 1860, c. 175, § 2, allowing each court from time to time to appoint commissioners in chancery or for stating accounts was continued by various enactments and remained in force until adoption of Code of 1887. Act April 2, 1873 (Acts 1872–73, c. 395), abolished the equity jurisdiction of the county courts. *Held*, that an acknowledgment taken before a commissioner in chancery appointed by a county court after its equity jurisdiction had been abolished, but before the power to appoint commissioners in chancery had* been withdrawn was sufficient; commissioners in chancery being authorized by Act of June 17, 1870 (Acts 1869–70, c. 138), to take and certify acknowledgments.

3. ACKNOWLEDGMENT ⬤⇒61—SUFFICIENCY—PROOF OF STATUS OF OFFICER.

    Where a deed purported to have been acknowledged before a commissioner in chancery of the county court, no evidence that the one taking such acknowledgment was then a commissioner was necessary.

4. EVIDENCE ⬤⇒343(1)—CERTIFIED COPIES—RECORDS.

    Where the original deed was recorded in 1883, and thereafter it was recorded anew from the original deed, a certified copy taken from the last record is admissible in evidence under Code Va. 1904, § 3339, providing for the re-recording of an instrument, where the book in which it was recorded shall have been lost, or become illegible, etc.

5. EVIDENCE ⬤⇒343(7)—COPIES—ADMISSIBILITY IN EVIDENCE.

    A certified copy of a deed, taken from the deed book of a county other than that in which the land was located and the conveyance was originally recorded, is not admissible in evidence under Code Va. 1904, § 2506, or section 3339, where it appeared from the registration certificate of the clerk that the paper presented to him for record was not the original deed, but was merely a copy, and hence not entitled to record under the statutes.

6. EVIDENCE ⬤⇒343(8, 9)—RECORDS—COPIES.

    Where a certified copy of the original deed, which had been duly recorded, was thereafter, the record being lost, recorded under Code Va. 1904, § 3339, a certified copy taken from the second record is admissible in evidence without any showing of the loss or destruction of the first certified copy, which was used for making the second record.

7. EVIDENCE ⬤⇒343(8, 9)—HEARSAY—DESTRUCTION OF PRIMARY EVIDENCE.

    Testimony that a witness tried to find the original deed in the office of the clerk of the county court, and that the then clerk informed him the original deed was destroyed by the fire which had destroyed the courthouse, is admissible, as is testimony that the grantee in the deed told him that the original had been burned in the clerk's office, for, while hearsay, such evidence shows a diligent and unsuccessful search for the original justifying the introduction of other evidence.

8. EVIDENCE ⬤⇒343(8, 9)—ADMISSIBILITY—SECONDARY EVIDENCE.

    Where a party proposing to offer secondary evidence of undoubted accuracy has no interest to hold back the original, and there is no ground

---

for suspicion that the original could be produced, if desired, the law does not require convincing evidence of the loss of the original document, so proof that on search for an original deed the searcher was informed that it had burned in a fire, warrants admission of secondary evidence.

9. EVIDENCE ⬥343(10)—DOCUMENTARY—ADMISSIBILITY.

Where a copy of a deed to the land in controversy was recorded in a county remote from the county where the land lies, a certified copy of the records of the said county was inadmissible, the deed having been duly recorded in the county where the land was situated, for recordation of a deed at a place remote from the land conveyed would give no notoriety to the transfer of title among people interested.

10. EVIDENCE ⬥40—JUDICIAL NOTICE—COURTS.

The federal District Court for the Western District of Virginia takes judicial notice that a circuit court of Virginia is, and was in 1856, a court of record and of general jurisdiction.

11. EVIDENCE ⬥383(12)—DOCUMENTARY—PART OF RECORD—EFFECT.

A decree of a circuit court of Virginia, which is a court of the widest possible original jurisdiction, directing its commissioner to convey lands unless the defendant in a chancery suit convey the same, is sufficient to establish the authority of the commissioner, and evidence of the loss of the remainder of the record is unnecessary.

12. EVIDENCE ⬥383(3)—DEEDS—RECITALS—EFFECT.

Where a decree authorized the court commissioner to convey lands, if the defendant in a chancery suit did not himself make the conveyance by a date fixed, a recital in the commissioner's deed that the defendant had not made the conveyance, as the commissioner was informed by complainant, should, after the lapse of more than 50 years, be treated as a recital merely that the defendant had not made the conveyance, which recital is prima facie true under Acts Va. 1899–1900, c. 1145 (Code Va. 1904, § 3333a).

13. EVIDENCE ⬥343(10)—UNAUTHORIZED RECORDATION OF A DEED—AS ACT OF OWNERSHIP.

A copy of a deed taken from the deed book of the county in which a part of the land was located, though the record was made from an attested copy of the original taken from the deed book of another county, is admissible as tending to show an assertion of ownership in plaintiff's predecessor, who was the only person interested in the land at the time the second record was made, and whom it is inferred went to the expense of recording the copy.

14. EVIDENCE ⬥343(10)—DEED RECORDED IN WRONG COUNTY—ADMISSIBILITY OF COPY.

Where an attested copy of a deed taken from the deed book of one county is recorded in a second county, Code Va. 1904, § 3339, does not apply and the copy from the records of the second county is inadmissible as evidence of transfer of title.

15. ACKNOWLEDGMENT ⬥20(1)—DISQUALIFICATION OF OFFICER.

Where a deed executed by a commissioner of court was acknowledged by him in open court as commissioner, and the court ordered it to be recorded, the indorsement on the deed of those facts by the commissioner in his capacity as clerk of the court did not invalidate the certificate of acknowledgment, on the ground that it was made by the grantor, for in making the indorsement showing the action of the court the clerk was acting merely in a ministerial capacity.

16. ACKNOWLEDGMENT ⬥15—SUFFICIENCY—TWO MAGISTRATES.

1 Rev. Code Va. 1819, c. 99, § 7, relating to certificates of acknowledgment, remained in force until Code 1849, c. 121, § 3, and a deed executed in 1839 in accordance with the earlier statute is not subject to attack on the ground that the law did not then authorize an acknowledgment before two magistrates.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

17. EVIDENCE ⬯343(7)—CERTIFIED COPIES—RECORDS.

Where, after a conveyance had been recorded in the county in which the land was then located the county was divided and the land included in the new county, a certified copy of the deed, taken from the deed book of the second county, in which an attested copy taken from the deed book of the original county had been recorded, is not admissible, under Code Va. 1904, §§ 2506, 3339, to show title, where there was no affidavit, produced to the recording officer, as to the loss of the original deed, for, while the clerk's certificate is conclusive as to any fact certified, it will not supply an omission.

18. JUDGMENT ⬯495(1)—COLLATERAL ATTACK—WANT OF JURISDICTION—WAIVER OF OBJECTIONS TO VENUE.

As under 1 Rev. Code Va. 1819, c. 71, § 7, the Russell county court in quarterly session was a court of general jurisdiction, and until 1849 (Code 1849, c. 124, § 1) there was no statutory provision giving jurisdiction in partition to the court of the county where the land was located, a decree of the Russell county court, in a consent proceeding prior to 1849, partitioning land located in another county, is not subject to attack on the ground that it was void for want of jurisdiction, for, the proceeding having been by consent, objections to the venue were waived.

19. EXECUTORS AND ADMINISTRATORS ⬯145—CONVEYANCE BY EXECUTOR—EXECUTION—REPRESENTATIVE CAPACITY.

A deed which shows on its face that it was executed by the grantors in their capacity as executors is valid and admissible to record, although signed and acknowledged as if the grantors had been acting in their individual personal right.

20. ACKNOWLEDGMENT ⬯38—SUFFICIENCY.

In view of Code Va. 1904, §§ 2500, 2501, declaring that, where any writing purports to have been signed in any representative capacity, a certificate of acknowledgment shall be sufficient, without expressing that such acknowledgment was in a representative capacity, which at least was declaratory of the pre-existing rule, an acknowledgment of a conveyance by executors, which in all ways conformed to 1 Rev. Code Va. 1819, c. 99, § 7, is sufficient, though it did not recite that they were acting in a representative capacity.

21. EXECUTORS AND ADMINISTRATORS ⬯138(1)—CONVEYANCES—AUTHORITY.

Where the testator's will declared that his just debts should be paid out of money arising from the sale of any part of his real estate that his executors might deem most proper to be sold, the executors were authorized either under the will or by 1 Rev. Code Va. 1819, c. 104, § 52, declaring that the sale and conveyance of lands devised to be sold shall be made by the executors, or such of them, as shall undertake the execution of the will, to convey the lands of the testator sold by them, without any order of court.

22. EXECUTORS AND ADMINISTRATORS ⬯335—CONVEYANCES—VALIDITY.

Where, either under the will or 1 Rev. Code Va. 1819, c. 104, § 52, the executors of a testator were authorized to sell his lands, but one of them refused to convey without order of court, a conveyance thereafter made in accordance with the decree of court is not subject to attack because devisees of the testator were not parties to the proceeding, for, the executors having joined in the conveyance, they needed no authority to render the same valid.

23. EXECUTORS AND ADMINISTRATORS ⬯145—CONVEYANCE BY EXECUTORS—DESCRIPTION—SUFFICIENCY.

Where a deed described the land of the testator as having been sold and conveyed to him by a tax collector by a specified deed, and the intention of the executors to convey a 200,000-acre tract conveyed by the collector to their testator was manifest, the instrument is not subject to attack on the ground of insufficiency of description.

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

24. ACKNOWLEDGMENT ⊜═6(1)—ADMISSIBILITY AS EVIDENCE OF DEFECTIVELY ACKNOWLEDGED INSTRUMENT.

A copy of a power of attorney, executed by one of plaintiff's predecessors in title before one justice of the peace prior to Code Va. 1849, is inadmissible; the law in force at the time of the execution of the power of attorney requiring it to be acknowledged before two justices.

25. EVIDENCE ⊜═271(18)—DECLARATIONS—ACTS OF OWNERSHIP.

Conveyances executed by plaintiff's predecessors in interest, as well as powers of attorney for the sale of the lands claimed, are admissible in evidence as acts of ownership.

26. EVIDENCE ⊜═271(18)—DECLARATIONS—ACTS OF OWNERSHIP.

Where land had been partitioned in 1837, and the conveyance by one of the parceners was not recorded until 1848, original tax receipts, showing payment by or for her of taxes on one-half of the land for 1840 and 1841, are admissible in evidence as acts of ownership by her.

27. EVIDENCE ⊜═372(3)—ANCIENT DOCUMENTS—ADMISSIBILITY.

Original receipts showing payment in redemption of delinquent taxes on land coming from the possession of one who made the payments are properly admitted in evidence; the originals being much over 30 years of age.

28. EVIDENCE ⊜═341—CERTIFIED COPIES—ADMISSIBILITY.

Where plaintiff deraigned title from a deed executed by the designated collector of the federal direct tax of 1816, an extract from the Journal of the Executive Proceedings of the United States Senate, certified in accordance with Rev. St. § 895 (Comp. St. 1916, § 1508), showing that the nomination of the grantor in the deed relied on as collector of direct taxes was confirmed in 1814, is admissible, though not showing that he was appointed designated collector.

29. EVIDENCE ⊜═334(2)—OFFICIAL CERTIFICATES.

Code Va. 1904, § 3334, authorizing the auditor to certify copies of any paper or record, does not authorize the auditor of public accounts to certify as to facts not shown by any document on file in his office, and a certificate by the auditor as to facts not so appearing is inadmissible in evidence.

30. EVIDENCE ⊜═341—CERTIFIED COPIES—SURVEY.

A certified copy of a survey and plat for the original patent under which plaintiff in ejectment deraigned its title, which was certified under Code Va. 1904, § 3334, and has a tendency to show the county in which the sundry deeds introduced by plaintiff should have been recorded, is admissible in evidence.

31. EVIDENCE ⊜═158(4)—SECONDARY EVIDENCE—ADMISSIBILITY.

Where plaintiff deraigned title based on a deed by the designated collector for federal direct taxes, depositions which, in conjunction with other evidence, at least circumstantially showed that the person executing the deed relied on was the designated collector, and that the papers directly relating to the tax sale were not to be found, are admissible.

32. LOST INSTRUMENTS ⊜═5—JURISDICTION—SCOPE OF.

While the mere destruction of a deed will not give equity jurisdiction, yet, where a party in possession of land has by accident lost the evidence of his title, a court of equity has jurisdiction to establish the former existence and contents of the lost document.

33. JUDGMENT ⊜═497(3)—PRESUMPTION—REGULARITY.

In view of the presumption of regularity, a decree purporting to be against nonresidents of the state of Virginia, which recited that the order of publication had been duly published and executed, is not open to collateral attack on the ground that the affidavit on which the order was made is not in the record; Code Va. 1904, § 3230, not in terms requiring the affidavit to be reduced to writing.

⊜═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

34. Process ☞86—Service—Publication—"Quasi in Rem."

A suit to establish the existence and contents of a lost document evidencing the title of one in possession of land is to be regarded as quasi in rem, and an order of publication against nonresident defendants gives a court of equity jurisdiction over them for the purpose of establishing the contents of the lost document.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Quasi in Rem.]

35. Judgment ☞712—Conclusiveness of Decree—Parties Bound.

As a suit to establish the contents of a lost muniment of title is not strictly in rem, the judgment is binding only on parties.

36. Judgment ☞712—Conclusiveness Against Person Not Party.

The general rule is that a judicial record is not admissible as evidence against a stranger, although it ordinarily may be used in evidence against a stranger, when it is a link in the chain of title of the party offering it.

37. Judgment ☞712—Parties Concluded—Evidence.

Where land sold as delinquent and bid in by the commonwealth of Virginia was later conveyed to plaintiff's grantor by the clerk of the court, a decree in a suit establishing a lost muniment of title in favor of those against whom the land was assessed for taxes is conclusive only on parties, and as to others is, in the older sense of the term, merely res inter alios acta.

38. Judgment ☞712—Admissibility as Against Person Not Party.

A decree in a suit establishing a lost muniment of title of one in possession is not admissible against third persons not parties, on the theory that the record showed an admission against interest on the part of the defendants in such suit, for to allow a party or a privy of a party to use an admission by another party to the record against a stranger would make the danger of collusion too great.

39. Evidence ☞271(18)—Declarations—Claim of Ownership.

A partial record of an ejectment suit by one through whom plaintiff deraigned title is admissible as evidence of an assertion of ownership by plaintiff's predecessor.

40. Depositions ☞100—Deposition Taken in Former Suit—Admissibility.

The general rule in Virginia is that depositions taken in a former suit cannot be read in evidence in a subsequent suit, unless there be substantial identity both of parties and issues.

41. Depositions ☞100—Admissibility in Other Action.

Contrary to the general rule, a deposition of a witness now dead, taken in a suit between strangers, if tending to prove ancient possession of land, is admissible in evidence.

42. Depositions ☞100—Admissibility in Other Action.

A deposition of the then clerk of the United States Circuit Court for the Eastern District of Virginia as to destruction of the records of that court in 1865, taken many years before trial, in another action, is inadmissible to prove that fact, as it might be shown by the custodian in charge of the records at the time of trial.

43. Evidence ☞317(9)—Hearsay—Admissibility.

Where plaintiff relied on a deed executed by the designated collector of federal taxes for 1846, testimony as to statements made by the Treasury Department officials concerning the supposed location of the original documents relating to sales made under the direct tax act was admissible to show the good faith of the witness in his search and to warrant the receipt of secondary evidence.

44. Evidence ☞271(18)—Declarations—Maps—Admissibility.

In ejectment, a map of the property involved is admissible in evidence as an act of ownership, where it is almost a necessary inference either

that plaintiff's predecessor had it made or that some one authorized by him to try to sell the property had it made.

45. EVIDENCE ☞333(1)—OFFICIAL STATEMENTS—ADMISSIBILITY.
    An excerpt from a reporter's statement of fact in the report of a Virginia case is inadmissible to establish a fact recited therein.

46. APPEAL AND ERROR ☞1057(1)—REJECTION OF EVIDENCE—HARMLESS ERROR.
    Where the court found that a fact was established by other evidence, the rejection of evidence offered to show such fact was harmless, if erroneous.

47. EVIDENCE ☞359(1)—PHOTOGRAPHS—ADMISSIBILITY.
    Photographic reproductions of parts of issues of a newspaper, in which were published notices of sale of lands on account of nonpayment of federal direct taxes for 1816, are admissible in evidence, where the validity of the collector's tax deed was involved.

48. INTERNAL REVENUE ☞28—PRESUMPTIONS—VALIDITY OF TAX DEED.
    Where a collector of federal direct taxes for 1816 sold land for nonpayment, a party claiming under such deed must, in the circumstances here, affirmatively show that every prerequisite to the execution of the deed was complied with; there being no presumptions in favor of such conveyances, where there has been no long-continued open possession under such deed.

49. TAXATION ☞788(8)—PRESUMPTIONS—VALIDITY OF TAX DEED.
    The long-continued possession under an ancient muniment of title, which creates a presumption of validity, is a bold, open, and notorious possession, such as attracts the attention of and challenges attack by all adversary parties, and the mere fact that one asserting title under a tax deed arranged with an adverse possessor of a small portion of the land that he should hold possession for the claimant, and that, if claimant's title was established, he could remain, does not show such possession as will establish a presumption in favor of the validity of the tax deed.

50. TAXATION ☞788(8)—PRESUMPTIONS—ANCIENT TAX DEED.
    Lapse of time, where the claimant is out of possession, will raise no presumption of the validity of an ancient tax deed; the long neglect of claimant to assert his title warranting an inference of a defect therein.

51. EVIDENCE ☞57—PRESUMPTIONS—POSSESSION OF LAND.
    A presumption that land has been in possession does not arise from the mere fact that the land has been conveyed a number of times during a long period by deeds of bargain and sale.

52. TAXATION ☞788(1)—TAX TITLES—COLLATERAL ATTACK.
    The rule against collateral attack upon judgments does not apply to a tax deed executed by a collector without any judicial proceedings.

53. DEEDS ☞81—EFFECT OF RECORD—REPEAL OF STATUTE.
    As Act Va. March 13, 1912 (Acts 1912, c. 235), prescribing the effect as evidence to be given to deeds recorded prior to 1865, was directly repealed by Act March 14, 1914 (Acts 1914, c. 100), Code 1904, § 6, prescribing a rule of construction in case of repeals, has no application; there being no ambiguity in the repealing statute.

54. TAXATION ☞727—TAX TITLE—REPEAL OF STATUTE.
    Act Va. March 13, 1912 (Acts 1912, p. 524), was absolutely repealed by Act Va. March 14, 1914 (Acts 1914, p. 186), even as to one who purchased a claim under an ancient tax deed while the act of 1912 was in force, and section 6, Code Va. 1904, does not save the benefit of the Act of 1912.

55. DEEDS ☞81—STATUTE—REPEALS.
    The intention of the Virginia Legislature to repeal Act March 13, 1912, relating to the effect to be given as evidence to deeds recorded prior to 1865, as shown by Act March 14, 1914, cannot be overthrown by Code 1904, § 6, prescribing a rule for the construction of statutes in case of repeals.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

56. STATUTES ⊜274—REPEAL—ACCRUED RIGHTS.

Code Va. 1904, § 6, prescribing a rule of construction as to repeals, saves not only accrued rights, but inchoate rights, so long as they are substantive in their nature; but a statute which prescribes merely a mode of procedure gives no person any right in the strict sense of the word to that particular mode, unless he avails himself of it while the statute is in force.

57. CONSTITUTIONAL LAW ⊜139—"IMPAIRING OBLIGATION OF CONTRACTS."

In order that a state statute may impair the obligation of a contract, the statute must affect the validity, construction, discharge, or enforcement of the contract, and hence Act Va. March 14, 1914, repealing Act March 13, 1912, prescribing a rule of evidence as to deeds recorded before 1865, is not invalid as impairing the obligation of a contract, in derogation of the rights of one who purchased a tax title while the act of 1912 was in force.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Impairing Obligation of Contract.]

58. CONSTITUTIONAL LAW ⊜311—DUE PROCESS OF LAW—RULE OF EVIDENCE.

There is no want of due process of law in the enactment of a reasonable rule of evidence.

59. CONSTITUTIONAL LAW ⊜311—DUE PROCESS OF LAW—RULE OF EVIDENCE.

The repeal by Act Va. March 14, 1914, of Act March 13, 1912, which prescribed the effect as evidence to be given deeds recorded before 1865, did not work deprivation of due process of law as to one purchasing a tax title while the act of 1912 was in force, for it merely restored the common-law rule of evidence, which had been changed by the act of 1912.

60. POWERS ⊜34(2)—EXECUTION OF—VALIDITY—REFERENCE TO POWER.

As a general rule it is not necessary that a deed made in execution of a power should even refer on its face to the power.

61. TAXATION ⊜757—TAX DEEDS—VALIDITY.

While a tax deed, showing on its face that some essential requirement of the law has been disregarded or disobeyed, is void on its face, a failure to recite that every essential step leading up to the delivery of the deed has been complied with does not render the deed void on its face, though a stricter rule prevails in case of tax deeds than ordinary instruments.

62. INTERNAL REVENUE ⊜26—LIENS—STATUTES.

The two-year limitation on the lien created by the assessment of federal direct taxes, provided in Act July 22, 1813, c. 16, § 19, 3 Stat. 30, and repealed by Act Jan. 9, 1815, c. 21, § 24, 3 Stat. 172, was kept in force by Act March 5, 1816, c. 24, § 2, 3 Stat. 255, for Act April 26, 1816, c. 82, § 1, 3 Stat. 302, in no way repealed the limitation.

63. INTERNAL REVENUE ⊜28—DIRECT TAX—LIEN—STATUTES—CONTINUANCE —DEED.

Act March 5, 1816, imposing direct federal taxes adopted the provisions of Act Jan. 9, 1815, except as changed by later acts. Section 4 of Act Jan. 9, 1815, as amended by Act March 3, 1815, c. 91, § 1, 3 Stat. 231, required the assistant assessors to commence the making of the assessment lists for the tax of 1816 on April 1, 1816. Section 13 required the list to be put in the hands of the principal assessor within 60 days thereafter, while section 14 required the principal assessor to immediately advertise the fact that the lists were in his hands subject to correction; 25 days being allowed for appeals. By section 16 each principal assessor was required to make out corrected lists and lay them before a board, consisting of all the principal assessors, which board was to meet at such time and place as the Secretary of the Treasury should appoint. A collector's deed to land sold for nonpayment of federal direct taxes showed that the sale was made in 1820. *Held*, it not appearing what time was fixed by the Secretary of the Treasury for the meeting of the board of

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

assessors to act upon the tax of 1816, that the deed was not void on its face, as showing that at the time of the sale the two-year lien had expired.

64. INTERNAL REVENUE ☞28—DIRECT TAX—DEED—CONSTRUCTION—PUBLICATION.

Though the notice that direct taxes for 1816 were due was by law required to be published in every newspaper in the state in which the laws of the United States were by public authority published, a tax deed reciting publication in a newspaper, which declared that such paper was one in the state in which the laws of the United States were by public authority published is not void on its face, as showing that publication was not made in every newspaper in the state in which the laws of the United States were authorized to be published, for the recital does not warrant an inference that the paper in which the notice was published had not been designated, or that any other newspaper in the state had been designated.

65. INTERNAL REVENUE ☞28—DIRECT TAX—TAX DEEDS—PRESUMPTION THAT COLLECTOR'S POWERS HAD CEASED.

A deed, showing that land was sold for nonpayment of federal direct taxes in 1820 by the designated collector, is not void on its face, on the theory that Act Dec. 23, 1817, c. 1, 3 Stat. 401, Act April 20, 1818, c. 80, § 5, 3 Stat. 440, containing conditional provisions for retiring collectors of direct taxes, raised a presumption that the collector's tenure of office had ceased at the time he made sale.

66. INTERNAL REVENUE ☞28—DIRECT TAX—TAX TITLES—TAX DEEDS—SIGNATURE.

A tax deed for federal direct taxes is not void on its face, because the tax officer did not annex to his signature his official title; the deed clearly showing that it was his act as a taxing officer.

67. INTERNAL REVENUE ☞28—DIRECT TAX—TAX TITLES—DEEDS—ACKNOWLEDGMENT.

A deed to land sold for nonpayment of federal direct taxes, which clearly showed that the sale was made by the tax collector in his official capacity, is not void on its face because the grantor's official title was not mentioned in the certificate of acknowledgment.

68. INTERNAL REVENUE ☞28—DIRECT TAX—TAX TITLE—DEEDS.

Where an entire parcel of land was sold for nonpayment of federal direct taxes, and the deed recited that the grantee was the only bidder who would pay the taxes with the per cent. thereon for the quantity so purchased of the land, the deed is not void on its face for failure to recite that a part of the land would not sell for a sum sufficient to pay the taxes.

69. INTERNAL REVENUE ☞28—DIRECT TAX—TAX TITLES—DEEDS—CONSTRUCTION.

A deed to land sold for nonpayment of federal direct taxes, the granting clause of which recited, "doth grant unto the said —— the said two hundred thousand acres of land in the county of Russell, and state of Virginia, being the land which was assessed," must be construed to cover the entire 200,000 acres, and not merely a part.

70. TAXATION ☞764(1)—TAX TITLES—DEEDS—DESCRIPTION.

The rules governing the description of the land conveyed are the same, whether the deed be made by a party in his own right or by a taxing official, who disposes of the land as a means for collecting the taxes.

71. INTERNAL REVENUE ☞28—DIRECT TAX—TAX DEEDS—PROPERTY CONVEYED.

A tax deed to land sold for federal direct taxes, though it incorrectly stated the Christian name of one of the owners, in whose name the

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

property was assessed, sufficiently described the property, where the advertisement referred to in the deed identified the land.

72. INTERNAL REVENUE ⬡⟶28—DIRECT TAX—TAX TITLES—VALIDITY—RECITAL IN DEED.

A recital in a deed to lands sold for nonpayment of federal direct taxes, to the effect that the land had been duly assessed, is not evidence of that fact.

73. INTERNAL REVENUE ⬡⟶28—DIRECT TAX—TAX TITLES—PRESUMPTION.

The fact that land was advertised for sale for federal direct taxes of 1816 authorizes no more than an inference that the local collector may have reported the land as delinquent, and does not show that it was ever assessed.

74. INTERNAL REVENUE ⬡⟶28—DIRECT TAX—TAX DEEDS—VALIDITY.

Where it did not appear that any notice of assessment of land for federal direct taxes was made in accordance with Act July 22, 1813, or Act Jan. 9, 1815, §§ 13, 14, a tax deed to the land which had been sold must be held void; assessment and notice, with an opportunity to contest an erroneous assessment, being important rights of the taxpayer.

75. INTERNAL REVENUE ⬡⟶28—FEDERAL DIRECT TAXES—LOCAL ADVERTISEMENT.

The requirements of Act Jan. 9, 1815, § 26, for local advertisement of federal direct taxes due, apply to nonresidents; the provision of section 28 for additional publication for the benefit of nonresidents not doing away with the requirement of local notice, in view of the proviso of the latter section as to payment within one year after the day on which the collector of the district where the property lies had notified that the tax had become due.

76. EVIDENCE ⬡⟶343(3)—CERTIFIED COPY—SEAL—PRESUMPTION.

Where a deed, acknowledged by nonresident before the mayor of Philadelphia, as authorized by Act Va. Dec. 13, 1792 (Code 1803, p. 160), as amended by Act Dec. 25, 1794 (Code 1803, p. 327), recited that the mayor had attached thereto the mayoralty seal, it will be presumed that the seal was duly attached, and a certified copy, taken from the deed book in which the same was recorded, is admissible in evidence, though neither the copy nor deed book showed any seal, for it may be inferred the seal was omitted in recording.

77. DEEDS ⬡⟶85—RECORDING—TIME FOR.

Though a deed recited that the grantor was of the city of Richmond, in the commonwealth of Virginia, yet where it was acknowledged before the mayor of a city in a foreign state, Code Va. 1803, p. 327, allowing two years after sealing and delivering for recordation, where the grantor did not reside in Virginia, applies, instead of the provision requiring conveyances by residents to be recorded within eight months.

78. PRINCIPAL AND AGENT ⬡⟶19—PRESUMPTION—POWER OF ATTORNEY.

Where a conveyance by one of two patentees of land recited that the patentee executing the conveyance acted as attorney for the other, but no power of attorney was shown to have been executed and acknowledged, a presumption to that effect cannot be indulged in merely because the record book in which the same could have been recorded had long since been destroyed by fire.

79. PRINCIPAL AND AGENT ⬡⟶19—PRESUMPTION—POWER OF ATTORNEY.

Where two own land, and one conveyed the same as grantor and as attorney for the other owner, the mere fact that the owner not joining in the conveyance paid no taxes thereafter raises no presumption that he had given a power of attorney to convey his interest.

80. PRINCIPAL AND AGENT ⬡⟶19—PRESUMPTION—POWER OF ATTORNEY—STATUTE.

Code Va. 1904, § 3333a, declaring that whenever the title to any property claimed under a conveyance or deed purporting to be in execution of a

⬡⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

sale under a deed of trust, mortgage, or any judicial proceedings is attacked or called in question, if it shall appear from the face of such conveyance or deed that such sale has been regularly made, etc., such deed or conveyance shall be prima facie evidence that such sale was regularly made and that other recitals in the deed are true, does not apply to a conveyance by one of two owners of land, who recited that he conveyed as attorney for his co-owner.

81. EVIDENCE ☞82—PRESUMPTION—JUDICIAL PROCEEDINGS.

As the Virginia county courts, in ordering deeds to be recorded, never undertook to judicially pass on the validity of the instrument, the recordation of a conveyance of land executed by one of two owners, who signed as grantor and as attorney of his co-owner, raises no presumption that a power of attorney was produced, for the instrument was in any event entitled to record as the deed of the grantor in his own right.

82. NEWSPAPERS ☞1(4)—FEDERAL DIRECT TAXES—PUBLICATION.

Evidence *held* insufficient to show that advertisement of federal direct taxes for 1816, as required by Act 1815, § 28, was made in a newspaper designated as one for the publication of United States laws.

83. INTERNAL REVENUE ☞28—DIRECT TAX—TAX TITLES—DEEDS—RECITALS.

A recital in a deed to land sold for federal direct taxes that advertisement of the tax appeared in a named newspaper is no evidence of that fact.

84. STATUTES ☞219—CONSTRUCTION BY ADMINISTRATIVE OFFICIALS.

A tax collector's construction of federal laws imposing direct taxes need not be deferred to by the courts, where there is no grave doubt as to the meaning of the law.

85. INTERNAL REVENUE ☞28—FEDERAL DIRECT TAXES—ADVERTISEMENT OF TAX SALE.

Act March 5, 1816, c. 24, 3 Stat. 255, provided for direct federal taxes to be laid and apportioned according to act of 1813, and all of the provisions of Act Jan. 9, 1815, except so far as the same had been varied by subsequent acts. Sections 28 and 29 of the later act, relating to publication, were amended by Act March 3, 1815, which required publication of notice of tax sales to be made by the designated collectors at least once a week for eight weeks in every newspaper within the state in which the laws of the United States are by public authority published. *Held*, that notice of a tax sale on account of nonpayment of direct taxes for 1816 should be published in every newspaper in the state in which laws of the United States were by public authority published.

86. NEWSPAPERS ☞1(4)—DESIGNATION OF OFFICIAL NEWSPAPER.

Evidence *held* insufficient to show that a newspaper, in which it was asserted sale for nonpayment of federal direct taxes had been advertised, was at the time of the advertisement a newspaper authorized to publish laws of the United States.

87. INTERNAL REVENUE ☞28—FEDERAL DIRECT TAX—TAX TITLES—DEEDS—PRESUMPTION.

A recital in a deed to land sold for federal direct taxes that a newspaper in which it was stated advertisement of sale had been published was one authorized to publish laws of the United States raises no presumption to that effect.

88. NEWSPAPERS ☞1(1)—DESIGNATION OF OFFICIAL NEWSPAPER.

Under Act March 5, 1816, levying federal direct taxes and providing for advertisement in accordance with earlier statutes imposing direct taxes in newspapers designated for the publication of United States laws, publication should be made in newspapers which at the time the advertisements were to be published were designated for the publication of laws of the United States.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

89. NEWSPAPERS ☞1(1)—EFFECT OF DESIGNATION.

In view of Const. art. 6, declaring that the Constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made, shall be the supreme law of the land, Act March 3, 1815, § 3, providing that publication of notice of sales of land for nonpayment of federal direct taxes, etc., should be in every newspaper within the state in which the laws of the United States are by public authority published, requires publication of such notices be made only in the newspaper or newspapers designated to publish the federal laws.

90. NEWSPAPERS ☞1(1)—PUBLICATION OF ADVERTISEMENTS—CHARACTER OF NEWSPAPER.

In view of Act April 20, 1818, c. 80, 3 Stat. 439, and Act May 11, 1820, c. 92, 3 Stat. 576, relating to publication of United States laws, one relying on publication in one newspaper of the advertisement of a tax sale under Act March 5, 1816, imposing federal direct taxes, must show. not only that that.paper was, at or before and after the time of publication, publishing orders, resolutions, and laws passed by Congress, but that it was the only newspaper in the state then so authorized.

91. INTERNAL REVENUE ☞28—FEDERAL DIRECT TAXES—PUBLICATION.

Publication of advertisement for sale of land for nonpayment of federal direct taxes imposed under Act March 5, 1816, which named one of the owners as "Robert," instead of "Richard," is insufficient, where the publication under the correct name "Richard" did not appear to have continued for the requisite number of times; the names not being idem sonans.

92. INTERNAL REVENUE ☞28—FEDERAL DIRECT .TAXES—DEPOSIT OF LISTS WITH CLERKS OF DISTRICT COURTS.

One relying on a tax title to land sold for nonpayment of federal direct taxes must show that the collector complied with Act Jan. 9, 1815, § 30, requiring collectors designated by the Secretary of the Treasury to deposit with clerks of District Courts correct lists of the property sold, and where the records had been destroyed that fact must be proven affirmatively by other evidence.

93. EVIDENCE ☞186(1)—SECONDARY EVIDENCE—DESTRUCTION OF DOCUMENTS.

While satisfactory evidence of the loss or destruction of a document authorizes the receipt of secondary evidence of its contents, it does not establish the contents of the document.

94. INTERNAL REVENUE ☞28—FEDERAL DIRECT TAXES—STATUTES—DIRECTORY PROVISIONS.

Provisions of tax laws which are clearly intended for the benefit of the taxpayer are mandatory; hence Act Jan. 9, 1815, § 30, relating to collection of federal direct taxes, which requires collectors designated to deposit with clerks of District Courts correct lists of the property sold, is mandatory, and not directory, even though the lists were required to be filed after the tax sale.

95. INTERNAL REVENUE ☞28—FEDERAL DIRECT TAX—TAX DEEDS.

Where evidence extrinsic of the collector's deed showed what land sold for nonpayment of federal direct taxes was intended to be conveyed, an error in the Christian name of one of the owners against whom it was recited taxes had been assessed, should be treated as a clerical error, insufficient to invalidate the instrument.

96. INTERNAL REVENUE ☞25—FEDERAL DIRECT TAXES—ASSESSMENT.

Evidence *held* insufficient to show that federal direct taxes were assessed by the wrong collector.

97. INTERNAL REVENUE ☞28—FEDERAL DIRECT TAXES—ASSESSMENT.

Circumstantial evidence *held* sufficient to show that one executing a deed to land sold for federal direct taxes was the designated collector.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

98. STATUTES ☜38—PUBLICATION.

Under Act Va. Jan. 29, 1803 (2 Rev. Code 1819, p. 528), providing for forfeiture of lands for nonpayment of taxes, and requiring the auditor to publish the statute, forfeitures cannot be enforced where the statute was not published as directed.

99. TAXATION ☜788(5)—SALES—BURDEN OF PROOF.

Where the burden of proving its validity rests on a party claiming under a tax forfeiture, a failure to affirmatively prove that the required notice was given is as fatal as would be evidence to the contrary.

100. STATUTES ☜283(1)—PRESUMPTION—PUBLICATION.

Where there was no long, notorious, unbroken, and actual possession following an alleged forfeiture of lands under Act Va. Jan. 29, 1803, providing for nonpayment of taxes, there can be no presumption that the statute was published by the auditor as required.

101. TAXATION ☜851—FORFEITURES—EXTRANEOUS EVIDENCE.

If extraneous evidence must be considered to identify land claimed to have been forfeited under Act Va. Feb. 9, 1814 (2 Rev. Code, 1819, p. 542), irregularities shown by such evidence should be considered, notwithstanding section 38, declaring that no irregularities, except such as appear on the face of the proceedings, may be relied upon to defeat the forfeiture.

102. TAXATION ☜849—FORFEITURE—SUFFICIENCY OF ASSESSMENT.

Under Act Va. Feb. 9, 1814, providing for forfeiture of lands for nonpayment of taxes, it was not intended that land could be forfeited for nonpayment of taxes assessed on practically twice too great an acreage.

103. TAXATION ☜338—ASSESSMENT—PERSONS TO WHOM LAND IS ASSESSED.

Land is properly assessed to persons in whom record title appears to be vested.

104. TAXATION ☜849—ASSESSMENT—FORFEITURE.

A forfeiture for nonpayment of taxes cannot be enforced under Act Va. Feb. 9, 1814, where each record owner of one-half of the parcel was assessed on the whole, and the land was likewise assessed against the original patentees, for no one of those who might have been interested in the land could have obtained a redemption by payment of the tax for which he was justly liable.

105. TAXATION ☜849—DELINQUENCY—EVIDENCE.

Where it appeared that many certificates have been issued by the auditor of public accounts as to the delinquency of taxes, based on check marks on old assessment lists, such check marks, while not very reliable, are admissible in evidence as tending to show that land was delinquent.

106. EVIDENCE ☜341—TAX HISTORY OF LAND.

Where the tax history of land is deemed of importance, it should be shown by the attested or examined copies of entries in land books, lists of lands forfeited, etc.

107. TAXATION ☜853—FORFEITED LANDS—PAYMENT OF TAX BY CLAIMANT.

Under Act Va. March 22, 1842 (Laws 1841–42, c. 13) § 3, declaring that all the right, title, and interest which shall be vested in the commonwealth in any lands west of the Alleghany Mountains by reason of the nonpayment of taxes heretofore due, or of the failure of the owner to cause the same to be entered on the books of the commissioner of the proper counties, and to have the same charged with taxes according to law, shall be and is absolutely transferred and vested in any person or persons other than those for whose default the same may have been forfeited, for so much as such person or persons may have just title to, held or derived from any grant of the commonwealth bearing date previous to January 1, 1843, who shall have discharged all taxes duly assessed against him or them, payment of taxes for the year 1841 by those claiming under the forfeited title does not transfer the commonwealth's title.

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

108. TAXATION ⬤═853—ASSESSMENT—REDEMPTION.

Until there has been a valid forfeiture of lands for nonpayment of taxes, no redemption or attempted redemption can possibly vest title in the party making the redemption.

109. TAXATION ⬤═855—PATENT OF LANDS FORFEITED FOR TAXES—TRANSFER OF TITLE.

Where the commonwealth of Virginia issued a second patent to lands, title to which it was asserted had been forfeited, the commonwealth cannot thereafter, except for default of the second patentee or his successors, transfer title to another.

110. TAXATION ⬤═855—TAX DEED—WARRANTY—CONSTRUCTION.

A warranty contained in a clerk's tax deed, pursuant to Code Va. § 666, is intended merely to prevent the clerk from asserting any title to the property, and does not have any binding effect on the state; the statute probably being based on the practice in chancery, which required commissioners to make deeds of special warranty.

111. EJECTMENT ⬤═25(4)—OUTSTANDING TITLE—DEFENSES.

Unless an outstanding title be subsisting, valid, and enforceable it cannot be relied upon by a defendant in ejectment.

112. EJECTMENT ⬤═9(2), 25(1)—ACTIONS—RECOVERY.

Where the plaintiff in ejectment fails to show that he has the true legal title to the land, he cannot recover.

113. APPEAL AND ERROR ⬤═1061(1)—REVIEW—HARMLESS ERROR.

Where the court rendered judgment for defendant, the refusal to sustain defendant's demurrer to the evidence, if erroneous, was harmless.

114. EVIDENCE ⬤═314(5)—HEARSAY—ADMISSIBILITY.

Testimony of a surveyor that a witness told him the place at which he located a corner was a point where the witness had seen corner trees standing is hearsay, and where the witness' testimony did not show that the trees stood at that point, the surveyor's testimony was not admissible to identify the place where he ended his line with the place where the trees had formerly stood.

115. ADVERSE POSSESSION ⬤═101—"CONSTRUCTIVE POSSESSION."

One in possession of a small parcel of land, who obtained a patent to lands somewhat distant, and thereafter obtained patents to the intervening lands, so that he had one contiguous tract, has "constructive possession" of the whole, although the patents were obtained at different times, for the principle on which the doctrine of constructive possession of contiguous tracts is founded is that an actual possession by a colorable title holder of one of several tracts gives to the true title holder notice of an adverse claim to all of the tracts, and he must at his peril sue before the period of limitation runs.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Constructive Possession.]

116. ADVERSE POSSESSION ⬤═45—RUNNING OF STATUTE—COMMENCEMENT.

Where constructive adverse possession of defendant's predecessor did not commence until 1862, limitations by reason of the stay law (Code Va. 1904, § 2919) did not begin to run until January 1, 1869.

117. TAXATION ⬤═730—TAX TITLES—NATURE OF TITLES.

The title of a tax purchaser is a derivative one, and the tax purchaser is entitled only to such interest as he can show was vested in the owner at time of default.

118. STATUTES ⬤═159—CONSTRUCTION—CONFLICT.

Statutes should be construed, if possible, so as to avoid conflicts.

119. ADVERSE POSSESSION ⬤═49½, New, vol. 6 Key-No. Series—RUNNING OF STATUTES—COMMENCEMENT.

Actual possession of a tract of land creates a constructive possession of another tract which is the last of a chain or series of adjoining tracts.

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Levy of taxes against senior title holder, followed by sale to the commonwealth and subsequent sale for taxes to a stranger, does not prevent junior title holder's constructive adversary possession of interlock from ripening and barring action by tax purchaser of the senior title.

120. COURTS ⊚⇒352—FEDERAL COURTS—GENERAL OR SPECIAL FINDINGS.

Under Rev. St. § 649 (Comp. St. 1916, § 1587), the court where an action is tried without the jury has the discretion to find the facts, either generally or specially.

At Law.  Ejectment by the Virginia & West Virginia Coal Company against Green Charles.  Judgment for defendant.

On November 16, 1795, the commonwealth of Virginia granted to Richard Smyth and Henry Banks a tract of land, described as containing 200,000 acres, located then in Russell county, later in Tazewell county, and since 1858 in Buchanan county.  On October 23, 1820, Wm. D. Taylor, "designated collector" of the federal direct tax of 1816 (3 Stats. at Large, 255, c. 24), sold this tract of land on account of nonpayment of said tax to Wm. Lamb, and on November 3, 1823, executed the following deed (Plaintiff's Exhibit 87):

"This indenture, made this third day of November, in the year of our Lord one thousand eight hundred and twenty-three, between William D. Taylor, collector designated by the Secretary of the Treasury for the state of Virginia, and collector of the direct taxes of the United States for the Eighteenth collection district of the state of Virginia, of the one part, and William Lamb, of the other part: Whereas, under and by virtue of the act of the Congress of the United States passed the 9th day of January, 1815, entitled 'An act to provide additional revenues for defraying the expenses of government and maintaining the public credit, by laying a direct tax upon the United States and to provide for the collection and assessing the same,' and the act passed the fifth day of March, eighteen hundred and sixteen, entitled 'An act to reduce the amount of direct tax upon the United States and the District of Columbia, for the year one thousand eight hundred and sixteen, and to repeal in part the act entitled "An act to provide additional revenue for defraying the expense of government, and maintaining the public credit by laying a direct tax upon the United States, and to provide for assessing and collecting the same,"' and also the act entitled 'An act to provide additional revenue for defraying the expense of the government, and maintaining the public credit by laying a direct tax upon the District of Columbia,' the tract of land hereinafter mentioned, lying and being in the county of Russell, in the First collection district of said state of Virginia, was duly assessed in the name of Robert Smith and Henry Banks as the owners or proprietors thereof, and by the said assessment and by virtue of the act secondly above mentioned the sum of fourteen dollars was imposed as a tax thereon for one year, to wit, the year one thousand eight hundred and sixteen; and whereas, the said proprietors or owners of the said tract of land were not resident of the said collection district in which the said land was situated, nor was the said land owned, occupied, or superintended by any person resident in the said collection district, nor were the said taxes paid to the collector of the said collection district within ninety days after the said collector had received the collection list from the principal assessor of the said district, nor within ninety days after the said collector had been required by the Secretary of the Treasury to advertise that the said taxes had become due; and whereas, in consequence of the said nonpayment of the said taxes, and in pursuance of the first recited act, and the twenty-eighth section thereof, the said collector of the said First collection district did transmit to the said William D. Taylor (the party of the first part to this conveyance and the collector designated by the Secretary of the Treasury, for the purpose of receiving such lists) lists of the property lying within the First collection district, not owned, occupied, or superintended by any person residing in the said First collection district, and the tax on which had not been paid within ninety days aforesaid, which lists comprised the said tract of land; and

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

whereas, the said party of the first part (the collector designated as aforesaid) did cause due notification of the taxes due on the said land to be published once a week for eight weeks in succession in the Richmond Enquirer, the said newspaper being one in the state of Virginia, in which the laws of the United States were by public authority published, as provided by the said twenty-eighth section of the said first recited act, and the act amendatory thereof, passed the 3d day of March, 1815; and whereas, the said taxes on the said land remained unpaid for one year after the notification aforesaid. and the said party of the first part (the said designated collector), the said taxes having so remained unpaid for the term of one year, did, in pursuance of the twenty-ninth section of the said first recited act, and the said act amendatory thereof, passed the 3d of March, 1815, duly advertise once a week, for eight weeks in succession, the said land for sale for said taxes, and twenty per cent. thereon, as provided by the said first recited act, at the Eagle Hotel in the city of Richmond, Virginia, on the twenty-third day of October in the year one thousand eight hundred and twenty, which advertisement was published for the term and in the newspaper aforesaid, and in pursuance of the said advertisement so much of the said land was, at the time and place mentioned therein, offered at public sale as any purchaser would pay the taxes thereon and twenty per cent. added thereto for, and at the said sale the said William Lamb, the party of the second part to this conveyance, became the purchaser of two hundred thousand acres of the said land, he being the only bidder who would pay the said taxes, with the per cent. thereon, for the quantity so purchased of the said land; and whereas, since the said sale two years have elapsed, and the said land so sold as aforesaid has not been redeemed by any person, and by virtue of the provisions of the said first recited act the purchaser is now entitled to a deed for the same, from the said first party of the first part (the designated collector), conveying such title therein as the said act authorizes to be conveyed, or as the said party of the first part can, as the designated collector aforesaid (without any personal or individual responsibility whatever), convey, under the authority of the said first recited act: Now, this indenture witnesseth that the said William D. Taylor, collector of the Eighteenth collection district, in the state of Virginia, and the collector designated as aforesaid, by the Secretary of the Treasury, for and in the consideration of the premises, and for the sum of sixteen dollars and eighty cents, that being the amount of said taxes and twenty per cent. in addition thereto, to him in hand paid by the said William Lamb, before the ensealing and delivery of these presents, the receipt whereof from the said William Lamb he doth hereby acknowledge, has granted, bargained, and sold, and by these presents doth grant, bargain, and sell, unto the said William Lamb the said two hundred thousand acres of land in the county of Russell, and state of Virginia, being the land which was assessed in the name of Robert Smyth and Henry Banks, as aforesaid, and its appurtenances, and all the right, title, and interest that the said party of the first part is, under and by virtue of the said first recited act, authorized to convey in and to the same. To have and to hold the said two hundred thousand acres of land, in the county of Russell, and state of Virginia, and all and singular its appurtenances, to the said William Lamb, his heirs and assigns, forever, to the only use and behoof of the said William Lamb, his heirs and assigns, forever.

"In witness whereof the said party of the first part has hereunto set his hand and affixed his seal the day and year first above written.

"William D. Taylor.  [Seal.]"

On August 30, 1833, the executors of Wm. Lamb conveyed the above-mentioned tract of land, as well as many other tracts and lots which had been purchased by Lamb at tax sales held by Taylor, collector, to Joseph Hagan and Sarah Purcell. On September 13, 1834, Joseph Hagan and Sarah Purcell conveyed to Geo. W. Hopkins 2,850 acres, a part of the 200,000-acre tract. On July 9, 1835, Hopkins reconveyed the 2,850 acres to Hagan and Purcell. Between 1834 and 1838 Sarah Purcell executed three powers of attorney authorizing sales of her interest in the 200,000-acre tract; but no sales appear to have

been made. In 1835 Joseph Hagan instituted a suit against Sarah Purcell for a partition, inter alia, of the 200,000-acre tract, which was eventually granted. Some time prior to September 26, 1836, Joseph Hagan and Sarah Purcell were the plaintiffs in 9 caveat proceedings in the circuit superior court of Tazewell county, brought against as many proposing junior patentees of parts of the 200,000-acre tract. These suits were continued from time to time, and on April 23, 1844, they were dismissed, without trial, at the cost of the plaintiffs. On February 7, 1839, Sarah Purcell conveyed her part of the land to James Culbertson. In 1842 or 1843 Joseph Hagan and James Culbertson made, or at least attempted to make, a survey of the Smyth and Banks tract. While this was being done Culbertson made an agreement with one Edward Collins who was in adverse possession of a small part of the Culbertson tract to the effect that Collins, if Culbertson's title were subsequently held by the courts to be valid, should say that he had been holding possession for Culbertson and Hagan. This claim of possession, which continued until about 1855, is hereinafter discussed. As a result of a chancery suit between Joseph Hagan and James Culbertson, the latter's interest in the 200,000-acre tract was conveyed, on October 6, 1857, by Morison, commissioner, to Joseph Hagan. On April 4, 1871, Joseph Hagan conveyed the land to Patrick Hagan. From the recitals in a deed from Dennis, clerk, to Buchanan Company, to be mentioned later, it appears that some time prior to 1876 the 200,000-acre tract was transferred on the assessment list ("land book") from Patrick Hagan to Frederick Pearson. An offer by the plaintiff here to introduce in evidence (Exhibit 53) the record of a chancery suit, brought by Buchanan Company, against Patrick Hagan and the nonresident heirs at law of Frederick Pearson, to establish the fact that Patrick Hagan had conveyed the land in 1874 to Pearson, which deed and the record thereof had been destroyed by fire, was overruled. In 1878 Frederick Pearson instituted in this court at Abingdon some 47 actions of ejectment against as many adverse claimants of parts of the 200,000-acre tract. None of these actions was ever brought to trial, although the evidence indicates that Pearson's attorneys made great efforts to find evidence sustaining the validity of the tax deed from Taylor to Lamb. In 1907 these actions were all dismissed. On November 3, 1883, Patrick Hagan, making no mention therein of a previous conveyance, conveyed the 200,000-acre tract to Frederick Pearson. The land was returned in the name of Pearson as delinquent for the taxes of 1876, as well as of subsequent years, to and including 1883. In 1886 the land was offered for sale because of these delinquencies and was bid in by the commonwealth. It was later conveyed to the Buchanan Company by Dennis, clerk. A part of the land was conveyed by the Buchanan Company to the plaintiff by deed of December 27, 1913, and the remainder by deed of April 2, 1914—both deeds having been made while the Virginia statute of March 13, 1912 (Acts 1912, p. 524), making ancient tax deeds prima facie evidence of the validity of the proceedings, was still in force.

No possession, except the claim of possession by Collins from 1842 to 1855, of any part of the 200,000-acre tract was had by or for any claimant under the Smyth and Banks patent. In 1906 the Buchanan Company employed one Raines as its agent. Raines lived on a small parcel of land, within the Smyth and Banks tract, belonging to his wife, apparently holding under a junior title, and acted as the agent of the company until 1910. On February 1, 1796, Richard Smyth, in his own behalf and as attorney in fact for Henry Banks (the deed reciting a power of attorney under date of December 2, 1795), conveyed the 200,000-acre tract to Abraham Moorehouse. The power of attorney was not proved. On February 2, 1796, Moorehouse conveyed a portion of the 200,000 acres, containing 102,313 and a fraction acres, to George Ralph. The effort of the defendant to show a subsisting and enforceable outstanding title was not successful. Payments of state and county taxes by the successive claimants under the Taylor tax deed were often partial and very irregular. The facts are too voluminous to justify detailed statement. During considerable periods no taxes were paid. At very irregular intervals some redemptions from delinquent taxes were made. Neither Pearson nor his heirs ever paid any taxes whatever.

The defendant's chain of title, and the facts which raise some novel and interesting questions under the defense of adversary possession, will be hereafter set out. The location of the exterior lines of the Smyth and Banks patent were guessed at by several witnesses, who judged mainly from the location of the lands claimed by the numerous defendants in this and the other allied actions of ejectment brought in this court by this plaintiff. The patent, thus located, covers a very large part of Buchanan county, including the county seat, and contains apparently much more than 200,000 acres. Many of the defendants in these actions are the grandchildren of early settlers, who claimed partly under junior patents and largely under "court rights"—statutory judicial grants. From the evidence offered in behalf of the defendant it appears that during practically a century the land covered by the Smyth and Banks patent has been gradually settled by adverse claimants. Homes, schoolhouses, churches, and roads, many of them long antedating the memory of the oldest inhabitants, have been built. While the best informed of these adverse claimants probably knew, at least vaguely, of the existence of the claim under the Smyth and Banks patent, it has been seemingly for many years, and until recently, regarded as either abandoned or at least as invalid.

The third section of the Virginia act of March 22, 1842, hereinafter referred to, reads as follows:

"3. And be it further enacted, that all the right, title and interest, which shall be vested in the commonwealth in any lands or lots lying west of the Alleghany Mountains, by reason of the nonpayment of the taxes heretofore due thereon or which may become due on or before the first day of January next, or of the failure of the owner or owners thereof to cause the same to be entered on the books of the commissioner of the proper counties, and have the same charged with taxes according to law, by virtue of the provisions of the several acts of assembly heretofore enacted, in reference to delinquent and omitted lands, shall be and the same are hereby absolutely transferred to and vested in any person or persons (other than those for whose default the same may have been forfeited, their heirs or devisees), for so much as such person or persons may have just title or claim to, legal or equitable, claimed, held or derived from or under any grant of the commonwealth, bearing date previous to the first day of January eighteen hundred and forty-three, who shall have discharged all taxes, duly assessed and charged against him or them upon such lands, and all taxes that ought to have been assessed or charged thereon, from the time he, she or they acquired title thereto, whether legal or equitable: Provided, that nothing in this section contained, shall be construed to impair the right or title of any person or persons, who shall bona fide claim said land by title, legal or equitable, derived from the commonwealth, on which the taxes have been fully paid up according to law, but in all such cases the parties shall be left to the strength of their titles respectively." Acts 1841–42, p. 13; Hutchinson, Land Titles, pp. 92, 93.

The great length of the following opinion is due chiefly to an intent, fully shared in by counsel, to make of this, if possible, a test case.

S. B. Avis, of Charleston, W. Va., and Jeffries & Jeffries, of Norfolk, Va., for plaintiff.

E. M. Fulton, of Wise, Va., Wm. H. Werth, of Tazewell, Va., Chase & Daugherty, of Clintwood, Va., Greever, Gillespie & Devine, A. S. Higginbotham, Geo. W. St. Clair, and Geo. C. Peery, all of Tazewell, Va., C. C. Burns, of Lebanon, Va., J. H. Stinson, of Grundy, Va., Geo. E. Penn, of Abingdon, Va., and M. O. Litz, of Welch, W. Va., for defendant.

McDOWELL, District Judge (after stating the facts as above). This action of ejectment, which by agreement involves only one of several tracts of land claimed by the defendant, is a branch of an

action brought by the plaintiff against Fairmount-Buchanan Company and some 1250 other defendants; and the main action is one of 17 similar actions of ejectment brought in this court at or about the same time by the same plaintiff against some hundred and seventy odd additional defendants. The trial of the case was by stipulation held before the court without a jury. Chiefly because of the short time allowed for the trial, by reason of terms of court elsewhere, the trial was conducted in a somewhat novel manner. In a very great majority of instances objections to the admission of testimony were, pro forma, overruled; but it was announced that I would, before final decision, review these rulings so far as they were of importance and correct such as appeared to be improper, with an exception saved to the losing side in each instance. The trial thus conducted so nearly occupied the entire time between the commencement of the trial and the beginning of the October term at Abingdon that it was shown that the method adopted was well chosen. The questions as to the admissibility of evidence raised and in effect taken under advisement during the course of the trial will be disposed of in this opinion in so far as seems necessary.

The boundaries of the tract of land in controversy in this particular trial are set out in a stipulation which has been filed and are also set out in Plaintiff's Exhibit 34. While a grant of land from the commonwealth to an individual may not be generally known as a patent, it is usually so styled in the Virginia Reports, and that term will be so used in this opinion. For the purpose of this trial alone it was stipulated that the Smyth and Banks patent covers the tract claimed by Green Charles in this particular controversy.

### Plaintiff's Chain of Title.

The muniments of the plaintiff's title were in the main introduced in the reverse of the order in which the title accrued. A list of the chief documents in the chains of title, in the order of their dates, may aid in an understanding of the questions to be considered:

(1) Patent, November 16, 1795, from state of Virginia to Richard Smyth and Henry Banks.

(2) Tax deed, November 3, 1823, Taylor, collector, to Wm. Lamb.

(3) Will of Wm. Lamb, March 5, 1827.

(4) Deed, August 30, 1833, Lamb's executors to Joseph Hagan and Sarah Purcell.

(5) Deed, February 7, 1839, Sarah Purcell to James Culbertson.

(6) Record, 1856, Joseph Hagan v. James Culbertson.

(7) Deed, October 6, 1857, Morison, commissioner, to Joseph Hagan.

(8) Deed, April 4, 1871, Joseph Hagan to Patrick Hagan.

(9) Deed November 8, 1883, Patrick Hagan to Frederick Pearson.

(10) Tax deed, February 17, 1905, Dennis, clerk, to Buchanan Company.

(11) Deeds from Buchanan Company et al. to Virginia & West Virginia Coal Company.

## The Defendant's Chain of Title.

(1) Patent, May 1, 1861, state of Virginia to Silas Ratliff.

(2) Deed, December 8, 1896, Ratcliff's heirs to Margaret Justice.

(3) Deed, May 24, 1910, John W. and Margaret Justice to Green Charles.

At the trial the plaintiff offered the charter of the plaintiff company, the tax deed from Dennis, clerk, et al., to the Buchanan Company, a deed from the Buchanan Company to the plaintiff, another deed from the Buchanan Company to the plaintiff, and a deed from Martin Williams et al. to the plaintiff. No objection was made to the introduction of any of the foregoing exhibits.

## Exhibit No. 6.

Copy of deed from P. Hagan et ux. to F. Pearson.

[1] (1) The first objection to the introduction of this copy is that the deed does not appear to have been sealed by the grantors. By section 2841, Code 1904, a scroll affixed by way of a seal by a natural person has the same force as a seal. The copy offered in evidence was written on a typewriting machine. The signature and scroll are shown as follows: "Patrick Hagan (        )." I have no hesitation in ruling that this copy is prima facie evidence that the original instrument had a scroll used by way of seal after the name of Patrick Hagan, and that the deed book so shows.

[2] (2) The next objection is that the deed was not acknowledged before an officer authorized to take acknowledgments. This objection is based on the supposition that the statute of April 2, 1873 (Acts 1872–73, p. 382), which abolished the equity jurisdiction of the county courts, ipso facto destroyed the office of commissioner in chancery of the county courts. The acknowledgment in question was certified on November 8, 1883. By the act of June 17, 1870 (Acts 1869–70, p. 174), "commissioners in chancery of a court of record" were authorized to take and certify acknowledgments. This power has never been withdrawn (Code 1904, § 2501), and it appears that the power of the county courts (which were courts of record) to appoint commissioners in chancery was not withdrawn until the Code of 1887 (section 3319) took effect. In Code 1860, p. 720, c. 175, § 2, is the following:

"Each court may, from time to time, appoint commissioners in chancery, or for stating accounts, who shall be removable at its pleasure; there shall not be more than three such commissioners in office at the same time for the same court."

In Acts 1871–72, p. 466, is the same provision, in effect. In Code 1873, p. 1103, it is provided:

"Each court shall, from time to time, appoint commissioners in chancery, or for stating accounts, who shall be removable at pleasure. * * * *"

This same language is used in the act of March 29, 1875, after the chancery jurisdiction had been taken from the county courts (Acts 1874–75, p. 366), and also in Act Jan. 3, 1876 (Acts 1875–76, p. 7),

Act Dec. 29, 1877 (Acts 1877–78, p. 6), Act Jan. 14, 1879 (Acts 1878–79, p. 21), and Act March 6, 1886 (Acts 1885–86, p. 544). See, also, Act July 11, 1870 (Acts 1869–70, p. 442), which reads:

"The judge of each court having jurisdiction of the probate of wills and granting administration in the state, shall designate one of its commissioners in chancery, who shall be known as the commissioner of accounts. * * * "

This statute, so far as I have discovered, remained in force until the Code of 1887 was adopted. See section 2671, Code 1887.

[3] As the county court of Scott county had the power to appoint James B. Osborne a commissioner in chancery, and as such commissioner had power to take and certify acknowledgments of deeds in 1883, this objection was properly overruled, even without reference to the curative act of March 5, 1900 (Acts 1899–1900, p. 851). No evidence that Osborne was then a commissioner was necessary. Smith v. Chapman, 10 Grat. (Va.) 445, 452, 453. The doubt that gave rise to that statute was, it seems, not well founded. See, also, Acts 1901–02, p. 43; section 2501a, Code 1904.

[4] The original deed was recorded in Buchanan county in Deed Book 6, p. 147, on November 12, 1883. The copy offered in evidence was taken from Deed Book L, p. 418. This last record appears to have been made January 9, 1894, from the original deed. Under section 3339, Code 1904, there seems to be no ground on which to question the admissibility of the copy offered.

## Exhibit No. 7.

[5] This is a copy of the same deed (Patrick Hagan et ux. to Frederick Pearson) above considered, taken from the deed book of Dickenson county. I am not advised of any authority for admitting this copy in evidence. It appears from the Dickenson county clerk's certificate of admission to record that the paper presented to him was not the original deed, but was a copy. The case does not come under the terms of either section 2506 or section 3339, Code 1904. Moreover, no evidence has been offered showing that any of the land conveyed lies in Dickenson county. There was no statement that this copy was offered for the purpose of showing that the mere act of having a copy of the deed recorded in Dickenson county was an act of ownership The ruling allowing this copy in evidence was erroneous.

## Exhibit No. 8.

This exhibit was later withdrawn, and Exhibit 53 offered in lieu thereof.

## Exhibit No. 9.

A Buchanan county copy of a certified copy of a deed from Joseph Hagan to Patrick Hagan.

[6] The paper offered is a certified copy taken from Buchanan County Deed Book L, which was made from an attested copy in 1894. By this paper it is shown that the original deed was recorded in Buchanan county in 1874, that a certified copy thereof was made in 1883 and that this copy was recorded in 1894. The testimony of W. L. Den-

nis, the clerk and custodian of the Buchanan county deed books, is that the deed book in which the original deed was recorded (No. 2) is not in existence. I think that section 3339, Code 1904, makes the copy admissible. See, also, Taliaferro v. Pryor, 12 Grat. (Va.) 277, 283, 284; Effinger v. Hall, 81 Va. 94. The original deed was properly acknowledged and certified, and was clearly admissible to record. It is true that the attested copy of the deed made in 1883 is not offered, and that there is no evidence of its loss or destruction. But the statute gives to the record of that copy the same force and effect that the first record had. I read the last sentence in the statute as giving by implication as great authenticity to the officially certified copy taken from Deed Book L as a duly certified copy taken from Deed Book No. 2 would have had. Exhibit 9 was, in any event, properly admitted.

[7, 8] However, before it occurred to any one at the trial that the foregoing statute covered the point another very interesting question arose as to the admissibility of the evidence of J. L. Jeffries. Mr. Jeffries testified that he tried in 1903 or 1904 to find the original deed in the office of the clerk of the Buchanan county court, and that Jos. Hibbitts, then the clerk, had informed him that the original deed was destroyed by the fire which destroyed the Buchanan county courthouse in 1885. He also testified that Hibbitts has since then died, and that Patrick Hagan had told him that he did not have the original deed and that it had been burned in the clerk's office. All of this evidence was admitted over objection. I shall as briefly as may be discuss the question, as it recurred at later stages of the trial.

The statement of what Hibbitts had told the witness was admissible, even without the evidence of his subsequent death. Corbett v. Nutt. 18 Grat. (Va.) 625, 638, 639. As a matter of authority, all of the testimony in question was admissible. Corbett v. Nutt, supra; Beirne v. Rosser, 26 Grat. (Va.) 537, 543, 545; Minor v. Tillottson, 7 Pet. 99, 101, 8 L. Ed. 621; 2 Wigmore, Ev. 1196. See, also, De Lane v. Moore, 14 How. 253, 363, 364. 14 L. Ed. 409; Mechan v. Forsyth, 24 How. 175, 180, 16 L. Ed. 730. As a matter of reason, also, I think it true that the evidence was admissible and sufficient. In cases where the party proposing to offer secondary evidence of undoubted accuracy has no interest to hold back the original, and where there is no ground for suspicion that the original could be produced, if desired, the law does not require convincing evidence of the loss or destruction of the original document. Nothing more is required than evidence that an unsuccessful search for the original was made in good faith and with reasonable diligence. Colley v. Sheppard, 31 Grat. (72 Va.) 312, 321; 25 Am. & Eng. Encyc. (2d Ed.) 165, 166; 8 Encyc. Ev. 350, 351; 2 Wig. Ev. § 1194.

As direct evidence of the loss of the original deed the witness' statement of what Hibbitts and Hagan had said is clear hearsay. However, it was necessary to show that the unsuccessful search had been made in good faith and with diligence. For the purpose of showing this fact, the statements are information acted upon by the witness and are admissible. See 1 Greenleaf, Ev. (14th Ed.) § 101; 3 Wigmore, Ev. §§ 1789, 2314. From 8 Ency. Ev. 349, 350, 353, 354, and notes, 2 El-

liott, Ev. § 1467, and notes, and 1 Greenleaf, Ev. (14th Ed.) § 558, p. 646, it may seem that there is much authority for the contrary view; but I doubt if such is the fact. In cases where the party proposing to introduce secondary evidence of the contents of an alleged lost document has an interest in holding back the original, or where there is doubt as to the accuracy of the secondary evidence, testimony such as we have under consideration may with perfect propriety be held admissible, but insufficient to justify the introduction of the secondary evidence. The circumstances of each case must be known before it can be said that any case is opposed to the ruling here made. I think the rulings made were correct.

### Exhibit No. 10.

Certified copy from the Lee county deed book of the record of the original deed from Joseph Hagan to Patrick Hagan.

[9] Admitting this copy in evidence was, I think, error, although harmless error. There is nothing in the deed or in the evidence to indicate that any part of the land conveyed was in Lee county. The reason given for offering this copy without evidence that the clerk's office of Lee county was in the vicinity of the land, would, I think, be insufficient. The recordation of a deed at a place remote from the land conveyed would give no notoriety to the transfer of title among people interested in the land. The copy was not offered as evidence tending to show claim of ownership. I think this copy was improperly admitted.

### Exhibits 11, 12, 13, and 14.

[10-12] These are two decrees of the Scott county circuit court in the cause of Joseph Hagan v. James Culbertson and another, a deed from Smith H. Morison, commissioner, to Joseph Hagan, taken from the Buchanan county deed book, and another copy of the same deed taken from the Scott county deed book.

I think the decrees were properly admitted, although only the decree of October 16, 1856, was strictly necessary. The purpose in offering the decrees was merely to show the authority of Morison, as commissioner, to pass Culbertson's title to Hagan. The first decree shows that James Culbertson was a defendant in a chancery suit, that he answered the bill, and that the decision was rendered on the merits, after consideration of the pleadings and depositions and a report of a commissioner. The decree directs Smith H. Morison, as commissioner, to convey to Joseph Hagan (if Culbertson does not himself do so by a given date) James Culbertson's interest in certain tracts of land. The first is described as James Culbertson's "interest in one hundred thousand acres of land lying in Tazewell county, Virginia, being the same land purchased by said James from Sarah Purcell." The Scott county tract is described more in detail. (It may be remarked in passing that the sufficiency of the description of the land in Tazewell county is made plain by Exhibit 15.) This court takes judicial notice of the fact that the circuit court of Scott county, Va., is, and was in 1856, a court of record and of general jurisdiction. Although all the

details of the controversy between Hagan and Culbertson are not made clear by the decree, enough is shown to make it appear that the court had jurisdiction of the subject-matter. The circuit courts then, as now, were courts of the widest possible original jurisdiction in civil cases. It follows that there was no necessity of offering any more of the record than was offered. In Krebs v. Welch, 111 Va. 432, 435, 69 S. E. 346, 347, it is said:

"Whether or not a judgment or decree, without any other portion of the record, is competent and sufficient evidence, depends upon whether or not the judgment or decree so offered satisfactorily establishes the fact it is offered to prove."

See, also, White v. Clay, 7 Leigh (Va.) 68, 78, 82; Masters v. Varner, 5 Grat. (Va.) 168, 171, 50 Am. Dec. 114; Cales v. Miller, 8 Grat. (Va.) 6, 8, 12; Alderson v. Miller, 15 Grat. (Va.) 279, 285.

The decree in question authorized Morison to convey, if James Culbertson did not himself make the conveyance by January 16, 1857. Morison's deed, made October 6, 1857, recites:

" * * * And whereas, the said James Culbertson has not made said conveyance to said Hagan as said Morison is informed by said Hagan, * * * " etc.

I think this should be treated, especially after the lapse of time that has intervened, as a recital that Culbertson had not made the conveyance, and the remainder treated as surplusage. By statute this recital is prima facie true. Acts 1899–1900, pp. 1247–48; Code 1904, § 3333, a. The admissibility of the decree as constituting a link in plaintiff's title is not open to question. See authorities cited in the discussion of Exhibit 53, post. The evidence of the loss of the remainder of the record of Hagan v. Culbertson, while unnecessary, was not inadmissible.

[13, 14] Exhibit 13 is a copy of the deed by Morison, commissioner, to Hagan, taken from the Buchanan county deed book. It shows that the record was made from an attested copy of the deed taken from the Scott county deed book. Section 3339 does not seem to apply, and as evidence of the transfer of title it was inadmissible. However, this copy was admitted merely as tending to show an assertion of ownership, in that the copy was recorded. This expenditure was made in 1894. The inference that Pearson had the copy recorded is not an unreasonable one, as he alone had any legitimate interest to go to this expense, and it does, in some very slight measure, tend to show a belief of ownership of the land on his part. This exhibit is almost on the border line between tendency to prove an issue and too great remoteness, but was probably rightly admitted for the purpose for which it was admitted.

[15] Exhibit 14 is a copy taken from the deed book of Scott county. Part of the land conveyed by the deed is in that county, and hence the deed was properly recordable there. The objection to this copy is that the certificate of acknowledgment is, as alleged, made by the grantor. This objection was made under a misapprehension of the facts shown on the face of the exhibit. The deed was acknowledged

(section 2500, Code 1904) in open court by S. H. Morison as commissioner, and the court ordered it to be recorded.   I think it has always been the practice for the clerks of the county courts, where a deed was acknowledged in open court and ordered to be recorded, to indorse on the deed these facts.   Assuming that S. H. Morison, clerk, is the same man that executed and acknowledged the deed as commissioner, I see no ground for holding that the deed was not properly admitted to record, or why a certified copy thereof is not admissible in evidence.   The clerk of the county court was the right person to indorse on the deed the order of that court.   I know of no rule which disqualified him to act merely because he was, in his capacity as commissioner in chancery of the circuit court, the grantor in the deed. He performed merely a ministerial duty in making the indorsement showing the action of the county court.   The case is more nearly akin to Paul v. Baugh, 85 Va. 955, 961, 9 S. E. 329, than it is to Davis v. Beazley, 75 Va. 491.   My conclusion is that these exhibits were properly admitted.

## Exhibit 15.

Copy of deed from Sarah Purcell to James Culbertson.

[16] The only objection to this copy is founded on the assertion that the law in 1839 did not authorize an acknowledgment before two magistrates.   1 Rev. Code 1819, p. 363, § 7, fully authorized the certificate that was made.   This statute seems to have remained in force until the Code of 1849 (volume 1, p. 512, § 3) went into effect.   This exhibit was properly admitted.

## Exhibit 16.

[17] This is a copy of the deed from Sarah Purcell to James Culbertson, taken from the Buchanan county deed book record, which was made in 1894 from an attested copy taken from the Tazewell county deed book in 1883.   This paper is not made admissible by section 2506, Code 1904.   When Buchanan county was in 1858 (Acts 1857–58, p. 108) formed out of parts of Tazewell and Russell counties, the original deed from Sarah Purcell to Culbertson became recordable in Buchanan county.   If this original had become lost, on affidavit of such fact, an attested copy taken from the Tazewell county deed book became recordable.   There was in this court no evidence offered of the loss of the original deed, and the certificate of admission to record made by the clerk of the Buchanan county court in 1894 does not show that the affidavit required by section 2506 was made.   Granting that a clerk's certificate is conclusive of any fact certified (Taliaferro v. Pryor, 12 Grat. [Va.] 277, 284, 288), still the essential fact was not certified.   Section 3339, Code, does not apply.   If the original deed had prior to 1894 been recorded in Buchanan county, and the deed book subsequently destroyed, an attested copy made from that record could have been admitted to record.   As this paper was not offered for the purpose of proving an act of ownership by Pearson, in having a copy of the deed recorded in Buchanan county, I do not see that this copy is admissible.   It was improperly admitted.

### Exhibits 17 and 18.

Decrees of Russell county court in partition suit of Joseph Hagan v. Sarah Purcell.

[18] These decrees were offered merely as showing an act of own-ership, and in order to explain the fact that for a time taxes were as-sessed in severalty against Sarah Purcell and Joseph Hagan. The fact that the entire record was not offered, even without reference to the evidence showing loss of the remainder of the record, is of no mo-ment. See discussion of Exhibits 11 and 12. The Russell county court, in quarterly session, was a court of general jurisdiction. 1 Rev. Code 1819, p. 246, § 7. So far as I know, the statutory provi-sion giving jurisdiction in partition to the court of the county where the land is (section 2562, Code 1904) was not enacted until 1849 (Code 1849, p. 526, § 1). The act of 1831 (Acts 1830–31, p. 99) relates only to cases where some of the owners are unknown. The lands were at the date of this proceeding in Tazewell and Scott counties, but the proceeding was by consent. The suit was not in rem, but at most quasi in rem. If any objection to the venue could have been made, it was waived. The court had general jurisdiction of equity cases and the defendant consented that the decree of October 6, 1835, be entered. 22 Ency. Pl. & Pr. 831; 40 Cyc. 41, 111. I think these decrees were properly admitted.

### Exhibit 19.

A copy of deed of Wm. Lamb's executors to Hagan & Purcell.

[19] (1) The first objection to this deed is that the grantors did not add to their signatures anything to indicate that they signed as execu-tors. The deed begins:

"This indenture made * * * between William P. Thompson and Ber-nard Hagan, * * * executors of the last will and testament of William Lamb, deceased, of the one part, and Joseph Hagan and Sarah Purcell, * * * of the other part."

It contains a recital that the sale of the land was in pursuance of the authority vested in the parties of the first part by the said will; also a recital that the court directed Bernard Hagan to unite with his coexecutor in conveying the title as it was vested in the said execu-tors by the said will. The granting clause reads:

"That the said William P. Thompson and Bernard Hagan, executors as aforesaid, by these presents do grant * * * and convey," etc.

The warranty also is against all persons claiming under the grantors "as executors as aforesaid." The intention of the grantors in this deed is so manifest that I can think of no reason for holding that it is not the deed of the executors. It would have been more in accord-ance with modern practice had the word "Executor" been added to each signature, but such addition was, I think, unnecessary. The in-tent of the parties is the controlling principle in construing deeds, and I think this principle should apply in this case. In a digest note of the case of Kingsbury v. Wild, 3 N. H. 30, it is said:

"An administrator's deed to land sold under an order of the probate court need not be signed by him as administrator, especially if the capacity in which he conveys appears in any other part of the deed." 22 Cent. Dig. 2180.

See, also, 16 Cent. Dig. 67; Heffernan v. Harvey, 41 W. Va. 766, 24 S. E. 592; Boggess v. Scott, 48 W. Va. 322, 37 S. E. 661.

This objection was properly overruled, in so far as this ground of objection is concerned.

[20] (2) The second objection is that the deed does not appear to have been properly acknowledged. The particulars of this objection are not given. No Virginia authority has been cited, and I have found none. I am unable to find the slightest flaw in the certificate, as it seems to conform entirely to 1 Rev. Code 1819, p. 363, § 7, unless it be that the certificate does not state that the grantors acknowledged the deed to be their act and deed as executors. But this, again, was unnecessary. The certificate follows verbatim the form given in the statute. The purpose of the acknowledgment and the official certificate thereof is to prevent fraud and mistake. Its essence is the admission by the person who executes the instrument to which the certificate is appended that such instrument is his act. To put into the mere certificate of acknowledgment, in addition to the full statement in the deed, a statement of the capacity in which the party acted in executing the instrument would seem to be as unnecessary as to insert therein a statement of the authority under which he acted. In 1 Corpus Juris, p. 848, § 191, it is said:

"*Acknowledgment by Agent or Attorney.* A certificate of acknowledgment by an agent or attorney must show that it was made by such agent or attorney in behalf of the principal; but no particular set of words is necessary, in the absence of express statutory requirement, to show that he made the acknowledgment in his representative and not his private capacity. If that fact can be gathered from a consideration of the certificate, in connection with the deed, it is enough."

While perhaps the amendment of sections 2500 and 2501 found in Acts 1895–96, p. 542, may not be retroactive, still, if not, I know of no good reason for holding it to be anything but declaratory of the pre-existing rule. This statute reads in part:

"Where any such writing purports to have been signed * * * in any representative capacity whatsoever, the certificate of acknowledgment * * * shall be sufficient, * * * without expressing that such acknowledgment was * * * in a representative capacity."

This objection was, I think, properly overruled, in so far as this point is concerned.

(3) The third objection (that the recitals in the deed concerning the will of Wm. Lamb are not competent evidence) need not be considered, as a copy of the will was subsequently introduced in evidence.

[21, 22] (4) The fourth objection is that it appears from the recitals in the deed that the devisees of Wm. Lamb were not before the court "when the decree, under which the executors professed to act, was rendered." In Lamb's will we find:

"It is my will * * * that all my just debts [be paid], * * * all of which debts, costs and expenses shall be paid out of moneys arising from the

sale of any part of my real estate that my executors may deem most proper to be sold for the above purpose. ＊ ＊ ＊"

The expectation of the testator that some of his real estate would have to be sold in order to pay his debts, and his intent that the executors should select the lands to be sold, is beyond question. The will does not expressly give to the executors the power to either sell or convey the lands selected by them to be sold. I am inclined to believe that the will impliedly gives to the executors, acting jointly, power both to sell and to convey (40 Cyc. 1823); but, if not, there was in force during the entire period with which we are concerned a statute which reads as follows:

"52. The sale and conveyance of lands devised to be sold, shall be made by the executors, or such of them as shall undertake the execution of the will, if no other person be thereby appointed for that purpose, or if the person so appointed shall refuse to perform the trust, or die before he shall have completed it; but, if none of the executors named in such will shall qualify, or, after they have qualified, shall die before the sale and conveyance of such lands, then, in those cases, the sale and conveyance thereof shall be made by such person or persons to whom administration of the testator's estate, with the will annexed, shall be granted." 1 Code 1819, p. 388, § 52.

In part this statute was drawn from 21 Hen. VIII, c. 4, § 1, which is quoted in Mills v. Mills, 28 Grat. (Va.) 490. The first form of the statute (act of 1785) is found in 12 Henning's Stats. at Large, 150. The statute as it appears in the Code of 1819 was enacted in 1792, and remained unchanged, so far as I have discovered, until 1849. See Code 1849, p. 545; Code 1904, § 2663. If the will should not be construed as authorizing the executors to sell and convey, the statute of 1792 seems to me to apply to the case, and to give to the executors the power to sell and to convey any lands which, acting jointly, they selected for sale. The lands to be selected for sale by the two executors were "lands devised to be sold," and the will, as we are assuming, did not appoint any one to sell them or to convey them to the purchaser. The English statute covered only the case in which some or one of several executors refused to join in a sale. The Virginia statute of 1785, supra, was much broader, and the act of 1792 was still broader. The purpose of this legislation was to prevent the necessity of a resort to a court of equity, and to empower the executors (or, failing them, the administrator c. t. a.) to sell and convey when the testator had by his will shown an intent that his land be sold. See Mosby v. Mosby, 9 Grat. (Va.) 584, 585, 598.

It follows that, under either construction of the will, the executors, acting jointly, had full power both to sell and to convey, and it seems a necessary conclusion that a sale and conveyance made by the two executors divested any title that was, or may have been, vested in Lamb's devisees. If the devisees had the legal title, it was divested by the execution of the power of sale. Coles v. Jamerson, 112 Va. 311, 317, 71 S. E. 618, 50 L. R. A. (N. S.) 407. From the only evidence we have it appears that the sale was made by the two executors acting in concert. The deed recites:

"And whereas, the said parties of the first part ＊ ＊ ＊ did on the first day of October, 1830, in pursuance of the power and authority vested in

them as aforesaid, expose[d] to sale, * * * at which sale Joseph Hagan and Sarah Purcell became the purchasers. * * * "

Subsequently the deed was executed by both the executors. It is true that a suit in equity was instituted and a decree obtained before Bernard Hagan was willing to join in the execution of the deed; but I do not see that we are concerned as to the nature of that suit, or as to the parties thereto. It seems to me that, if Bernard Hagan had by any not unlawful means been induced to execute the deed, the delivery thereof vested the legal title in the grantees. No matter who were or were not parties, the decree of the court overcame Hagan's objections to executing the deed, and he did execute it. As the will, or the will and the statute, gave the executors the power to sell and convey, no suit against the devisees was necessary. The chief purpose of the statute was to prevent the necessity of such suit. Elys v. Wynne, 22 Grat. (Va.) 224, 230. Just why Bernard Hagan declined to execute the deed we do not know. Among the numerous surmises that may be made, one is that he merely doubted if the executors had the power to convey, and wanted the sanction of an order of court. To the suit that was brought, the devisees may possibly have been proper parties. They were not necessary parties, for neither the power to sell nor the power to convey was derived from the court's decree. These powers were derived from the will, or from the will and the statute. A deed voluntarily made after the sale by the two executors would undoubtedly have passed the title to the land. It follows (at least in the absence of evidence of fraud or duress) that the nature of the proceeding which overcame Hagan's objections to joining in the execution of the deed cannot affect the devolution of title to Joseph Hagan and Sarah Purcell.

(5) If the foregoing be sound, the fifth ground of objection—that the court had no jurisdiction—also fails.

[23] (6) The last objection is that the land conveyed is, so far as we are concerned, described as formerly belonging to Robert Smith and Henry Banks. The deed further describes the land as having been sold and conveyed to Wm. Lamb by William D. Taylor, collector, by deed dated November 3, 1823, and admitted to record in Russell county March 22, 1824. The intention on the part of the executors to convey the 200,000-acre tract which was conveyed by Taylor to Lamb is so manifest that no discussion seems necessary.

It follows that all the objections to the deed from Lamb's executors to Joseph Hagan and Sarah Purcell were properly overruled.

### Exhibit 20.

A copy from the Buchanan county deed book of the deed from Lamb's executors to Hagan and Purcell.

This copy was offered merely "to keep the record straight." It is a copy of a record made from a copy taken from the Russell county deed book. I do not see that it falls under either section 2506 or section 3339. See discussion of Exhibit 16. It was unnecessary for the purpose of keeping the record straight, and the ruling admitting it must be reversed.

### Exhibits 21, 22, and 23.

[24, 25] The first is a deed of July 9, 1835, from Geo. A. Hopkins to Hagan and Purcell. As it does not relate to the Green Charles parcel, it would have no bearing on any question in this case, without the avowal that was made. Exhibit 22, next introduced, is a deed, dated September 30, 1834, from Joseph Hagan and Sarah Purcell, by Hagan, as attorney in fact, to Hopkins, for the same two parcels which Hopkins reconveyed by Exhibit 21. Exhibit 23 is a power of attorney from Sarah Purcell to Joseph Hagan. It was executed in November, 1834, and could not have authorized Hagan to make the deed to Hopkins of September 30, 1834. Moreover, it was acknowledged before one justice of the peace. So far as I know, this was not permissible until the Code of 1849 was adopted. Therefore the copy of this power was improperly admitted. It follows that Exhibit 22 did not pass Sarah Purcell's interest; but I think Exhibits 21 and 22 are admissible as evidence of an act of ownership by Joseph Hagan.

### Exhibits 24, 25, and 26.

I think these powers of attorney were properly admitted as acts indicating claim of ownership on the part of Sarah Purcell, although the last one verges on the extreme limits of admissibility because of remoteness.

### Exhibit 27.

The will of Wm. Lamb.

What has been said as to the deed from Lamb's executors covers the objections to this exhibit. I think it was properly admitted.

### Exhibits 28 and 29.

[26] These are original tax receipts, showing the payment by or for Sarah Purcell on 100,000 acres of land in Tazewell county for the years 1840 and 1841. The partition between Joseph Hagan and Sarah Purcell was made in 1837. The conveyance from Sarah Purcell to Culbertson was not recorded in Tazewell county until 1848. For the years of 1840 and 1841 Sarah Purcell was liable for the taxes, and I know of no reason why these receipts are not admissible as evidence of acts of ownership.

### Exhibits 30 and 31.

[27] These are also original receipts showing payment, in redemption, of the delinquent taxes on the 200,000-acre tract for the years 1865 to 1873, both inclusive. Being originals, much over 30 years of age, which came from the possession of Patrick Hagan, who made the payments in 1873, their authenticity is fully established. I think they were properly admitted.

### Exhibit 32.

Patent to Richard Smyth and Henry Banks for 200,000 acres of land in Russell county, dated November 16, 1795. No objection was made to the introduction of this document.

### Exhibit 33.

[28] This is an extract from the Journal of the Executive Proceedings of the United States Senate, certified in accordance with section 895 R. S., 3 Fed. Stats. Anno. 34 (Comp. St. 1916, § 1508), showing that Wm. D. Taylor's nomination as collector of direct taxes for the Eighteenth collection district was on February 14, 1814, confirmed. I think this document was properly admitted. It is duly authenticated, and proves what it purports to show. It does not, of course, prove that Taylor was appointed "designated collector"; but this fact does not make the paper inadmissible.

### Exhibit 34.

A copy of the deed from John W. Justice et ux. to Green Charles. This was introduced by the plaintiff merely to have in the record a description of the particular tract of land in controversy in this particular action. No objection was made.

### Exhibit 35.

[29] This is a certificate of the auditor of public accounts. It was (section 3334, Code 1904) filed in due time, on August 21, 1915. The first day of the term at which it was offered commenced on September 14, 1915. However, the fact certified does not come within the provisions of section 3334, Code 1904. See discussion of Exhibit 37, post. It is not shown to be a certificate of the payment of taxes on either forfeited or delinquent lands. For all that we can learn from this certificate the taxes for 1835 may have been paid in 1835. Indeed, the source of the auditor's information (the land book) indicates that they were then paid. The fact sought to be proved would be admissible, if properly proved, as an act of ownership; but the statute does not authorize an ex parte certificate to be used in the circumstances here shown. The paper does not purport to be a copy of any paper on file in the office of the auditor of public accounts. I was in error in admitting this certificate, and the ruling made at the trial must be reversed.

### Exhibit 36.

This is another auditor's certificate, and is open to the same objection as Exhibit 35. When this paper was offered, I thought that the quotation in the certificate might be of some importance to the plaintiff, and might possibly fall under the head of a copy of a document or paper in the auditor's office (section 3334); but it is not such. The part that is a copy is a mere excerpt, which would be meaningless, but for the facts certified as to where the quoted words are found. I was in error in admitting this exhibit, and the ruling must be reversed.

### Exhibit 37.

This is also an auditor's certificate. Section 3334, Code 1904, under the head of what is admissible in evidence, reads in part as follows:

"A copy of any record or paper * * * in the office of * * * either auditor. * * * And the certificate of the auditor of public accounts of the fact and time of the return of any real estate as delinquent, or of the sale thereof for taxes, shall be prima facie evidence of what is stated in such certificate. * * * The certificate of the auditor of public accounts of the payment or nonpayment, at any time, of taxes on forfeited or delinquent lands * * * shall, in any suit or proceeding in relation to such lands * * * be prima facie evidence of what is stated in such certificate, provided it be filed with the papers of said suit at least twenty days before the first day of the term at which it is to be offered in evidence. When the certificate purports to be signed by the said auditor, it may be admitted as evidence without proof of his signature."

The last two paragraphs and some parts of the first paragraph of this certificate are not admissible. I have marked with brackets on the transcript the parts that should not have been admitted.

### Exhibit 38.

This is a certificate of the same character as Exhibit 37. I have inclosed in brackets the parts that I think are inadmissible, because not authorized by the statute.

### Exhibit 39.

This certificate was properly admitted. It is an auditor's certificate "of the payment of taxes on delinquent land." Section 3334.

### Exhibit 40.

This certificate was properly excluded. It does not come within the statute at all.

### Exhibit 41.

[30] A duly certified copy of survey and plat for patent to Smyth and Banks. These are copies of records in the register's office. They are made admissible by section 3334, and have a tendency to show the county in which sundry deeds introduced by plaintiff should properly have been recorded. I think the exhibit was properly admitted.

### Exhibit 42.

A deposition by D. M. Paterson. No specific objection was ever presented to this deposition.

### Exhibit 43.

A deposition by C. H. Boardman. I adhere to the ruling made at the trial. The deposition shows acts of ownership on the part of the Buchanan Company.

### Exhibits 44–52.

[31] I do not deem it necessary to review the rulings made at the trial as to the depositions of McChord, Talbert, and Hendricks, and as to Exhibits 49, 50, 51, and 52. They, in conjunction with other evidence, at least circumstantially prove that Wm. D. Taylor was the "designated collector," and that the papers directy relating to the tax sale to Lamb are not now to be found in Washington. Although some hearsay testimony was admitted, the error is harmless.

251 F.—8

Exhibit 53.

Record of suit by Buchanan Company v. Patrick Hagan, Pearson's Heirs, et al.

[32] The plaintiff at an earlier stage of the trial offered merely the bill and the final decree in this suit (Exhibit 8) and then withdrew the offer. The suit in question was not brought under section 2361, Code 1904; it was not a statutory proceeding to perpetuate testimony (section 3369, Code), and it was not a suit under the ancient equity jurisdiction to perpetuate testimony (1 Story, Eq. Jurisp. [6th Ed.] § 1508 et seq.). It was instituted under the ancient equity jurisdiction, founded on accident, to establish a lost or destroyed title paper. The mere destruction of a deed would not give equity jurisdiction; but, where a party in possession of land has by accident lost the evidence of his title, there may be jurisdiction in equity to establish the former existence and contents of the lost document. 1 Story, Eq. Jurisp. (6th Ed.) § 84. The bill alleged that the Buchanan Company was in possession, and the court in its final decree decided that each allegation of the bill was true. In view of the conclusion reached later as to this exhibit, it may be conceded, without so deciding, that the court had jurisdiction of the subject-matter of the suit.

[33] The first objection I shall consider is based on the fact that the affidavit on which the order of publication was made is not in the record. The order of publication, however, reads in part:

"And affidavit having been made that Josephine Southwith Pearson * * * are nonresidents of the state of Virginia. * * *"

The final decree recites that the cause came on to be heard on "the order of publication duly published and executed." The statute (section 3230) does not in terms require that the affidavit be reduced to writing, nor do I know of any requirement, if it was reduced to writing, that it appear as part of the record. But, if there is any defect in this respect, the presumption in favor of the regularity of the proceeding covers the point. 8 Va. & West Va. Dig. 545, 546; Craig v. Sebrell, 9 Grat. (Va.) 131, 133; Wilcher v. Robertson, 78 Va. 602, 617; Howard v. Landsberg, 108 Va. 161, 165, 166, 60 S. E. 769; 23 Cyc. 1077.

[34-37] Whether or not the court gained jurisdiction of the persons of the nonresident defendants by publication depends on the nature of the suit. The suit in its nature is closely akin to the more familiar suits to quiet title. Notwithstanding Hart v. Samson, 110 U. S. 151, 155, 3 Sup. Ct. 586, 28 L. Ed. 101, I think the following authorities require that the suit be regarded as quasi in rem, and also a ruling that Pearson's heirs and the Butlers were before the court by publication: Clem v. Givens, 106 Va. 145, 55 S. E. 567; Arndt v. Griggs, 134 U. S. 316, 10 Sup. Ct. 557, 33 L. Ed. 918; Meyer v. Kuhn, 65 Fed. 705, 712, 13 C. C. A. 298; Tennant v. Fretts, 67 W. Va. 569, 68 S. E. 387, 29 L. R. A. (N. S.) 625, 140 Am. St. Rep. 979; 23 Cyc. 1412, note 79; 32 Cyc. 468; Hardy v. Beaty, 84 Tex. 562, 19 S. W. 778, 31 Am. St. Rep. 80. As the suit was not strictly in rem, the

judgment is binding only on the parties.    23 Cyc. 1410, e; 24 Am. & Eng. Ency. (2d Ed.) 828.    Consequently we have to consider the admissibility of the record as evidence against the defendant at bar as in ordinary cases.    The general rule is that a judicial record is not admissible as evidence against a stranger.    Payne v. Coles, 1 Munf. (Va.) 373, 394; Downer v. Morrison, 2 Grat. (Va.) 250, 256; 23 Cyc. 1280; 24 Am. & Eng. Ency. (2d Ed.) 190.    There are some exceptions to the foregoing general rule, the most familiar of which is that a judicial record may be used in evidence against a stranger when it is a link in the chain of title of the party offering it.    Lovell v. Arnold, 2 Munf. (Va.) 167, 172, 173, 174; Masters v. Varner, 5 Grat. (Va.) 168, 171, 50 Am. Dec. 114; Cales v. Miller, 8 Grat. (Va.) 6, 12; Smith v. Chapman, 10 Grat. (Va.) 445, 453, 465; Baylor v. Dejarnette, 13 Grat. (Va.) 152; 1 Greenleaf, Ev. (14th Ed.) § 539; 23 Cyc. 1287, 1288; 2 Black, Judgments (2d Ed.) § 607.

The reason for this exception is that the decree which directs a master in chancery to convey land itself constitutes his authority.    His deed without authority is a nullity.    This authority to execute the deed is as much a link in the chain of title as is the deed he subsequently makes.    The decision of the court shown by the record here in question, however, does not itself constitute a link in the plaintiff's title.    The chief purpose of the suit was to prove that Hagan had conveyed to Pearson in 1874, and hence that Pearson was properly chargeable with the taxes for 1876 and subsequent years.    But the judgment of the court (in 1912) of course did not give authority to the tax officials to assess the land to Pearson in 1876 and subsequent years, nor to Dennis, clerk, to convey the land to Buchanan Company in 1905. The judgment simply ascertained and adjudicated that there had been authority to assess the land to Pearson in said years.    This difference is of prime importance.    A judgment of a court of competent jurisdiction, which itself constitutes a link in title, is evidence against strangers; but a judgment which is not of this class does not come within this exception to the general rule.    Such judgment, however binding on the parties and privies, is, in the older sense of the term, merely res inter alios acta.    See 2 Wigmore, Ev. § 1273 (2), p. 1552; 3 Wig. Ev. § 1660; Duncan v. Helms, 8 Grat. (Va.) 68; Bargamin v. Clarke, 20 Grat. (Va.) 544, 548, 549; Lynchburg Mills v. Rives, 112 Va. 137, 141, 70 S. E. 542.

[38] Nor can this matter be proven as against the defendant at bar on the theory that the record shows an admission against interest on the part of Pearson's heirs and the Butlers.    All the authorities, so far as I have discovered, confine this exception to the general rule to cases in which a stranger to the record seeks to prove by such record that a party thereto made an admission.    2 Black, Judgments (2d Ed.) § 608; 2 Freeman, Judgments (4th Ed.) § 417a; 23 Cyc. 1288; 1 Greenleaf, Ev. (14th Ed.) § 527a.    To allow a party (or a privy of a party) to use an admission by another party to the record against a stranger would make the danger of collusion too great.    I think the exception that judicial records may be used as admissions cannot be extended to this case.

What has been said applies also to the fact shown by the record in question that Joseph and Patrick Hagan were residents of this state during all the time they were connected with the title. It falls under no exception to the general rule that I know of. The depositions in this record are not admissible as evidence against the defendant at bar. Even if they could otherwise be used, there is no competent evidence that Patrick Hagan is incompetent to testify. The other deponent is Mr. Jeffries, of counsel for the plaintiff. The only conclusion I can reach is that Exhibit 53 should not have been admitted for any purpose, and the ruling made at the trial must be reversed.

### Exhibit 54.

[39] This is a partial record of the ejectment suit of Frederick Pearson v. Thos. J. Fuller, instituted in this court at Abingdon, Va., in 1878. I adhere to the ruling, made at the trial, admitting the paper as evidence of an assertion of ownership by Frederick Pearson in 1878.

### Exhibits 55–63.

Depositions in Pearson v. Fuller.

[40] The defendant is not in privity with either Pearson or Fuller. The general rule prevailing in this state is that depositions taken in a former suit cannot be read as evidence in a subsequent suit, unless there be substantial identity both of parties and issues. Rowe v. Smith, 1 Call (Va.) 487, 489; Payne v. Coles, 1 Munf. (Va.) 373, 394; Sheppard v. Turpin, 3 Grat. (Va.) 373; Brown v. Johnson, 13 Grat. (Va.) 644, 649; Reed v. Gold, 102 Va. 37, 50, 45 S. E. 868. See, also, 1 Greenleaf, Ev. (14th Ed.) §§ 163, 164; 6 Ency. Pl. & Pr. 579; 7 Standard Procedure, 402; 2 Wigmore, Ev. § 1386; 1 Starkie, Ev. (7th Am. Ed.) 311 et. seq. Whether or not this general rule should apply will be best considered by taking up the depositions in detail.

### Exhibits 55 and 56.

[41] These are depositions of Samuel Culbertson. The deponent is dead, and his alleged tenant, Edward Collins, is dead. The possession sought to be proved by these depositions is probably to be classed as ancient. Culbertson was not cross-examined, but he was under oath. On the whole, I am of opinion that these two depositions were properly admitted. The subject is governed by the Virginia law (Clement v. Packer, 125 U. S. 309, 322, 8 Sup. Ct. 907, 31 L. Ed. 721), but I have found no decision quite in point. As a matter of general law the authorities are in conflict (2 Wigmore, Ev. p. 1941, note 9); but apparently, without attempting a full investigation, the weight of general authority supports the admissibility of Culbertson's depositions (16 Cyc. 1121; Bogardus v. Trinity Church, 4 Sandf. Ch. [N. Y.] 633, 724; Id., 7 N. Y. Ch. Repts. 1235, 1268; 1 Rice, Ev. p. 409). In Bank v. Albaugh, 188 U. S. 734, 737, 23 Sup. Ct. 450, 451 (47 L. Ed. 673), Mr. Justice Holmes used the following language:

"In these days, when the whole tendency of decisions and legislation is to enlarge the admissibility of hearsay, where hearsay must be admitted or a failure of justice occur, we are not inclined to narrow the lines."

In Richards v. Elwell, 48 Pa. 361, 367, it is said:

"There is a time when the rules of evidence must be relaxed. We cannot summon witnesses from the grave, rake memory from its ashes, or give freshness and vigor to the dull and torpid brain."

It should be noted that I am here dealing only with the admissibility of these depositions. The effect to be given the testimony will be considered elsewhere in this opinion.

## Exhibit 57.

This deposition by Enoch Young I hold for the same reason to be admissible as evidence tending, although slightly, to prove an ancient possession. There is some inadmissible testimony in these depositions, but the error in admitting it was harmless.

## Exhibits 58 and 59.

These depositions I hold now to be inadmissible. Their tendency to prove possession is too slight to justify a departure from the usual rule. They may tend to prove claim by Joseph Hagan, but this has otherwise been abundantly proved by unobjectionable evidence, and does not fall within any recognized exception to the ordinary rule. My ruling in admitting these depositions was, I think now, erroneous, and must be reversed.

## Exhibit 60.

A deposition by Wm. O. Yost. This also was improperly admitted.

## Exhibit 61.

[42] A deposition taken in 1882 by M. F. Pleasants, then clerk of the United States Circuit Court for the Eastern District of Virginia. At the trial only so much of this deposition was admitted as showed what the witness said as to the destruction of the records of that court in 1865. But even in this concession I think now that I fell into error. This deposition is not a book of history, generally accepted as truthful and reliable. The mere fact of the loss of certain papers is desired to be proved. Neither the time nor the manner of their loss is here material. The deposition of the present custodian of these papers, taken for use in the case at bar, could equally well prove this fact, and the defendant at bar would have had an opportunity to cross-examine such witness. I know of no rule of evidence which makes this deposition admissible. It may be that this court should take judicial notice of the great conflagration in Richmond in 1865 following the evacuation of that city by General Lee's army, but I doubt if this would cover the particular fact sought to be proved by this deposition.

## Exhibit 62.

This is a deposition by Jas. M. Taylor, a son of Wm. D. Taylor, taken to prove that the latter was a collector of United States direct taxes. The time when Wm. D. Taylor was in office was before the deponent was born. Whether or not the deposition would have been admissible in the case in which it was taken, had the action

of Pearson v. Fuller come to trial, need not now be considered. I know of no reason for holding it admissible in the case at bar. My ruling admitting it was erroneous.

### Exhibit 63.

A deposition by Conway Robinson. I think that this deposition was also improperly admitted. Even waiving all other objections, this deposition does not seem to me to have any sufficient tendency to prove that Wm. D. Taylor was the "designated collector." It may tend to show that Taylor was a collector, but nothing in the deposition indicates whether Taylor was a district collector merely, or a designated collector.

### Exhibit 64.

A deposition by John Yates. This was also improperly admitted. Of exceptions to the rule against hearsay, see Queen v. Hepburn, 7 Cranch, 290, 296, 3 L. Ed. 348.

### Ruling as to Testimony Reversed.

[43] I now reverse the ruling made at the trial to which the plaintiff excepted. The witness, as a foundation for the use of circumstantial evidence, had as I now think a right to state what he had been told at the Treasury Department concerning the supposed location of the original documents relating to sales made under the Direct Tax Act of 1816. This evidence shows the good faith of the witness in his search.

### Exhibit 64.

[44] I adhere to the ruling made at the trial in admitting the Boyd map. It is almost a necessary inference either that Pearson had it made, or that some one authorized by him to try to sell the property had it made. It is evidence of an act of ownership.

### Ruling as to Testimony Reversed.

[45, 46] At the trial I admitted, as evidence that Wm. D. Taylor was the "designated collector," an excerpt from the reporter's statement of facts in the report of Jesse v. Preston, 5 Grat. (Va.) 120, 121. As elsewhere appears, I hold that the circumstantial evidence is sufficient to show that Taylor was the designated collector, who should have advertised and sold lands of nonresidents under the act of 1816. It follows that in now reversing the ruling made at the trial I am committing harmless error, if error at all. Merely as a matter of accuracy, I must hold that this evidence should not have been admitted. The original deposition, if it could have been found, would not be admissible. If the court reporter had stated as a fact that Taylor was the designated collector, a question might have arisen as to evidence furnished by history.

### Exhibits 65–85.

[47] I adhere to the rulings made admitting these photographic reproductions of parts of issues of the Richmond Enquirer, and generally to the rulings as to the oral testimony concerning the files of the ancient newspapers.

### Exhibit 86.

Also as to this exhibit, the qualification of Richard Jeffries as clerk of the District Court for the District of Virginia.

### Exhibit 87.

The most interesting questions arising in this case relate to the admissibility and effect of Exhibit 87, the tax deed from Wm. D. Taylor, collector, to Wm. Lamb. The document is a certified copy taken from the Russell county deed book. I shall discuss the many questions which have been raised under sundry different heads, and shall not hereafter adhere to the order of introduction of the different exhibits.

### Presumption of Validity of the Taylor Tax Deed.

A. It is contended by counsel for plaintiff that the court should presume the prima facie validity of the tax deed made by Taylor to Lamb. This deed was not made as a result of a judicial proceeding, but was the act in pais of a mere tax collector. The general rule is that the party claiming under such a deed must affirmatively show that every prerequisite to the execution of the deed was complied with. Christy v. Minor, 4 Munf. (Va.) 431, 435; Nalle v. Fenwick, 4 Rand. (Va.) 585, 590, et seq.; Allen v. Smith, 1 Leigh (Va.) 231, 250, 251; Chapman v. Bennett, 2 Leigh (Va.) 329, 330, 331; Jesse v. Preston, 5 Grat. (Va.) 120, 129, 131; Masters v. Varner, 5 Grat. (Va.) 168, 171, 50 Am. Dec. 114; Wiley v. Givens, 6 Grat. (Va.) 277, 283, 284; Walton v. Hale, 9 Grat. (Va.) 194, 198; Flanagan v. Grimmet, 10 Grat. (Va.) 421; Boon v. Simmons, 88 Va. 259, 264, 13 S. E. 439; Reusens v. Lawson, 91 Va. 226, 236, 21 S. E. 347; Sulphur Mines Co. v. Thompson, 93 Va. 316, 317, 25 S. E. 232; Minor's Tax Titles, p. 123; Williams v. Peyton, 4 Wheat. 77, 80, 4 L. Ed. 518; Ronkendorff v. Taylor, 4 Pet. 349, 359, 7 L. Ed. 882; Marx v. Hanthorn, 148 U. S. 172, 180, 13 Sup. Ct. 508, 37 L. Ed. 410; 37 Cyc. 1452, 1454; 27 Am. & Eng. Ency. (2d Ed.) 974; note 17 Am. Dec. 505.

The plaintiff's contention is based upon the antiquity of the tax deed, upon evidence of many acts indicative of claim of ownership other than possession of the land, and upon some evidence of possession of the land in behalf of claimants under the tax deed. In this respect reliance is placed on the depositions of James Culbertson (Exhibits 55–56) and of Enoch Young, taken to be used in the action of Pearson v. Fuller, and upon the testimony of Hiram Collins. However, this evidence does not seem to me to prove the kind of possession (if it proves possession at all) which would authorize presumptions of the validity of the Taylor deed. Young's testimony is almost entirely valueless. So far as appears, Looney may never have done anything except to agree to "hold possession for Hagan." But, if it be assumed that he did more, his tenancy was in all reasonable probability of the same character as that of Edward Collins, which will now be discussed more in detail. I think the clearest idea of the facts obtainable is found in the following from Culbertson's second deposition:

"The said Collins was living in the survey according to our running. I requested him to hold possession for us, which he agreed to do. I told him he should have his home, and not be turned off, and that he should have the refusal of it, if the survey was established by the court."

This seems to mean that Culbertson found Collins in possession of a small tract of land inside of the 200,000-acre boundary, claiming it as his own, and the agreement was that Collins should, if the Hagan and Culbertson claim of title was subsequently held valid, say that he had been holding possession for Hagan and Culbertson. Collins is not alleged to have ever taken any actual possession outside of the small tract ("his home"), nor is it alleged that he in any way did any act, after this quasi tenancy commenced, which he would not have done, if the arrangement with Culbertson had not been made. Actual possession of land necessarily implies the doing of some physical acts. Collins' possession, as the quasi tenant of Hagan and Culbertson, seemingly was, and I think was intended to be, purely mental. There is no intimation that Collins agreed to make a public claim, on behalf of Hagan and Culbertson, of the large boundary, or that he was to prevent other adverse claimants from continuing to live thereon, or that he was (outside of his home place) to do anything. So far as I can make out, there is nothing to show but that this "possession" by Hagan and Culbertson (which lasted from 1842 or 1843 to not later than 1855) was a furtive, secret, nominal possession, which might well be regarded as a sham possession. Its nature was such that, instead of tending to fortify the claim under the Taylor deed, it has to my mind rather an opposite tendency. The long-continued possession under an ancient muniment of title, which creates a presumption of the validity of the document, is a bold, open, and notorious possession, such as attracts the attention of, and challenges attack by, all adversary claimants. It is not a secret understanding with an adverse claimant of a small part of the land, whereby the latter continues the identical possession he had previously had. In 2 Blackwell, Tax Titles, § 1118, it is said:

"The same principle was asserted by the Supreme Court of New Hampshire in the case of Waldron v. Tuttle, 3 N. H. 340; and in that case the rule is laid down, which is probably applicable to all cases where the doctrine of presumption is relied upon, that in order to justify its application the possession of the party claiming under the tax deed must be a long, open, notorious, and exclusive possession—such an one as will constitute, technically, an adverse possession."

[50] As to the effect of the lapse of time where the claimants under a tax deed have not had possession, it is said in 2 Blackwell, Tax Titles, § 1105:

"The longer the claimant under the tax deed remains out of possession, the less favor will he meet in the courts, and the less readily will they presume anything in his favor; for his neglect to assert his title argues a defect in it. If lapse of time were a basis for presumption in such case, all the claimant under a defective title would have to do would be to lie by till time and legal presumption should make his title good."

In 37 Cyc. 1453, 1454, it is said:

"As a general rule, and in the absence of a statute changing the common law in this respect, mere lapse of time will not of itself afford presumptive

evidence of the regularity and validity of a tax sale, if the purchaser and those claiming under him have not had possession under the deed; that is, the antiquity of a tax deed, if no possession has been taken under it, affords no presumption in its favor, but, on the contrary, operates the more strongly against the holder."

To the same effect is Black, Tax Titles (2d Ed.) § 461. I know of no Virginia authority for taking a contrary position. The Virginia cases, cited ante, p. 119, seem to fully support the foregoing rule. In Reusens v. Lawson, 91 Va. 226, 235, 236, 21 S. E. 347, the clerk's tax deed was 58 years old at the time of the trial. In Sulphur Mines Co. v. Thompson, 93 Va. 293, 317, 25 S. E. 232, 237, it is said:

"The sale purports to have been made in 1813. The deed was made in 1830. This action was brought in 1890. No possession under it is shown. To hold that the recitals in that deed are prima facie evidence of the existence of the facts recited under these circumstances would violate every principle of law applicable to deeds executed under a naked power."

Counsel for plaintiff quote from 1 Greenleaf, Ev. (16th Ed.) § 20, to the effect that:

"Where an authority is given by law to executors, administrators, guardians, or other officers to make sales of lands, * * * and they are required to advertise, * * * the lapse of time [30 years, usually] raises a conclusive presumption that all the legal formalities of the sale were complied with."

The following from Black on Tax Titles, § 447, shows the inapplicability to the case at bar of the rule stated by Greenleaf:

"The rule applicable to sales by executors, guardians, and other officers. that the lapse of 30 years' time raises a conclusive presumption that all legal formalities of the sale were observed, does not apply to sales made in derogation of the common law, the proceedings for which were required to be evidenced by records and public documents, which are supposed to remain in the custody of the officers charged with their preservation. These must be proved, or their loss accounted for, and supplied by secondary evidence. If they cannot be found, or their loss accounted for, the presumption is, in the absence of evidence, that they never existed."

The plaintiff also relies upon Lasher v. McCreery, 66 Fed. 834, 836, and Cook v. Lasher, 73 Fed. 701, 19 C. C. A. 654. The tax sale in question in these cases was made in a proceeding in the circuit court of Tazewell county, Va., which had been instituted by the commissioner of delinquent lands. 73 Fed. 702, 19 C. C. A. 654. The proceeding was a judicial one. Smith v. Chapman, 10 Grat. (Va.) 445, 465; Hitchcox v. Rawson, 14 Grat. (Va.) 526, 534. Certainly these cases do not authorize the contention that the Circuit Court of Appeals for this circuit has departed from the usual rule.

I can find nothing in Ewing v. Burnet, 11 Pet. 41, 49, 52, 53, 9 L. Ed. 624, in Harris v. McGovern, 99 U. S. 161, 167, 25 L. Ed. 317, in Simmons v. Doran, 142 U. S. 417, 442, 12 Sup. Ct. 239, 35 L. Ed. 1063, or in Rich v. Braxton, 158 U. S. 375, 384, 15 Sup. Ct. 1006, 39 L. Ed. 1022, which in the least seems to me to support the idea that a long-standing claim to land, capable of occupation and use, will supply the place of a long-continued possession. See Dishazer v. Maitland, 12 Leigh, 525, 529, 532.

[51] Counsel for plaintiff contend that the mere execution of the Taylor deed and of those following it are evidences of possession. The English doctrine referred to in Wigmore, Ev. (volume 1, § 157; volume 3, § 2142), does not seem to be at all applicable to the situation before us. No one could rationally infer possession from the execution of the deed by Collector Taylor, or of the deed by Lamb's executors. Moreover, almost every fact that has been brought to light concerning the acts of Lamb, of Sarah Purcell and Joseph Hagan, of Culbertson, of Patrick Hagan, and of Pearson and his heirs, rebut any inference of possession on the part of any of them. The dismissal of the caveat proceedings by the plaintiffs, the dismissal of Pearson's actions of ejectment, the times and manner of paying such taxes as were paid by plaintiff's predecessors in title, and the testimony of many elderly witnesses for the defendant to the effect that they had never even heard of possession ever having been held for or by any one in plaintiff's chain of title, would seem to make it quite unreasonable to infer possession from the mere execution of the deeds in the plaintiff's chain of title. And it would be still more unreasonable to base a presumption of the validity of the Taylor deed on a possession inferred as above.

It is argued that there is no difference in principle between the presumption of the genuineness of an ancient original deed, and a presumption of the validity of an ancient tax deed, where there has not been possession in accordance with the deed in either case. I am unable to so hold. The genuineness of an original tax deed and the existence of the power to validly execute it are respectively dependent on such very different circumstances that I can see no reason for holding that a presumption in favor of the one has any close relation to a presumption in favor of the other. In Barley v. Byrd, 95 Va. 316, 319, 321, 28 S. E. 329, the authenticity of a very ancient and important document was fully conceded; but the court denied its validity as evidence of the transfer of title. Caruthers v. Eldridge, 12 Grat. (Va.) 670, 678, and Nowlin v. Burwell, 75 Va. 551, 553, relate to presumptions of the authenticity of ancient deeds, and not at all as to presumptions as to the validity of a deed executed by a tax collector.

In this connection counsel for plaintiff rely greatly on the unofficially reported case of Lennig v. White, 1 Va. Dec. 873 (date Dec. 22, 1894). If the entire soundness of that opinion be taken for granted, still the facts are so entirely unlike those in the case at bar that it cannot be fairly considered as in point. Nor in any event could any of the three last cases be followed, if in conflict with the later cases of Reusens v. Lawson, 91 Va. 226, 235, 236, 21 S. E. 347, and Sulphur Mines Co. v. Thompson, 93 Va. 293, 317, 25 S. E. 232.

[52] It is further contended that the defendant is making a "collateral attack" on the Taylor deed such as is forbidden by the law. This contention finds some seeming support in authorities discussing tax deeds made as the result of judicial proceedings, but only a seeming support. Of the quotation from 37 Cyc. 1378, counsel for defendant say:

"We have found in the Tazewell law library nearly all of the cases referred to in the notes to the above text in Cyc., and they are cases arising on tax

sales made under judicial proceedings; the rule as to which will be found stated in 37 Cyc. 1315–1317, in Blackwell on Tax Titles (5th Ed.) § 351 et seq., and also in Black on Tax Titles (2d Ed.) § 177 et seq."

If this conclusion is not correct there is an irreconcilable discrepancy between different parts of the text of that work.

Counsel for plaintiff also rely upon certain Virginia decisions.   In Robinett v. Preston, 4 Grat. 141, 146, the court was discussing a deed under which long possession had been held.   See Jesse v. Preston, 5 Grat. (Va.) 120, 131; Walton v. Hale, 9 Grat. (Va.) 194, 198; Sulphur Mines Co. v. Thompson, 93 Va. 293, 317, 25 S. E. 232.   In Hitchcox v. Rawson, 14 Grat. (Va.) 526, 534, the deed was made in the course of a judicial proceeding.   If the very brief and unsatisfactory opinion in Machir v. Funk, 90 Va. 284, 289, 18 S. E. 197, may be supposed to support the plaintiff's contention, it is in conflict with many Virginia decisions, including the later case of Sulphur Mines Co. v. Thompson, supra.   Bowe v. Richmond, 109 Va. 254, 64 S. E. 51, does not seem to me to support the contention of counsel for plaintiff in the least.   We are here dealing with a collector's tax deed, upon which a plaintiff in ejectment relies, under which there has been no open and continuous possession of land entirely susceptible of possession.   I think the following from Minor's Tax Titles, p. 123, is sounder than the statement in the brief of counsel for plaintiff:

"Independently of statute, the tax deed is of no effect whatever as evidence of the validity of the purchaser's title, or of the due and proper performance of all or any of the various steps prescribed by the law, whether they are required to be recited in the deed, or are in fact recited therein or not.   The burden is still on the purchaser to show that all these preliminary steps have been complied with."

It should be added that describing the defendant's objections to the Taylor deed as a "collateral attack" is, I think, an erroneous use of this phrase.   In ejectment, in the circumstances here, the defendant's plea of not guilty puts in issue the plaintiff's entire case.   Richmond v. Jones, 111 Va. 214, 219, 68 S. E. 181.   It should here be said that there is some hearsay in the evidence of Jno. A. Looney, a witness for the defendant, and perhaps some in that of Gillespie, Davis, Smith, Wolford, and Elswick.   It seems unnecessary to go over it all in detail.   The evidence for the plaintiff, without reference to anything that could be objectionable in the testimony for the defendant above mentioned, wholly fails in my judgment to show facts which would authorize a presumption of the validity of the Taylor deed.   From what has been said it follows that, on common-law principles at least, the validity of that deed cannot be presumed.

## Acts of 1912 and 1914.

[53] An act of the Virginia Legislature, approved March 13, 1912, reads as follows:

"Chap. 235.—An act to prescribe the effect as evidence to be given to deeds recorded prior to the year 1865.

"Approved March 13, 1912.

"1. Be it enacted by the General Assembly of Virginia, that in every action at law or suit in equity, in which it shall appear that a deed or other writing,

which constitutes a part of the chain of title to any lands has been made by an officer or other person, purporting to act under the provisions of any statute or decree, authorizing or providing for a sale or conveyance of real estate, and that said deed was duly recorded in the proper clerk's office prior to the year eighteen hundred and sixty-five, and that the record or evidence, or some parts thereof of the proceedings under or pursuant to which such sale, deed or other writing was made, has been lost or destroyed, or cannot be produced, the said deed or other writing, or a certified copy thereof, taken from said record, shall be prima facie evidence of the fact that all provisions and requirements of such statute or decree were duly complied with in the making of such sale, deed or other writing as well as the power or authority of such officer or other person to make and execute the same, and of the due execution thereof by him."

Acts 1912, p. 524.

This statute was repealed by the act of March 14, 1914. This act reads as follows:

"Chap. 100.—An act to repeal an act of·the General Assembly of Virginia entitled 'An act to prescribe the effect as evidence to be given to deeds recorded prior to the year 1865. Approved March 13, 1912.' (S. B. 73.)

"Approved March 14, 1914.

"1. Be it enacted by the General Assembly of Virginia that an act entitled an act to prescribe the effect as evidence to be given to deeds recorded prior to the year eighteen hundred and sixty-five, approved March thirteenth, nineteen hundred and twelve, be and the same is hereby repealed."

Acts 1914, p. 186.

The plaintiff earnestly contends that by force of section 6, Code 1904, the act of 1914 should be so construed as to leave to the plaintiff a right to rely upon the act of 1912. Section 6 of the Code reads as follows:

"No new law shall be construed to repeal a former law,·as to any offence committed against the former law, or as to any act done, any penalty, forfeiture, or punishment incurred, or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offence or act so committed or done, or any penalty, forfeiture, or punishment so incurred, or any right accrued, or claim arising before the new law takes effect; save only that the proceedings thereafter had shall conform, so far as practicable, to the laws in force at the time of such proceedings; and if any penalty, forfeiture, or punishment be mitigated by any provision of the new law, such provision may, with the consent of the party affected, be applied to any judgment pronounced after the new law takes effect."

This section of the Code applies only when the repealing statute is open to construction; that is, when there is some ambiguity or doubt as to the intent of the lawmakers in enacting the repealing statute. As was said in Hamilton v. Rathbone, 175 U. S. 414, 421, 20 Sup. Ct. 155, 158 (44 L. Ed. 219): `

" * * *· The province of construction lies wholly within the domain of ambiguity."

In Lake County v. Rollins, 130 U. S. 662, 670, 671, 9 Sup. Ct. 651, 652 (32 L. Ed. 1060), it is said:

"Where a law is expressed in plain and unambiguous terms, * * * the Legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction."

In Great Northern R. Co. v. United States, 208 U. S. 452, 465, 28 Sup. Ct. 313, 52 L. Ed. 567, in regard to section 13, U. S. Rev. Stats. (Comp. St. 1916, § 14), it is said:

"As the section of the Revised Statutes in question has only the force of a statute, its provisions cannot justify a disregard of the will of Congress as manifested either expressly or by necessary implication in a subsequent enactment."

In 36 Cyc. 1231, it is said that general saving statutes are applicable, "unless such application is negatived by the express terms or clear implication of a particular repealing act." In Danville v. Pace, 25 Grat. (Va.) 1, 6, 18 Am. Rep. 663, in which this section (which was section 18, c. 16, Code 1860) was under consideration, it is said:

"In construing this section, it is necessary to consider also the preceding one, which provides that this rule of construction shall not be adopted, if it would be inconsistent with the manifest intention of the Legislature. In other words, the two sections taken together mean no more than that a new law shall not be construed to affect any right accrued under a former law, unless such is the manifest purpose of the Legislature."

The first question, therefore, is whether or not the act of 1914 is capable of more than one construction. The act of 1912 provided a new mode of procedure, was prospective in operation, and applied to all trials thereafter to be held. To wholly repeal this mode of procedure was to restore the common-law rule of evidence as to all cases thereafter to be tried. And this seems to me to be necessarily so, because the generality of the language employed conveys and admits of no other meaning.

Again, the act of 1912, assuming its constitutionality, is revolutionary and extreme. It is not improbable that the Legislature in enacting it intended only to validate deeds made by commissioners in chancery, prior to 1865, where the court order books and case files containing the decrees authorizing such deeds had been lost or destroyed. Many of the state court records were lost or destroyed during the Civil War. In many such cases it would be impossible to prove by direct evidence that there ever had been in existence any decree authorizing the deed. Hence the manifest intent was that mere inability to produce such decrees should throw the burden of proof on the party claiming against such deeds. The expression "or cannot be produced" was therefore intended as it was written, and cannot properly be read "lost or destroyed and [therefore] cannot be produced." Even as applicable solely to masters' deeds, because of the presumption of validity where there has been long possession under such deed, the policy of the statute was open to just criticism.

However, the language of the statute is such that it applies also to ancient tax deeds. It therefore introduced a rule of evidence which threw doubt upon the validity of probably thousands of titles theretofore considered as impregnable, and created fear of an unprecedented flood of litigation. When this surprising and very grave defect in the act of 1912 was, at its next session, called to the attention of the same Legislature which enacted it, the statute was repealed. Can we take the position that the intent shown by the repealing statute is not,

at least by necessary implication, to wholly abolish the privilege given by the act of 1912 in all cases thereafter to be tried? With the limited library facilities at my command I have not been able to find any decision in which the facts are like the facts here. The old law in express terms applied to "every action at law or suit in equity." An absolute repeal, an unlimited annulment, of such law would seem therefore to be by necessary implication the exact equivalent of a statute reading, "In no action at law or suit in equity," etc.

[54] This conclusion is strengthened by the want of any sufficient reason for imputing a different intent to the Legislature in enacting the repealing statute. Is there any reason for an intent to save to those who may have purchased ancient tax titles to land during the existence of the act of 1912 the privilege conferred by that act? Certainly the rule of evidence created by the act of 1912 was impolitic and unwise. It was to protect the great number of citizens holding or claiming land adversely to ancient official deeds that the repealing statute was enacted. This purpose would have been very imperfectly realized, if there was also an intent to leave the act of 1912 in full force as to all who acquired claim of title during the existence of that statute.

And there is also want of reason for any intent to favor those who acquired claim of title under an ancient official deed while the act of 1912 was in force. I so say because no one has in any strict sense a right to a particular mode of procedure. The privilege unwisely and injudiciously conferred by the act of 1912 was completely within the control of the Legislature. Whoever bought a claim to land founded on an ancient official deed must be considered as having bought with full knowledge that the lawmakers might perceive the injustice of the act of 1912 and abolish the privilege before he could take advantage of it. He acquired no legal or moral right to such privilege so long as it remained wholly inchoate, and hence there was no reason for the existence of an intent in 1914 to exclude such persons from the operation of the repealing statute.

It is contended by counsel for the plaintiff that the Legislature in 1914 enacted the repealing statute, not only with full knowledge of section 6 of the Code, but with the expectation that the courts would construe the repeal by reading section 6 as a proviso thereto. If section 6 saves the benefit of the act of 1912 to those who acquired claims under ancient official deeds while that statute was in force, although their titles were still unadjudicated when the repeal took effect, it also saves the same benefit to those who acquired claims of title to land under such deeds prior to the enactment of the statute of 1912 and who still hold such unadjudicated claims of title. Every reason for holding that section 6 applies to the first class also leads to the same conclusion as to the second class. If the first class have a claim arising under the old law, so have the second class. If section 6 saves a wholly inchoate, executory "right" to a particular mode of judicial procedure to all of the first class, it necessarily saves this same "right" to the second class. If, therefore, the intent of the Legislature in enacting the repealing statute in 1914 was that section 6 would be read as a

proviso to the repeal, and that it would save the benefit of the act of 1912 to all except those who might acquire title after the repeal went into effect, the repealing act was, while not entirely futile, intended to be futile in very large measure. Practically every possible claim of title founded on an official deed recorded prior to 1865 was, of course, in existence and owned by some one in 1914. To so repeal the act of 1912 that the repeal should apply only to those acquiring claims under these ancient deeds after the repeal was to accomplish in very small part the result that was desired by thousands of citizens. After the repeal went into effect, claims to land under ancient official deeds, the evidences of the validity of which could not be produced, and under which there had not been the long-continued possession or other facts necessary to create a common-law presumption of validity, would become practically unmarketable. Consequently the junior title holders, for whose benefit the repeal was enacted, were given no relief, except against a class of claimants who would, practically speaking, not come into existence for a long course of years. And where, as in the case at bar, a claim under an ancient official deed was acquired by a corporation having perpetual existence, the benefit of the act of 1912 was saved to a practically unending succession of new stockholders. I am therefore unable to concede that the Legislature in 1914 intended or expected that section 6 would be read as a proviso to the act of 1914.

Counsel for plaintiff rely strongly upon the following excerpt from Philips v. Commonwealth, 19 Grat. (Va.) 485, 524, relating to what is now section 6:

"It was designed to meet contingencies ensuing upon repeals, and superseded the necessity for future Legislatures undertaking to prescribe or limit the operation of repealing laws. After its adoption in the Code, it was thenceforth to be taken as a part and limitation of every repealing statute, as much so as if it had been therein re-enacted, unless, indeed, a contrary intent should appear from the statute itself. We are therefore bound to construe the operation of this repeal as governed by this prescribed rule of construction. It will be found in chapter 16, § 18, p. 115, under the head of 'Construction of Statutes.'"

I cannot possibly read this as holding that section 6 must be read as a proviso to every repealing statute. The last clause is expressly to the contrary, and without such saving the rule laid down would have been contrary to all authority and reason.

[55] Again, the mere fact, if it be a fact, that the language of section 6 is such that it could apply to the repealing statute here in question, is no sufficient reason for reading it as a proviso to the act of 1914. The intent of the Legislature of the year 1914 necessarily prevails over the intent of the earlier Legislatures which enacted and retained section 6. However, I am not satisfied that section 6 shows an intent that it should be applied to a case where the repealed statute provides only a mode of procedure, the right to which had not accrued at the time the repeal went into effect. I concede that section 6 is applicable to a statute repealing one creating a mode of procedure which has been partly executed when the new law goes into effect, as in Philips v. Commonwealth, supra, 19 Grat. (Va.) 485. In that

case the prosecution had been commenced before the new law of pro-
cedure went into effect. The first examining trial was held prior to
July 1, 1867. The defendant as well as the commonwealth had there-
fore, before the new law became effective, acquired a right to the old
mode of proceeding. Philips' Case could be an authority against my
reasoning only if the prosecution there had been commenced after the
new law went into effect. Under the facts the right to the old procedure
had accrued before the new law went into effect.

[56] However, I do not hold that section 6 saves only accrued
rights. "Claims arising under the old law" must, I think, embrace
inchoate rights. But that which is saved must be a claim to a right—
although an inchoate right—and no one can be said to have an entirely
inchoate right to a particular mode of procedure. A statute which pro-
vides a mere mode of procedure does not give any one a right, in the
strict sense of the word, to that particular mode, unless he avails himself
of it while the statute is in force. The only inchoate rights saved by
section 6 are, I think, inchoate substantive rights. Reading section 6 as
intended to save only accrued procedural rights, and both accrued and
inchoate substantive rights, seems to give it the full operation intended
and to be in accord with all of the Virginia decisions. I can see no rea-
son for an intent, in enacting section 6, to save to any one some partic-
ular mode of proceeding, if inchoate and unaccrued at the time the
Legislature substitutes therefor some other mode of judicial proceed-
ing. The very reason for substituting another mode of proceeding is
that the repealed mode has been found unfair or inexpedient. Where
the repealed statute gave substantive rights, even inchoate rights, or
gave mere procedural rights, which had accrued when the repealing
statute takes effect, there is a probability of hardship resulting. Hence
an intent that a repeal should not affect such rights. But no such rea-
son exists where the repealed law affords an inchoate, unaccrued, un-
executed privilege to rely upon some particular mode of procedure.
There is no hardship in substituting for an unfair or unwise mode of
procedure another mode which is fairer and wiser. The only satis-
factory conclusion I can reach is that the act of 1914 wholly abolished
the act of 1912 in the case at bar.

### Constitutionality of the Act of 1914.

[57] It is contended by the plaintiff that the act of 1914, if read as
an absolute repeal of the act of 1912, is unconstitutional. I am unable
to see that the statute impairs the obligation of any contract by or
under which the plaintiff claims. Every contract, with one exception,
in the plaintiff's chain of title, was made prior to 1912 and while the
common-law rule of evidence was in force. The only possible excep-
tion is the contract between plaintiff and the Buchanan Company.
The conveyances were made in 1913 and in April, 1914, before the
act of 1914 went into effect. Section 53, Const. Va. Granting that
the act of 1914 reduced the value of the Buchanan Company's title,
the statute did not in any sense impair the obligation of the contract.
In order that a state statute may impair the obligation of a contract,
the statute must affect the validity, construction, discharge, or enforce-

ment of the contract. It seems to me clear that the act of 1914 is absolutely without effect in any one of these particulars. See Curtis v. Whitney, 13 Wall. 68, 70, 71, 20 L. Ed. 513; Railroad Co. v. Maguire, 20 Wall. 46, 61, 22 L. Ed. 287; Ochiltree v. Railroad Co., 21 Wall. 249, 253, 22 L. Ed. 546; Edwards v. Kearzey, 96 U. S. 595, 607, 24 L. Ed. 793; Wolff v. New Orleans, 103 U. S. 358, 365, 26 L. Ed. 395; Insurance Co. v. Cushman, 108 U. S. 51, 65, 2 Sup. Ct. 236, 27 L. Ed. 648.

[58, 59] Does the act of 1914 deprive of property without due process of law? The authorities fully sustain the position that there is no want of due process of law in the enactment of a reasonable rule of evidence. In Railroad Co. v. Turnipseed, 219 U. S. 35, 43, 31 Sup. Ct. 136, 138 (55 L. Ed. 78, 32 L. R. A. [N. S.] 226, Ann. Cas. 1912A, 463), it is said:

"If a legislative provision, not unreasonable in itself, prescribing a rule of evidence, in either criminal or civil cases, does not shut out from the party affected a reasonable opportunity to submit to the jury in his defense all of the facts bearing upon the issue, there is no ground for holding that due process of law has been denied him."

The act of 1914 simply restored a common-law rule of evidence, which had come to be a rule because the highest court of this state, not to mention the highest courts of the nation and of the great majority of the other states, had for generations considered it fairer and more politic than any other rule. It is surely impossible to say that such a rule is an unreasonable one. On the other hand, the act of 1912 created an impolitic and unwise rule of evidence. Certainly the reasonableness of the act of 1912 is much more open to question than is that of the act of 1914. The following authorities seem to me to make it necessary to hold, and I do hold, that the act of 1914 is not unconstitutional. See Crawford v. Halsted, 20 Grat. (Va.) 211; Fong Yue Ting v. United States, 149 U. S. 698, 729, 13 Sup. Ct. 1016, 37 L. Ed. 905; Li Sing v. United States, 180 U. S. 486, 493, 21 Sup. Ct. 449, 45 L. Ed. 634; Ewell v. Daggs, 108 U. S. 143, 150, 151, 2 Sup. Ct. 408, 27 L. Ed. 682; Marx v. Hanthorn, 148 U. S. 172, 181, 13 Sup. Ct. 508, 37 L. Ed. 410; Hawkins v. Bleakly, 243 U. S. 210, 37 Sup. Ct. 255, 61 L. Ed. 678, Ann. Cas. 1917D, 637; Campbell v. Iron Co., 83 Fed. 643, 27 C. C. A. 646; 37 Cyc. 1459; 8 Cyc. 896, 925; Cooley, Const. Lim. (7th Ed.) 524, 525; Gage v. Caraher, 125 Ill. 447, 17 N. E. 777, 779; Burk v. Putnam, 113 Iowa, 232, 84 N. W. 1053, 86 Am. St. Rep. 372; People v. Cannon, 139 N. Y. 32, 34 N. E. 759, 36 Am. St. Rep. 668, 682–684; O'Bryan v. Allen, 108 Mo. 227, 18 S. W. 892, 32 Am. St. Rep. 595, 596; People v. Turner, 117 N. Y. 227, 22 N. E. 1022, 15 Am. St. Rep. 498, 501; Irwin v. Pierro, 44 Minn. 490, 47 N. W. 154. But, if there is even a doubt, it is the duty of the court to hold the statute to be valid. Dartmouth College v. Woodward, 4 Wheat. 518, 625, 4 L. Ed. 629; Ogden v. Saunders, 12 Wheat. 213, 270, 6 L. Ed. 606; Von Hoffman v. City, 4 Wall. 535, 549, 18 L. Ed. 403; Mayor v. Cooper, 6 Wall. 247, 251, 18 L. Ed. 851; Sinking Fund Cases, 99 U. S. 700, 718, 25 L. Ed. 496; Hooper v. California,

155 U. S. 648, 657, 15 Sup. Ct. 207, 39 L. Ed. 297; Fairbank v. United States, 181 U. S. 283, 285, 21 Sup. Ct. 648, 45 L. Ed. 862.

### Contention that Taylor Deed is Void on Its Face.

[60, 61] When a tax deed shows on its face affirmatively that some essential requirement of the law has been disregarded or disobeyed, the deed is void on its face. Moore v. Brown, 11 How. 414, 425, 13 L. Ed. 751; French v. Edwards, 13 Wall. 506, 509, 514, 515, 516, 20 L. Ed. 702. But, after as careful study of the question as my library facilities permit, I cannot hold that a mere failure to recite in a tax deed that every essential step in the procedure leading up to the delivery of the deed has been complied with is essential to the validity of the deed on its face. As a general rule it is not always necessary that a deed made in execution of a power should even refer on its face to the power. 31 Cyc. 1131. However, it may be assumed, for present purposes, that a stricter rule prevails in regard to tax deeds. I have found no Virginia decision which seems to me to throw light on this point. The statements found in the text books are rather unsatisfactory. 37 Cyc. 1434, 1436; 27 Am. & Eng. (2d Ed.) 968 et seq.; Blackwell, Tax Titles (5th Ed.) § 771 et seq.; Black, Tax Titles (2d Ed.) § 396 et seq. If it be the law that it is essential to the validity of a tax deed on its face that there be recited compliance with every essential step in the proceeding, the Taylor deed is, I think, void on its face because of its failure to recite (1) publication or posting of the local notice of taxes due, and (2) compliance with section 30 of the Act of 1815, if not for other reasons. But the most satisfactory conclusion I have been able to reach is that there are sufficient recitals in the deed. In French v. Edwards, 13 Wall. 506, 515–516 (20 L. Ed. 702) it is said:

"* * * If a sheriff should refer in his deed to an execution issued to him, and recite that in obedience to it, and the statute in such case provided, he had sold the property to the highest bidder, it would be presumed that he had done his duty in the premises, given proper advertisement, and made the sale at public auction in the proper manner."

In the Taylor deed there is a reference to the statutes, and it is recited that the land was assessed, that the taxes were not paid, that a sale was held, that the grantee became the purchaser, and had paid the purchase money. I think that it would be going too far to hold the deed void on its face because it fails to recite each step or even every essential step in the proceeding. This conclusion disposes of many of the objections to the deed on its face. I shall, however, consider separately some of these objections.

### (1) Alleged Cessation of Lien of Taxes of 1816.

[62, 63] Counsel for defendant contend that by the terms of section 24 of the act of January 9, 1815 (3 Stat. 172, c. 21), kept in force by section 2 of the act of March 5, 1816 (3 Stat. 255, c. 24) the lien for the taxes for any year existed only for two years from the time the tax became due and payable. Contrary to my first belief, I am, after further study of the statutes, unable to hold that the first section of the

act of April 26, 1816 (3 Stat. 302, c. 82) was intended to repeal the limitation found in section 19, Act July 22, 1813 (3 Stat. 30, c. 16), repeated in section 24, Act Jan. 9, 1815 (3 Stat. 172), and kept in force by section 2, Act March 5, 1816 (3 Stat. 255). And I have been unable to find any statute which extended the life of the lien for the taxes of 1816. The sale here was made October 23, 1820. However, merely from the face of the deed and the statutes it cannot be said that the lien had ceased to exist. Under the act of March 5, 1816, the provisions of the act of January 9, 1815, except as changed by later acts, are adopted. As I read section 4 of the act of January 9, 1815, as amended by section 1 of the act of March 3, 1815 (3 Stat. 231, c. 91), the assistant assessors were required to commence the making of the assessment lists of the tax of 1816 on April 1, 1816. By section 13 these lists were to be completed and put into the hands of the principal assessor within 60 days thereafter—June 1, 1816. Then (section 14) the principal assessor was to immediately advertise the fact that the lists were in his hands and subject to correction on complaint of taxpayers. Twenty-five days after the date of the publication is allowed for appeals to the principal assessor. By section 16, immediately after the 25 days have elapsed, each principal assessor was required to make out corrected lists and lay them before a board consisting of all the principal assessors. This board was to meet "at such time and place as the Secretary of the Treasury should appoint." The board was then (section 21), within 20 days after it convened, to equalize and apportion the taxes. After this had been done, each principal assessor was to make out lists of the taxes. These lists were to be furnished to the collectors within 35 days after the apportionment had been completed. It is unnecessary to further follow the details. The time which the Secretary of the Treasury fixed for the meeting of the board of assessors to act upon the taxes of 1816 does not appear (and I may say here, in order to show why this topic is not again considered, that it is not proven anywhere in the evidence), and consequently it is impossible to know when the tax of 1816 became due and payable. It may be that the convening of the board was so long deferred that the tax had not been due and payable for over two years when the sale was held.

### (2) Alleged Insufficient Advertisement of Taxes Due.

[84] While I am satisfied that this notice had to be advertised at least once a week for eight weeks in succession in every newspaper in the state in which the laws of the United States were by public authority published (3 Stat. 175, 231, 255), I am unable to infer, merely from the recital in the deed, that the Richmond Enquirer had not been designated or that any other newspaper had been. 1 Stat. 724; 3 Stats. 439, 576, cc. 80, 92. The document offered in evidence is certified as a true copy from the deed book, and the latter presumptively contains a true copy of the original deed. I know of no more authority for inserting the words "of several" after the word "one" than for inserting the word "the" before the word "one," where the

deed reads: "The said newspaper being one in the state of Virginia, in which," etc. While the deed shows that Collector Taylor understood the law to require that the advertisement need be published in only one newspaper which had been designated for the publication of the laws (although several may have been designated), it remains so far unknown to us that more than one had in fact been designated.

### (3) Alleged Presumption that Taylor's Powers had Ceased.

[65] Because of the conditional provisions for retiring collectors of the direct taxes found in Act Dec. 23, 1817, c. 1, 3 Stat. 401, and Act April 20, 1818, c. 83, § 5, 3 Stat. 442, it is contended that a presumption arises that Taylor was no longer the designated collector at the time he made the deed to Lamb. I am unable to so hold. 16 Cyc. 1052, 3, 5; 22 Am. & Eng. Encyc. (2d Ed.) 1240.

### (4) Absence of Taylor's Title in Signature and Acknowledgment.

[66, 67] It is contended that the deed is void because the grantor's official title is not annexed to his signature to the deed and does not appear in the certificate of acknowledgment. This subject has been discussed in treating the objections to the deed (Exhibit 19) from Lamb's executors to Hagan and Purcell. It is contended in behalf of the defendant that the rule of intention does not apply to a tax deed made by an administrative officer. No authority exactly in point has been cited and I have found none. The authorities holding that in some respects intendments and inferences are not to be made in aid of defective tax deeds do not seem to me to be quite pertinent to the point under consideration. As a matter of reason it seems to me that where a deed shows distinctly on its face, as this does many times, that it is the deed of a tax officer, the mere fact that his signature lacks his official title cannot be held to invalidate the deed. And the same is to be said as to the supposed defect in the certificate of acknowledgment. See Acts 1895–96, p. 542.

### (5) Alleged Failure to Recite that Part of Land would Not Bring Taxes.

[68] The contention that the deed is void for failure to recite that a part of the land would not sell for a sum sufficient to pay the taxes seems to me to be answered by the language of the deed:

"And at said sale the said William Lamb * * * became the purchaser of two hundred thousand acres of the said land, he being the only bidder who would pay the said taxes, with the per cent. thereon, for the quantity so purchased of the said land."

While the phraseology is awkward, the recital seems to plainly mean that no one would bid the required amount for less than the entire tract of two hundred thousand acres. This recital clearly distinguishes the case at bar from French v. Edwards, 13 Wall. 506, 509, 514, 20 L. Ed. 702, and similar cases.

### (6) Contention that Only a Part of the Tract was Conveyed.

[69] This contention does not seem quite sound. The granting clause of the deed reads:

"* * * Doth grant unto the said William Lamb the said two hundred thousand acres of land in the county of Russell, and state of Virginia, being the land which was assessed in the name of Robert Smyth and Henry Banks, as aforesaid. * * *"

If anything passed by the deed, this language seems to me to cover the entire 200,000 acres.

### (7) The Description of the Land.

[70, 71] The Taylor deed not only describes the 200,000 acres in Russell county, Va., as being the same that was assessed to Robert Smyth and Henry Banks, but also as being the same tract that was advertised for sale for delinquent taxes in the Richmond Enquirer. Although the assessment had not been introduced when the Taylor deed was offered, one cannot pronounce the deed void on its face for want of description without considering the advertisement of a sale of 200,000 acres of land in Russell county belonging to Robert Smith and Henry Banks, to be held at the Eagle Hotel, Richmond, Va., on October 23, 1820. The evidence as to this advertisement (which is recited in the deed to have appeared in eight successive issues of the Richmond Enquirer) shows that it read on its first appearance "Robert Smith and H. Banks," and in the next seven issues it read "Richard Smith and Henry Banks." The reference in the deed to the advertisement of sale, and the nature of the advertisement, seems to me to make it reasonably clear that the land sought to be conveyed is the 200,000-acre tract in Russell county which had at one time belonged to Richard Smyth and Henry Banks. While such an error may vitiate an assessment or a tax advertisement, it does not follow that the deed is thereby rendered invalid. In some states it seems that deeds made by officials are construed differently from those made by private grantors, but I have not found that such rule prevails in this state. In White v. Luning, 93 U. S. 514, 523 (23 L. Ed. 938), it is said:

"Obviously, therefore, there are no merits in this defense. It rests alone on the idea that sheriffs' deeds and ordinary deeds inter partes are subject to different rules of construction. In regard, however, to the description of the property conveyed, the rules are the same, whether the deed be made by a party in his own right, or by an officer of the court."

See, also, 2 Blackwell, Tax Tit. (5th Ed.) § 772; Farmers' Co. v. Eno (C. C.) 35 Fed. 89, 90; Cox v. Hart, 145 U. S. 376, 387, 389, 12 Sup. Ct. 962, 36 L. Ed. 741; Atkinson v. Cummins, 9 How. 479, 485, 486, 13 L. Ed. 223.

There are some circumstances in which a tax deed cannot be construed as would be a private deed. See, for instance, 2 Blackwell, § 769. But in the case here I see no very good reason for holding that the Taylor deed may not be read as conveying the tract we are concerned with.

### Validity of the Taylor Deed under the Evidence.

#### (1) No Evidence of an Assessment.

[72, 73] It is in this connection unnecessary to determine under what particular statute or statutes the assessment for the direct tax of 1816 should have been made. Whether the procedure was that provided by the act of January 9, 1815, and was partly under that statute and partly under the act of July 22, 1813, is utterly immaterial. The fact that is important is that no evidence has been adduced that the 200,000-acre tract ever was assessed. The recital in the Taylor deed to the effect that the land had been duly assessed is not evidence of such fact. The fact that the land was advertised for sale for the taxes of 1816 authorizes no more than an inference that the local collector may have reported the land as delinquent, but this does not prove that it was ever assessed, unless we indulge presumptions which we are not at liberty to indulge. It seems to me to follow that the Taylor deed is void for this reason.

#### (2) No Evidence of Notice of Assessment.

[74] By section 13 of the act of July 22, 1813 (3 Stat. 28, c. 16) each assistant assessor is required to make out two assessment lists— one of the land and other property of residents and the other of which "shall exhibit in alphabetical order the names of all persons residing out of the collection district, owners of property within the district, together with the value and assessment thereof, or the amount of the direct tax due thereon." The next section reads in part:

"That immediately after the valuations and enumerations shall have been completed as aforesaid, the principal assessor in each collection district shall, by advertisement in some public newspaper, if any such there be in such district, and by written notifications to be publicly posted up in at least four of the most public places in each assessment district, advertise all persons concerned of the place where the said lists, valuations, and enumerations may be seen and examined; and that during twenty-five days after the publication of the notification as aforesaid, appeals will be received and determined by him relative to any erroneous or excessive valuations or enumerations by the assessor."

See, to the same effect, sections 13 and 14 of act of January 9, 1815 (3 Stat. 169).

There is in this record no evidence that these provisions of the law were complied with, or that any attempt was made to comply with them. An assessment and notice and opportunity to contest an erroneous assessment are certainly highly important rights of a taxpayer. On this account also the Taylor deed must be held void.

#### (3) No Evidence of Local Advertisement of Taxes Due.

[75] By section 26 of the act of January 9, 1815 (3 Stat. 173), it was the duty of the local collector, within ten days after receiving the revised lists from the board of principal assessors, to advertise in one newspaper printed in his district, if any, and by notification to be posted in at least four public places in his collection district, that the tax

had become due and payable. Notwithstanding my first impression to the contrary, it seems that this provision applies to both the lists of resident and nonresident property owners. In respect to nonresidents there is provision (section 28) for an additional publication, by the designated collector, but nothing that dispenses with the local advertisement required by section 26. That this is the intent of section 26 is made quite clear by the proviso at the end of section 28 (3 Stat. 175):

"Provided, that such payment is made within one year after the day on which the collector of the district where such property lies, had notified that the tax had become due on the same."

There was no evidence that such advertisement was made. It follows that the deed is void on this account.

### (4) Assessment (if Any) Not in Name of the Owners.

As this objection is purely theoretical, it seems unnecessary to discuss it. In connection with some other questions, however, the deed next to be mentioned is of some importance.

In order to show the invalidity of the tax deed the defendant offered in evidence (Exhibit 106) a certified copy from the Russell county deed book of a deed dated February 1, 1796 (and admitted to record in Russell county October 25, 1796), from Richard Smyth, acting in his own behalf and as attorney in fact for Henry Banks, conveying the entire 200,000-acre tract to one Moorehouse. It should here be said that no power of attorney from Banks to Smyth was ever produced. The plaintiff made several objections to the admission of this copy in evidence.

[76] As the deed of Richard Smyth in his own right, conveying an undivided half interest in the land, the first objection which seems to call for mention is the fact that the copy offered in evidence (and presumably the deed book also) does not contain any word, figure, or symbol to indicate that the certificate of acknowledgment was sealed. The acknowledgment was made, on February 6, 1796, before the mayor of Philadelphia. This was authorized by Act Dec. 13, 1792 (Code 1803, p. 160), as amended by Act Dec. 25, 1794 (Id. 327). See, also, Cales v. Miller, 8 Grat. (Va.) 6; Hassler v. King, 9 Grat. (Va.) 115. The certificate reads in part:

"In testimony whereof, I, the said mayor, have hereunto set my hand and caused the seal of mayoralty of the said city to be hereunto affixed. * * * "

I have little hesitation in holding that this objection was properly overruled. See Virginia Co. v. Keystone Co., 101 Va. 723, 45 S. E. 291; Howdashell v. Krenning, 103 Va. 30, 33, 48 S. E. 491; William James' Sons Co. v. Crouch, 72 W. Va. 794, 79 S. E. 815; 1 Cyc. 580; 34 Cyc. 615; 1 C. J. 839. Shanks v. Lancaster, 5 Grat. (Va.) 110, 112, 116, 50 Am. Dec. 108, seems to relate to an original deed offered in evidence. If so, the deed itself proved that the certificate had no seal on it, and that it had been improperly admitted to record. Therefore proof of its execution was necessary. In the case at bar there is a presumption that the seal of the mayor was affixed to the

original deed, which the clerk of the Russell county court simply failed to copy or indicate in making the copy on the deed book.

[77] It seems to be further contended that the copy of the deed to Moorehouse is not admissible as evidence of a conveyance of Smyth's half interest in the land, because not admitted to record within eight months after its date. In the deed (Exhibit 106) Smyth is stated to be "of the city of Richmond, in the commonwealth of Virginia." The statute, however, allowed two years after sealing and delivery for recordation, where the grantor did not "reside" in Virginia. Code 1803, pp. 327, 328. In Hassler v. King, 9 Grat. (Va.) 115, 119, it is said:

"The deed recites that the grantors were of the state of Virginia; but the acknowledgment by them before the mayor of New York, and his certificate thereof, afford sufficient evidence that, for the time being, the grantors dwelt in that city, and were, when they acknowledged the deed, nonresidents of Virginia, in the sense in which the terms were used in the act of 1785."

See, also, Cales v. Miller, 8 Grat. (Va.) 6, 12, 13.

[78, 79] It may be a fact that there was a duly executed and acknowledged power of attorney from Henry Banks to Richard Smyth in existence, which was admitted to record (in Wills and Inventories Book No. 1, since destroyed by fire) at the time the deed to Moorehouse was admitted. But such fact was not proved, and I cannot think that it ought to be presumed. Supervisors v. Railroad Co., 119 Va. 763, 770, 91 S. E. 124. There has, so far as the evidence discloses, never been any possession whatever by Moorehouse, or by any one claiming under him. Nor were there any other such acts of ownership as could justify a presumption that a valid power of attorney had been executed by Banks. The one fact which has made me hesitate on this point is that the evidence satisfies me that Banks never paid taxes on the land (or on any interest therein). Aside from the fact that Moorehouse and Ralph were equally delinquent, it is a matter of history that many owners of mountain land failed to pay taxes and allowed their lands to be forfeited, although they had not otherwise divested themselves of title. It would seem, therefore, that a mere failure to pay taxes is not a reliable indication of a previous voluntary divestiture of title.

[80] It is further contended that section 3333a, Code 1904, makes the deed to Moorehouse prima facie evidence of the authority of Smyth to convey Banks' interest. I think that, if the Legislature had intended this statute to apply to such cases as the one here, the expression "power," or "power of attorney," would have been used. If there is doubt as to the meaning of the statute, its title may be looked to. The title seems to me to show quite clearly that the case before us is not within the intent of the statute.

[81] To the mere fact that the court of Russell county admitted the deed to Moorehouse to record I cannot give weight. The deed was clearly entitled to record as the deed of Richard Smyth in his own right. The proceeding which resulted in the admission of a deed to record by order of court could be, and I believe nearly always was, ex parte, without notice to the grantors. From the many illus-

trations thereof appearing in the Virginia Reports, I think we may say that it is a historical fact that the courts, in ordering deeds to be recorded, never undertook to judicially pass on the validity of such a deed as we have under consideration. See Dawson v. Thurston, 2 Hen. & M. (Va.) 132, 137. Moreover, I have found no statute which forbade the recordation of a deed made by one professing to act as an attorney in fact for another, even where no power of attorney was offered. And I believe that the deed was admissible to record. See Code 1803, p. 156 et seq.

There was also introduced in evidence a deed of February 2, 1796, from Moorehouse to one Ralph, conveying a part of the 200,000 acres in severalty, which was recorded October 25, 1796. It is, however, unnecessary at this juncture to discuss this deed, or to now further advert to Ralph as an owner, except to note (Exhibits 82 and 83) that George Ralph's 102,312½ acres of land in Russell county was advertised by Collector Taylor for sale for the same tax which was charged to Smith and Banks.

(5) No Evidence of Advertisement under Section 28 of Taxes Due.

[82] No attempt was made by the plaintiff to prove publication of the advertisement required by section 28 of the act of 1815 (3 Stat. 175) in any one of the newspapers which had been designated to publish the laws enacted by either the Fourteenth or Fifteenth Congresses, or at the first session of the Sixteenth Congress. In the list filed with the deposition of Joel Grayson the Richmond Enquirer nowhere appears. The period covered by these designations ran from December 4, 1815 (3 Stat. 251), to May 15, 1820 (Id. 607). The advertisement of taxes due had to be made after the passage of the act of 1816 and prior to October 23, 1819.

[83] I think I have said enough to show that the Taylor deed is void on this account. But, even if the position were taken that this advertisement could legally have been in the Richmond Enquirer and it alone, there is no evidence that it appeared even in that one newspaper even once. It is recited in the Taylor deed that this advertisement appeared in the Enquirer, but this recital does not prove the fact.

(6) The Advertisement of the Tax Sale.

[84, 85] The direct tax for the year 1816 was imposed by the act of March 5, 1816 (3 Stat. 255). That statute provides that a direct tax of $3,000,000 be laid and apportioned according to an act of 1813, "and all the provisions of the act" of January 9, 1815, "except so far as the same have been varied by subsequent acts, and excepting the first section of the said act, shall be held to apply to the assessment and collection of the direct tax * * * hereby laid. * * * *" The act of January 9, 1815, by sections 28 and 29 (3 Stat. 175), required publication for 60 days in at least one of the newspapers published in the state. This statute was amended by two statutes of March 3, 1815 (3 Stat. 231 and 239, cc. 91 and 100), with the latter of which we are not now concerned. The first of these provided that the publications to be made by the designated collectors should be made "at

least once a week, for eight weeks in succession, in every newspaper within the state, in which the laws of the United States are by public authority published."·

The language of the act of 1816 means first that the provisions of the act of January 9, 1815, which had been changed by amendatory acts, were not to apply. But as this unnecessarily incomplete construction would leave this taxing act without any provision whatever for advertising the designated collector's notices of taxes due or the tax sales, it seems entirely clear that the necessary meaning was that the provisions of the amendatory acts which varied the requirements of the act of January 9, 1815, were to be followed. In order to hold that sections 28 and 29 of the act of January 9, 1815, were intended to apply to the delinquencies arising under the act of 1816, we must entirely ignore the clause "except so far as the same have been varied by subsequent acts."

Notwithstanding these clear provisions of the law, it is argued that, as Collector Taylor construed the law as requiring the advertisement of sale to be published in only one newspaper, his construction should be followed. My understanding of this rule of construction is that it does not apply unless there be grave doubt as to the meaning of the law. Houghton v. Payne, 194 U. S. 88, 99, 24 Sup. Ct. 590, 48 L. Ed. 888; United States v. Graham, 110 U. S. 219, 221, 3 Sup. Ct. 582, 28 L. Ed. 126; Manhattan Co. v. City, 74 Fed. 535, 543, 20 C. C. A. 642; 36 Cyc. 1141, 1142.

[**86, 87**] It is further a fact that there is no satisfactory evidence that the Richmond Enquirer was, at the period of the publication of the advertisement of sale (August 22 to October 10, 1820), a newspaper that had been authorized to publish the laws. In the issue of March 10, 1820 (see Exhibit 72) is a short act (admitting Maine to the Union), which may well have been copied from the National Intelligencer, or from one of the official papers, and published merely as a news item of public interest. The same may be said of the issue of May 30, 1820 (Exhibit 73). The recital in the Taylor deed creates no presumption that the Enquirer had been designated to publish the laws, and there was no sufficient evidence of such fact. Moreover, I am strongly inclined to believe the contrary. The publication of the laws of the first session of the Sixteenth Congress had been committed to the Palladium of Liberty, the Republican Compiler, and the Norfolk and Portsmouth Herald. This work was finished late in the month of June, 1820. The advertisement of sale was published from August 22 to October 10, 1820. The second session of the Sixteenth Congress did not convene until November 13, 1820 (3 Stat. 610). There was, therefore, no reason for the designation of any other newspaper prior to August 22, 1820. The total failure of the plaintiff to prove that the laws of the second session of the Sixteenth Congress were published in the Enquirer is strong evidence that the paper had not been designated at the time the advertisements of this tax sale were appearing.

[**88**] The contention by plaintiff to the effect that the publications required by the act of March 5, 1816 (3 Stat. 255), were to be

made only in the newspaper or newspapers that had prior to March 5, 1816, been designated, rather than those that were designated under later statutes, seems to me to be unsound. The draftsman of the act of 1816 had in mind the provisions of the act of January 9, 1815, and of March 5, 1815. Not only is this a presumption of law (Sutherland, Stat. Construction, § 333), but the act so shows. In providing, by means of those statutes, for publications in cases of failure to pay the tax under the act of 1816, he necessarily threw his mind forward, for such publications would be made only two years or more after the date of the act of 1816. When a writer has his mind fixed on the future, and uses language that could apply either to the present or the future, the reasonable construction of such language is that it applies to the future—the time in the thoughts of the writer. Hence the act of 1816, in adopting the provisions of the act of March 5, 1815, should be read as referring to such newspapers as would be designated for publishing the laws by authority when the advertisements under the act of 1816 were due to be published. In 1816 it was as well known as it is now that newspapers sometimes cease to exist. As the law contemplated publications to be made two or more years after the passage of the act, it seems most improbable that the lawmakers intended that the publications should be made in newspapers which had been designated on or before March, 1816, rather than such as would be in existence and under designation at the time of the publications.

Moreover, the Richmond Enquirer was not designated to publish the laws enacted at the first session of the Fourteenth Congress, which commenced December 4, 1815, and ended April 30, 1816. 3 Stats. 251. Hence, even if the intent of the act of March 5, 1816, had been that the publications should be made in the newspapers that were in March 1816, under designation, there was no authority for publication in the Enquirer. The Virginia newspapers then under designation were the Press of Lynchburg, the Argus of Richmond, and the Constitution of Winchester.

[89] It is earnestly contended by counsel for the plaintiff that the expression "in every newspaper within the state, in which the laws of the United States are by public authority published," does not restrict tax publications to those newspapers in which the acts and resolutions of Congress were published. Article 6 of the federal Constitution reads, in part:

"This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, * * * shall be the supreme law of the land. * * *"

Here at least it is quite certain that the words "laws of the United States" are used as meaning acts and resolutions of Congress. In the act of March 2, 1799 (1 Stat. 724, c. 30) it is provided:

"That the Secretary of State shall, as soon as conveniently may be, after he shall receive any order, resolution or law passed by Congress, cause the same to be published at least in one of the public newspapers printed within each state; and whenever in any state, the aforesaid publication shall be found not sufficiently extensive for the promulgation thereof, the Secretary of State shall cause such orders, resolutions and laws to be published in a

greater number of newspapers printed within such state, not exceeding three in any state."

The act of November 21, 1814 (3 Stat. 145, c. 6), reads as follows:

"That the Secretary for the Department of State be, and he is hereby authorized to cause the laws of the United States, passed, or to be passed, during the present or any future session of Congress, to be published in two of the public newspapers within' each and every territory of the United States: Provided, in his opinion, it shall become necessary and expedient."

So far as I know, this was the law in force when the acts of 1815 and of 1816 were enacted. In view of the foregoing, it seems to me impossible to say that the language used in section 3 of the act of March 3, 1815 (3 Stat. 231), "at least once a week, for eight weeks in succession, in every newspaper within the state, in which the laws of the United States are by public authority published," does not clearly refer to the newspapers designated by the Secretary of State for the publication of the acts and resolutions of Congress.

[90] The advertisement of the tax sale was made from August 22 to October 10; 1820. Prior to that date two additional statutes had been enacted. See Act April 20, 1818 (3 Stat. 439), and Act May 11, 1820 (3 Stat. 576). The last repealed the former. The first section of the act of May 11, 1820, reads:

"That the Secretary of State shall, as soon as conveniently may be, after he shall receive any order, resolution, or law, passed by Congress, except such orders, resolutions, and laws, as are of a private nature, cause the same to be published in a number of public newspapers, not exceeding one in the District of Columbia, and in not more than three newspapers in each of the several states and territories of the United States. And he shall also cause to be published, in like manner, in the said newspapers, all public treaties entered into and ratified by the United States, except Indian treaties, which shall be published' only in one newspaper, and that to be within the limits of the state, or territory, to which the subject-matter of such treaty shall belong."

In order to hold that publication for eight weeks in the Richmond Enquirer alone was a sufficient publication of the tax sale it would be necessary that the evidence show, not only that the Enquirer was at or before and after the period in question (August to October, 1820) publishing the "orders, resolutions and laws passed by Congress" by authority of the Secretary of State, but also that the Enquirer was the only newspaper in the state that was then so authorized and so doing. The evidence introduced by the plaintiff does not show either fact. The evidence introduced by the defendant goes far toward proving that the advertisement of sale could only have been validly published in the Palladium of Liberty, the Republican Compiler, and the Norfolk and Portsmouth Herald.

## (7) Insufficiency of Advertisement in the Enquirer.

[91] I am satisfied that a perfectly correct advertisement of sale made for eight successive weeks in the Richmond Enquirer would not have been a compliance with a mandatory requirement of the law. I am further inclined to the opinion that, in order to make the tax collector's deed valid, the assessment, the local advertisement of assess-

ment, the local advertisement of taxes due, the advertisement by the designated collector of taxes due, and the advertisement of the tax sale should have been in the names of Moorehouse and Ralph. But it is unnecessary to so decide. If it be assumed that these proceedings could have been in the names of Richard Smyth and Henry Banks, and if it be also assumed that an advertisement in such names for eight successive weeks in the Richmond Enquirer was sufficient, still the advertisement that was made was on its first weekly appearance in the names of "Robert Smith and H. Banks." And there is no evidence that there ever was an eighth advertisement in the names of Richard Smyth and Henry Banks. It is true that an eighth (corrected) advertisement may have appeared in a supplement, now lost, to the issue of the Enquirer of the 13th or 14th day of October, 1820. But the authorities which control here, already cited and quoted from, forbid that presumptions be made in favor of the validity of the Taylor deed, and the fact that the plaintiff is not now able to introduce evidence which proves its validity is simply the plaintiff's misfortune.

The statute required an advertisement for eight successive weeks. At the time this advertisement was appearing Richard Smyth was certainly not one of the owners of the land. Whether Moorehouse and Ralph (or their successors in interest) were the owners of all of the land, or only of Smyth's half interest, is at present immaterial. If they owned only a half interest (and if it be assumed that an advertisement in the names of the former owners was sufficient), they had a right to eight successive advertisements free from mistakes such as would have misled them. Robert Smith is not idem sonans with Richard Smyth. In requiring publications of delinquent taxes, and especially as to the property of nonresidents, the lawmakers must be supposed to have known, not only that owners of property may forget that they have not paid the taxes when due, but that the payment of taxes is frequently intrusted to an agent of the owner, who may be either forgetful or unfaithful. We should therefore assume it as possible that these nonresident owners may have sent the money to pay the direct tax of 1816 to their agents a year or more before this advertisement appeared. In such circumstances, it would seem that the advertisement was calculated to mislead. If Moorehouse, believing his taxes to have been paid, had actually seen the advertisement in the name of Robert Smith and H. Banks, as it appeared in the Enquirer of August 22, 1820, it seems to me that it could easily have been passed by as relating to land that he was not concerned with. Indeed, I am not sure that the true owner could have been expected, as his eye traveled down the column of owners' names in the advertisement, to read further than the word "Robert." The Virginia doctrine is expressed in Stevenson v. Henkle, 100 Va. at page 595, 42 S. E. 672. Amid the multiplicity of decisions of somewhat similar cases the opinion in Meyer v. Kuhn, 65 Fed. 705, 713, 13 C. C. A. 298 (C. C. A. 4th Circuit), is of great force. See, also, Marx v. Hanthorn, 148 U. S. 172, 184, 13 Sup. Ct. 508, 37 L. Ed. 410; Yellow Poplar Co. v. Thompson, 108 Va. 612, 619, 62 S. E. 358; 37 Cyc. 1005.

For this reason, also, I must hold that the Taylor deed is void.

· (8) No Evidence of Compliance with Section 30 of Act of January 9, 1815.

[92, 93] This is an important provision of the law, intended for the benefit of the property owner. Assuming that, by force of some statute which I have not found, and to which no citation has been furnished, this list (if it ever existed) should have been removed to the clerk's office in Richmond; and assuming, if it ever existed, and if it ever reached there, that it was destroyed by the great fire of 1865, we still have no evidence that the statute was in fact complied with. Satisfactory evidence of the loss or destruction of a document authorizes the reception of secondary evidence of its contents, but does not supply want of evidence of the fact which needs be proved. Supervisors v. N. & W. R. Co., 119 Va. 763, 770, 91 S. E. 124. As I understand the law, the plaintiff here had to affirmatively prove (either by direct or circumstantial evidence) that the list in question was made in due time, and was also in due time filed in a certain place. We cannot make presumptions in favor of the Taylor deed. The inability of the plaintiff to prove compliance with the law in the respect in question may be due solely to the accidents incident to great lapse of time; but this is not the fault of the defendant. It remains a fact that the plaintiff has not proved the performance of an essential prerequisite to the validity of the Taylor deed. Minor, Tax Titles, 4; 1 Blackwell, Tax Titles (5th Ed.) §§ 641, 644; Flanagan v. Grimmet, 10 Grat. (Va.) 421, 426; Boon v. Simmons, 88 Va. 259, 265, 13 S. E. 439; Gage v. Bani, 141 U. S. 344, 351, 12 Sup. Ct. 22, 35 L. Ed. 776; De Forest v. Thompson (C. C.) 40 Fed. 375, 380; Braxton v. Rich (C. C.) 47 Fed. 178, 190; Cook v. Lasher (C. C. A. 4th Circuit) 73 Fed. 701, 707, 19 C. C. A. 654; Collier v. Goessling, 160 Fed. 604, 87 C. C. A. 506; · Fay v. Crozer (C. C.) 156 Fed. 486, 489; Coulter v. Stafford, 56 Fed. 564, 6 C. C. A. 18.

In view of a contention made by plaintiff's counsel, attention should be called to the fact that there is an obvious typographical error in section 30 of the act of 1815. Where the act reads, "together with the names of the owners or presumed owners, or the purchasers, * * *" it should be read as "of the purchasers." This provision was manifestly copied from section 25 of the act of July 22, 1813 (3 Stat. p. 32).

[94] It should further be said that, while counsel for the plaintiff have succeeded in finding some decisions which may seem to sanction the theory that the provisions of section 30 of the act of 1815 may be regarded as directory, the rule which controls us here is that provisions of tax laws which are clearly intended for the benefit of the taxpayer are mandatory. In French v. Edwards, 13 Wall. 506, 511 (20 L. Ed. 702) it is said:

"But when the requisitions prescribed are intended for the protection of the citizen, and to prevent a sacrifice of his property, and by a disregard of which his rights might be and generally would be injuriously affected, they are not directory, but mandatory.",

In Marx v. Hanthorn, 148 U. S. 172, 180, 13 Sup. Ct. 508, 510 (37 L. Ed. 410), it is said:

"A statutory power, to be validly executed, must be executed according to the statutory directions. It is no doubt true that there may be provisions in tax laws that are made in the interest of the public, and which do not concern the taxpayer; and a failure to punctiliously observe them may furnish him with no just ground of complaint. But the well-established rule is, as above stated, that observance of every safeguard to the owner created by the statute is imperatively necessary."

See, also, Lyon v. Alley, 130 U. S. 177, 184, 185, 9 Sup. Ct. 480, 32 L. Ed. 899; Erhardt v. Schroeder, 155 U. S. 124, 129, 15 Sup. Ct. 45, 39 L. Ed. 94; Boon v. Simmons, 88 Va. 259, 264, 13 S. E. 439; Cooley, Taxation, p. 216 et seq.; 37 Cyc. 1281, 1479.

It is further insisted that the mere fact that the lists of sales were required to be filed after the tax sale forbids that this section be regarded as of importance. I am unable to see any force in this contention. 37 Cyc. 1281; Blackwell, Tax Tit. (2d Ed.) §§ 641, 644. The deed must be held void, also, on this account.

### (9) Description of the Land Conveyed.

[95] While I hold that the advertisement of the tax sale in the names of Robert Smith and H. Banks was insufficient, it does not follow that the description in the deed is also insufficient. The evidence extrinsic of the deed shows that the land which was intended to be conveyed was in seven issues of the Richmond Enquirer advertised as 200,000 acres in Russell county, the property of Richard Smith and Henry Banks. The patent introduced granted 200,000 acres in Russell county to Richard Smyth and Henry Banks. The error in the deed, whereby the 200,000 acres in Russell county is described as having been assessed and sold as the land of Robert Smith and Henry Banks, should, I think, be treated as a mere clerical error, insufficient to invalidate the deed.

### (10) Assessment by Improper Collector.

[96] I am not prepared to say that where a tract of land lies in two collection districts, and where the statute requires that the assessment be made by the collector of the district in which the land lies, it can properly be assessed by only one collector and in only one district. It may well be that the statute law we are dealing with required that, where a tract of land lies in two districts, each collector must assess the part of the land lying in his own district. However, there is under the evidence such uncertainty as to the location of the exterior lines of the Smyth and Banks tract that I do not feel quite justified in holding that this tract did in fact lie outside of the first collection district even in part. It was stipulated that the particular tract claimed by the defendant and involved in this action lies within the Smyth and Banks lines. And I am satisfied from the evidence that all of the Ratliff patents lie within the 200,000 acres. But the rather vague statements of the witnesses as to the location of the outside lines of the Smyth and Banks tract are too uncertain a foundation for the conclusion here urged by the defendant.

### (11) Authority of Taylor to Convey.

[97] It is contended by the defendant that there is no sufficient evidence of the appointment of Wm. D. Taylor as "designated collector." I think the circumstantial evidence is sufficient to authorize a ruling that this fact has been sufficiently shown. Ronkendorff v. Taylor, 4 Pet. 349, 359, 7 L. Ed. 882.

### (12) Claim that Land was Not Subject to Federal Tax in 1816.

#### (A) Act of 1803.

[98] It is contended that the 200,000-acre tract here in question was validly forfeited to the state of Virginia by force of the Virginia act of January 29, 1803 (2 Code 1819, p. 528), was not redeemed, if ever, until after 1816, and hence was not subject to the federal direct tax of 1816. The second section of the act of 1803, which ipso facto causes a forfeiture under certain conditions, required that the auditor publish the statute in the "gazette of the printer of this commonwealth, and in some newspaper published at the seat of the general government." It is true that the purpose in requiring publication of the statute may have been in part for the benefit of the state. But, when we recall that under the first section of the act many landowners might lose valuable land because of an unintentional failure to pay taxes amounting to only a small fraction of the value of the land, it seems to me necessary to hold that the publication of the statute was at least in part intended for the benefit of the landowners. It is also true that there is in the statute no express provision to the effect that the publication should be a condition precedent to the validity of forfeitures occurring by force of the statute. However, it is clear that the lawmakers intended that the publication should be made, and we have no warrant for assuming an intent that forfeitures should occur, although the publication was not made.

[99] No essential difference in principle has occurred to me between the notice in advance of a sale for taxes, required by practically every state, and the notice intended by the second section of the act of 1803. It seems to be universally held that a failure to give the notice of a tax sale invalidates the sale. And where the burden of proving its validity rests on the party claiming under the sale a failure to affirmatively prove that the notice was given is as fatal as would be evidence to the contrary effect.

[100] Whether or not the defendant is entitled to the benefit of a presumption that the auditor complied with the second section of the act of 1803 is a question which has been given careful consideration. It is the general rule that presumptions are not indulged in favor of a party claiming the benefit of a forfeiture. Moreover, there has never been any notorious, long, unbroken, actual possession of the tract specifically in controversy in this particular suit, and the evidence of other acts of ownership by Silas Ratliff and his successors in title does not seem to me at all sufficient to warrant a presumption in favor of a forfeiture. In Marx v. Hanthorn, 148 U. S. 172, 180, 13 Sup. Ct. 508, 510 (37 L. Ed. 410), it is said:

"A statutory power, to be validly executed, must be executed according to the statutory directions. It is no doubt true that there may be provisions in tax laws that are made in the interest of the public, and which do not concern the taxpayer; and a failure to punctiliously observe them may furnish him with no just ground of complaint. But the well-established rule is, as above stated, that observance of every safeguard to the owner created by the statute is imperatively necessary. So, too, it is the rule, when not modified by statute, that the burthen of proof is on the holder of a tax deed to maintain his title by affirmatively showing that the provisions of the law have been complied with."

In Wilson v. Bell, 7 Leigh (Va.) 22, 24, it is said:

"It is therefore the well-settled law that he who claims under a forfeiture must show that the law has been exactly complied with."

## (B) Act of 1814.

[101-104] It is further contended on behalf of the defendant that, if there was no valid prior forfeiture, the 200,000-acre tract was forfeited in 1815, under the act of February 9, 1814 (2 Code 1819, p. 542). Under section 38 (page 551) of this statute no irregularities, except such as appear on the face of "the proceedings," may be relied upon to defeat the forfeiture. As this provision attempts to make the proceedings conclusive evidence of the regularity of the listing and assessment and of other necessary prerequisites to a valid taxation, it is probably void. See Marx v. Hanthorn, 148 U. S. 172, 182, 183, 13 Sup. Ct. 508, 37 L. Ed. 410; Minor, Tax Titles, p. 132.

However, it is not necessary to so hold. Admitting that the only document now in existence which may be regarded as "the proceedings" is the list or return of forfeitures in 1815, I am unable from it alone to identify any one of the 200,000-acre tracts therein mentioned as being the tract we are concerned with. The entry in the names of Richard Smyth and Henry Banks of 200,000 acres raises, of course, the nicest question. It is not an impossibility that the same Richard Smyth and Henry Banks with whom we are concerned obtained title to a tract of 200,000 acres of land in Russell county, other than the tract we are concerned with. But if we go to evidence outside of the forfeiture list in order to identify the lands on the list, we must, if the other evidence shows that grave irregularities are shown by the list, make use of such other evidence. If, by the extraneous evidence we identify any one entry of a 200,000-acre tract shown on Exhibit No. 1 with the second deposition of C. Lee Moore (the forfeiture list), we must also learn that every entry of 200,000 acres on that exhibit relates to the tract we are concerned with. This list (not to mention other errors) shows 200,000 acres returned as forfeited in the name of Moorehouse, and 200,000 acres as forfeited in the name of Ralph. In order to identify these two tracts with the land we are concerned with, we must consider evidence which, while it shows that the land returned as forfeited is the Smyth and Banks 200,000-acre tract we have been dealing with, also shows that neither Moorehouse nor Ralph was ever properly assessable with taxes on 200,000 acres. The same day that the deed from Smyth to Moorehouse (Exhibit 106)

was admitted to record, the deed from Moorehouse to Ralph (Exhibit 107) was admitted to record. Moorehouse was never assessable on more than 97,686 acres, and Ralph was never assessable on more than 102,313 acres. The lawmakers never intended that Moorehouse's land or Ralph's land could be forfeited for nonpayment of taxes assessed on practically twice too great an acreage.

Nor can any sound argument be based on the theory that no real injustice was done them. If my construction of the act of 1814 (sections 23, 24, and 48) be correct, the amounts charged in the list of for-feited lands against Moorehouse and against Ralph respectively are considerably too great. It is true that in making this computation I have as to Moorehouse reduced the taxes for 1797 and 1798 by one-half, and have not guessed at, but have omitted, any taxes for 1799, 1800, 1802; and 1808, as the land books do not show the taxes for these years. A party seeking to support a forfeiture cannot ask the court to guess at unknown assessments. But, even if the taxes for the omitted years were assumed to be the same as in the years nearest thereto, still the total would be too large. In the case of Ralph I charge only the tax on 102,313 acres for 1797, charge a third of the assessment for 1798, and omit taxes for 1799, 1800, 1802, and 1808. But here, again, if the proper amounts be guessed at for the omitted years, the total is still considerably more than was just. The totals found in the forfeiture list are explicable only on the theory that Moorehouse was charged on 200,000 acres for 1797 and 1798, and that Ralph was charged on 302,313 acres for the same years.

And the case against a valid forfeiture in the name of either Moorehouse or of Ralph is stronger than has been stated. The same 200,000-acre tract was returned (in two entries) as forfeited in the names of Smith and Banks. Under section 37 of the act (2 Code 1819, p. 551) a forfeiture in the name of a grantor is made binding on the grantee. From the land books we learn that from 1804 until after 1815 the entire tract was assessed to Moorehouse and Ralph and also to Smith and Banks. As I read the statute, neither Moorehouse nor Ralph could have redeemed, and secured thereby a marketable title, except by paying, in addition to the sums charged to himself, the sums charged to Smith and Banks.

Let us now consider the validity of the attempted forfeiture in respect to Henry Banks' possible rights. To identify the tract that was returned as forfeited in the names of Smith and Banks and of Richard Smith and Henry Banks we must consider extraneous evidence, including the land books. And if we solve in favor of the defendant the doubt as to the identity of the 200,000-acre tract, appearing on the land book in the names of Smith and Banks for the first time in 1804, we are by force of the same evidence led to know that the land could not properly have been assessed in the names of Smith and Banks. For the year 1804 (and for each year thereafter until after 1815), as has been said, every acre of the entire tract was assessed to either Moorehouse or Ralph, and properly. Lohrs v. Miller, 12 Grat. (Va.) 452, 456. This is itself a sufficient reason for holding that the returns of forfeiture in the names "Smith & Banks" and "Richard Smith and Henry

Banks" are invalid.  A claim of forfeiture based on an entirely erroneous assessment cannot be sustained.

Moreover, Banks, had he so wished, could not have redeemed, except by paying taxes which, so far as the evidence shows, were in excess of what should have been assessed.  The statute allowed redemption only "by the payment of the taxes and damages for which the land was sold."  It may possibly be doubtful if this language authorized a redemption of an undivided half interest in a tract of land by payment of half of the taxes and damages for which the entire tract was sold. But, if we solve this doubt in favor of the defendant, it still remains a fact that Banks could not have so redeemed his half interest in the land as to secure a marketable title, except by paying half of all the charges made in the list of forfeitures against both Moorehouse and Ralph (not to consider those made against Smith and Banks).  This is so because the land was properly assessed to Moorehouse and Ralph. See Lohrs v. Miller, supra, 12 Grat. (Va.) 452, 456.  The charges made against Moorehouse and Ralph, as has been shown, are considerably too great.

The conclusion necessarily reached is that no valid forfeiture of the land in question prior to 1816 has been shown.

### Check Marks on Land Books.

[105]  Objections by the plaintiff to the testimony of C. Lee Moore, the auditor of public accounts, concerning certain check marks on old land books (assessment lists) in his office, which are said to indicate delinquency, raise a question which may be of great interest in some subsequent trial.  I adhere to the rulings made at the trial.  It may be that a check mark alone is not sufficient evidence of delinquency. Such a mark could so easily and innocently be made by any one examining a title that the evidence, standing by itself, is not very reliable.  But as a circumstance tending to show delinquency it seems to me that the evidence is admissible.  It appears that many certificates have been issued from the auditor's office stating that the records of the office show that certain land was returned delinquent, and that they have been based merely on these check marks.  Section 3334, Code 1904, makes a certificate by the auditor of the fact of the return of any real estate as delinquent admissible and prima facie true.  It would be unreasonable to hold inadmissible the facts on which such a certificate is based, while compelled to admit as prima facie true the certificate itself.

### Auditor's Records.

[106]  A very large part of the first deposition of C. Lee Moore is unintelligible, without an extravagant consumption of time.  If another of these cases is to be tried, and if the tax history of the land in question is deemed of importance by either side, the contents of the land books, lists of lands forfeited, lists of lands sold and bought by the commonwealth, etc., should be presented by examined or attested copies (or extract copies) of the different sheets.

### Claim of Title in Plaintiff under Act of 1842.

[107] The contention that the commonwealth's title by forfeiture, if any, was vested in Joseph Hagan and Sarah Purcell, or in James Culbertson, by force of the third section of the act of March 22, 1842 (Acts 1841–42, p. 13), does not justify more than the briefest discussion. I am satisfied that the interpretation put on the statute by counsel for plaintiff is utterly unsound. The expressions found in the opinions in Wild v. Serpell, 10 Grat. (Va.) 405, at pages 409 and 412, and in Atkins v. Lewis, 14 Grat. (Va.) 30, at page 36, are dicta; but the construction therein put upon the statute was unavoidable. See Hutchinson, Land Titles, pp. 28–110, especially pages 36, 37, 49, 62, 63, 71, 85–87. It is true that the section of the statute in question is badly phrased. But the highly ingenious interpretation put on it by counsel for the plaintiff will not withstand examination. If their construction be correct, the Legislature intended, for instance, the following result: If a tract of land had been granted to A. in 1800, and if he, never having paid any taxes, had on January 1, 1841, conveyed the land to B., the latter would gain the commonwealth's title on March 22, 1842, if he had paid merely the taxes for the year 1841. In such case B. would have "discharged all taxes duly assessed and charged against him * * * and all taxes that ought to have been assessed or charged * * * from the time he * * * acquired title thereto. * * *" It should be added that the entire argument under this head ignores the fact that the Taylor deed is void.

### Redemptions Claimed by Plaintiff.

[108] As has been shown, there was no forfeiture under either the act of 1803 or of 1814. I do not find that counsel for either side have specified any time or any other particular statute under which a forfeiture may have occurred. I am not justified in giving to this case the time that would be necessary to make an independent investigation as to each one of the numerous statutes enacted after 1814. As of course, until it appears that there had previously been a valid forfeiture, no redemption, or attempted redemption, could possibly vest any title in the party making the redemption, or in any one else.

### Warranty in the Deed from Dennis, Clerk (Exhibit 2).

[109] If the commonwealth acquired title to the land in question under the act of 1835, it is certain that the patent issued to Ratliff in 1861 (Exhibit 114) vested in him every vestige of title that was then in the commonwealth. That the commonwealth could thereafter, except for the default of Ratliff or his successors in title, pass the title to the land in controversy to some one else, is too unreasonable to call for discussion.

[110] However, the meaning of the Legislature in providing (in section 666, Code 1904) that the clerk's tax deed shall be with covenants of special warranty has interested me. It has been the practice in the chancery courts of this state, since an early day in the history

of the courts, in directing that commissioners in chancery execute deeds, to order that the commissioner shall make a deed of special warranty. Certainly it was never the intention that such warranty should bind the court, and the only reason for the practice that has occurred to me is that this requirement has some tendency to prevent the commissioner from illegally making conveyance to some one other than the person entitled to the deed, and thereafter also making conveyance according to the court's decree. And the analogy between the tax deed to be made by the clerk and the conveyances so frequently made by commissioners in chancery may have suggested the insertion in section 666 of the sentence in question. But in no event can the warranty be considered as one made in behalf of the commonwealth. It is no more binding on the state than is the special warranty in a deed made by a commissioner in chancery binding on the court by whose authority he makes the deed. Again, the entire course of legislation on the subject of delinquent lands negatives a theory that the state intended to warrant the title conveyed by the clerk of court under section 666.

As no objections to the Dennis deed have ever been filed by the defendant, I assume that it passed such title to the land in controversy as was vested in Pearson. But it cannot be held to have any greater effect.

### Title Outstanding in Third Persons.

[111] The true, senior, legal paper title to the land in controversy is, if not in the defendant, outstanding in the heirs, or other successors in title, of Moorehouse, Ralph, and Banks. The entire failure of any one claiming under any of the three to take possession, or to do any sufficient act of ownership to indicate that that title is valid, subsisting, and enforceable, is a sufficient reason for saying that in this particular case the defendant cannot rely upon the defense of outstanding title. It follows that a discussion of the admissibility and effect of the deed from the heirs of Lewis Pascault to Wante (Exhibit 141), or of the curious Derrick deed (Exhibit 176) would be of academic interest only.

### Plaintiff's Title.

[112] Having found the Taylor deed to be a nullity, the plaintiff has not the legal title to the land in controversy. As has been said, the Dennis deed passed only such title as was in Pearson, and that was not the true legal title. Without regard to the question of title outstanding in third persons, or to the possession of the defendant and his predecessors, the judgment of the court must be for the defendant. And, such being the conclusion reached, it may seem quite unnecessary to go further. But to make this, as far as may be possible, a test case, it seems advisable to consider at least the defendant's paper title and the defense of adversary possession.

### Defendant's Paper Title.

The patent issued to Silas Ratliff in 1861 could have vested in him the true legal title to the tract now in controversy, if theretofore there

had been a valid forfeiture of the title under the Smyth and Banks patent. The defendant's claim of forfeitures under the acts of 1803 and 1814 have been discussed and rejected. Counsel for defendant have not pointed out any other specific statute under which a forfeiture may have occurred, nor has mention been made by them of the time when any such forfeiture may have occurred. The time already given to this case has been so great, and the demands from many other litigants are so pressing, that I do not feel justified in pursuing this theory in this case. If, in some other of these allied cases, counsel will specify some date and some particular statute under which a forfeiture is claimed,. I will examine the question as thoroughly as I can.

### . Defendant's Motion for Judgment.

[113] The theory of this motion, made first at the conclusion of the testimony in chief for plaintiff, and renewed at the close of the testimony, is that an exception to the action of the court in overruling it would bring the facts before the appellate court for review. See Insurance Co. v. Folsom, 18 Wall. 237, 249, 21 L. Ed. 827. It is not within my province to express an opinion on this question. It may be that this motion could properly have been granted. However, no harm is done either party (in view of the conclusion I have reached on the whole case) by overruling it. I take this course, as it seems much more likely to result in making this a test case than would a judgment based on the theory of a demurrer to the evidence.

### Exhibit 123.

This is a copy, taken from the Buchanan county deed book, of a deed from Martin Gibson to Silas Ratliff. The Buchanan county record was made from a copy taken from the Tazewell county deed book. I do not think section 3339 authorizes the use of the copy that was offered. However, counsel for plaintiff did not make this objection at the trial. Had the objection been then made and sustained, the defendant could have obtained and offered a copy from the Tazewell county record. This document was offered on Tuesday, September 28, 1915. The reception of evidence continued until the afternoon of October 1, 1915; and, as the objection would have been highly technical, I would have given the defendant more time, if needed, to obtain a copy from Tazewell county. Hence no change of the ruling admitting the copy that was introduced can now fairly be made.

### Ruling as to Testimony Reversed.

[114] At the trial the surveyor, Stone, was permitted to state, concerning the place at which he located a corner, that Fred Ratliff had thereafter told him that said place is the point where he (Ratliff) had seen the corner trees standing. As evidence of the fact that the corner trees had formerly stood at that place this testimony is hearsay. It was admitted under the belief that, when reached, Fred Ratliff's deposition would show what place he had pointed out to Stone. In such event I think the statement would have been admissible as identifying the place where Stone ended his line with the place where the trees

had formerly stood. However, Fred Ratliff's deposition does not clearly meet the requirements. The ruling made on page 1424, vol. 2, of transcript of evidence, must be reversed.

## Adversary Possession.

[115] The defendant, inter alia, relied upon the defense of adversary possession. Using the expression "actual possession" as meaning a visible possession, resulting from a series of physical acts, which have noticeably changed the land from its state of nature, and the expression "constructive possession" as meaning an invisible, unreal possession, which must always be connected with, and founded upon, a partial actual possession, the facts as to the possession were as follows: The defendant's predecessor in title, Ratliff, acquired color of title long prior to the Civil War to two small adjoining tracts of land, which were in large part taken into and kept in unbroken, notorious, actual possession from about 1852 until 1896. The two tracts are over a mile from the land in controversy, which was never in actual possession. Ratliff obtained a grant from the commonwealth of the tract in controversy May 1, 1861. This tract adjoins another tract granted by the commonwealth to Ratliff August 1, 1862, which in turn adjoins a tract granted by the commonwealth to Ratliff in 1861, which adjoins and impinges upon the two tracts which Ratliff had in actual possession. There has never been any actual possession of the tract in controversy, or of either of the two tracts which serve to connect the tract in controversy with the two tracts which were kept in actual possession. The doctrine of constructive possession of contiguous tracts, claimed under color of title, is laid down in Overton v. Davisson, 1 Grat. (Va.) 211, at pages 213, 216, 224, 42 Am. Dec. 544. In Va. Co. v. Fields, 94 Va. 102, at pages 106, 107, and bottom of page 115, 26 S. E. 426, it is affirmed, as it also is in Roller v. Armentrout, 118 Va. 173, 177, 86 S. E. 906. In Hot Springs Co. v. Sterrett, 108 Va. 710, at pages 712 and 713, 62 S. E. 797, and in Harman v. Ratliff, 93 Va. 249, 255, 24 S. E. 1023, it is recognized. See, also, Sharp v. Shenandoah Co., 100 Va. 27, at pages 34–36, 40 S. E. 103; Merryman v. Hoover, 107 Va. 485, 492, 502, 59 S. E. 483; Garrett v. Ramsey, 26 W. Va. 345, 370; State v. Harman, 57 W. Va. 447, 50 S. E. 828, 835; Simmons Co. v. Doran, 142 U. S. 417, 443, 12 Sup. Ct. 239, 35 L. Ed. 1063; Braxton v. Rich (C. C.) 47 Fed. 178, 180; Rich v. Braxton, 158 U. S. 375, 384, 15 Sup. Ct. 1006, 39 L. Ed. 1022; Hutchinson, Land Titles, § 416.

Harman v. Ratliff, 93 Va. 249, 255, 256, supra, 24 S. E. 1023, without close attention to the facts, might be misleading. At pages 250, 251, are set out the titles claimed by Silas Ratliff in that case. They do not include his home tract. The key to the opinion—a fact which should have been stated in the report—is that Silas Ratliff's home tract was outside of the Harman & Bender patent. The record, sent me by the clerk at Wytheville, rather clearly indicates that only the 14 acres, the 465 acres, and the 1,080 acres impinged on plaintiff's boundary. Both Judge Coulling and Mr. Finney, of counsel in that case, have written me that Silas Ratliff's home tract was outside of

the Harman tract. In the brief for the plaintiff in error, signed by the late Judge John H. Fulton, it is said:

"The defendant [Ratliff] owned a tract that adjoined the plaintiff on the east called the 640-acre tract. This does not include any of the land in controversy. It is called the home tract (presumably). He lived upon it."

There is nothing to the contrary in the opposing brief. In the case at bar the junior claimant, Ratliff, before the Civil War took actual possession of a part of the tract conveyed to him by Gibson, as well as of the 15-acre tract. The Gibson tract lies, as do the other tracts to be mentioned, wholly within the Smyth & Banks patent. The 15-acre patent to Ratliff (whose name is also spelled Ratcliff) was issued in 1854. In 1861 Ratliff got a patent for the 595 acres which adjoins the 15 acres and the Gibson tract. In 1861 he also obtained a patent for the 673 acres (the land in controversy), which did not then adjoin any of Ratliff's other tracts. In 1862 (August 1st) Ratliff obtained the 163-acre patent, which adjoins the 673 acres and the 595 acres, and then the land in controversy became a part of a chain of contiguous tracts. If any one in plaintiff's chain of title ever had any actual possession of any part of the 200,000-acre tract, such possession had been abandoned long prior to 1862, and was never afterwards resumed. The doctrine here relied upon by the defendant does not greatly commend itself to my mind, but I am unable to satisfactorily distinguish the case at bar from Overton v. Davisson, supra. In that case Davisson's actual possession (which was commenced before the emanation of either grant and was confined to a part of a tract of 400 acres, granted to Davisson on January 3, 1787) was held to extend Davisson's constructive possession over another adjoining tract of 800 acres granted to him on January 23, 1787. If a constructive possession can arise after an interval of 20 days, it may also arise after an interval of one or of several years. There is no time at which a line of demarcation can be drawn. Hence, although the interval of time is longer here than in Overton v. Davisson, the principle there laid down seems necessarily to apply here, unless it be because the land in controversy does not immediately adjoin either of the two tracts of which Ratliff had a partial actual possession.

In this respect this case differs from Overton v. Davisson. But I am unable to see any sufficient reason for limiting the doctrine to an immediately adjoining tract. The principle on which the doctrine is founded is that an actual possession within the interlock by a colorable title holder gives to the true title holder notice of an adverse claim, and he must at his peril sue before the period of limitation runs. It can make no difference to the senior that the junior's colorable titles were acquired at different times. All contiguous tracts constitute one parcel, so far as the senior title holder is concerned. After August 1, 1862, Ratliff was in the actual possession of a part of what was in effect one large boundary, shown by the exterior lines on the trial map. In Overton v. Davisson, 1 Grat. (Va.) 216, 229 (42 Am. Dec. 544), it is said:

"And, moreover, that upon the question of adversary possession, it is immaterial whether the land in controversy, be embraced by one or several coter-

minous grants of the older patentee, or one or several coterminous grants of the younger patentee; in either case the lands granted to the same person by several patents must be regarded as forming one entire tract."

[116] As has been shown, Ratliff's constructive possession of the tract in controversy commenced on August 1, 1862 (the date when the land in controversy became one of the several adjoining tracts); but at that time the stay law was in force.   Section 2919, Code 1904; 4 Minor's Insts. 624.   It was not until January 1, 1869, that Ratliff's possession could start the running of the statute of limitation.   The 10 years of adverse possession necessary to bar the senior title holder could not have run until January 1, 1879.

[117-119] In 1876 Pearson failed to pay the taxes assessed against him on the 200,000-acre tract.   It is contended in behalf of the plaintiff that the statute of limitations ceased to run on January 1, 1876, and did not commence to run again until the tax deed was made by Dennis, clerk, to the Buchanan Company.   This contention is founded on section 661, Code 1904:

"*Sec. 661.   When Deed Made—What Title is Invested in Grantee—How Defeated—When Title of Remainderman Not Divested by Sale.*—When the purchaser of any real estate sold as aforesaid or sold in pursuance of section six hundred and sixty-six, his heirs or assigns, has obtained a deed therefor, and the same has been duly admitted to record in the county or corporation in which such real estate lies, the right or title to such real estate shall stand vested in the grantee in such deed as it was vested in the party assessed with the taxes or levies on account whereof the sale was made, at the commencement of the year for which said taxes or levies were assessed, or, in any person claiming under such party," etc.

I concede that from the date of the purchase by the commonwealth (October 12, 1886) until the deed was made to the Buchanan Company the possession of Ratliff and his successors did not count.   Smith v. Chapman, 10 Grat. (Va.) 445, 464.   The exact question here presented does not seem to have ever been decided by the Virginia Court of Appeals.   In Thomas v. Jones, 94 Va. 756, 759, 27 S. E. 813, 815 (where it was contended that the purchaser of the tax title took subject to a vendor's lien in favor of the delinquent's grantor), the court said:

"The provision in section 661 of the Code, that 'the right or title to such estate shall stand vested in the grantee in such deed as it was vested in the party assessed with the taxes or levies on account whereof the sale was made,' refers to the character of the title that shall be vested in the grantee in such deed, whether it be a fee simple or otherwise.   It has no reference to liens, and does not mean, as contended, that the purchaser takes the land subject to the liens resting thereon at the time the taxes are assessed."

In Stevenson v. Henkle, 100 Va. 591, 598, 42 S. E. 672 (where it was contended that a deed of trust made by the landowner prior to the assessment of taxes for which the land was subsequently sold was paramount to the tax lien), the language used in Thomas v. Jones, supra, is again used.   While the question is not entirely free from difficulty, I believe that the language of the statute means no more than that the grantee in the tax deed shall have the estate that was vested in the delinquent former owner.   Without going further back than the tax statutes collected in the Code of 1819, it will be advisable

to note the genesis of the language used in the statute in force when the land was conveyed to the Buchanan Company. In the act of January 7, 1788 (2 Code 1819, p. 512), it is provided that the sheriff's deed "shall be effectual for passing to the purchaser all the estate and interest which the debtor had and might lawfully part with in the lands." In another act of the same date (Id. p. 515), in providing for redemption after purchase by the tax commissioner for the public, it is provided that the person who was originally chargeable with the land tax "may discharge the same, and be entitled to all the estate he held in such land, in as full and ample a manner as if the said sale had never been made." In the act of November 30, 1792 (Id. 522), the deed "shall be effectual for passing to the purchaser all the estate and interest which the debtor had, and might lawfully part with. * * *" In the act of February 14, 1811 (Id. p. 536), is the following:

"* * * No forfeiture of any lands occasioned by the failure of any tenant for life to pay the taxes due thereon shall operate on any other estate except that of such tenant for life, unless such estate be found to be insufficient to pay the arrears of taxes due thereon."

In the act of February 9, 1814 (Id. 551), it is provided:

"37. The sales made as aforesaid, and the titles vested in the literary fund as aforesaid, shall give to the purchaser, or to the literary fund, as the case may be, only such estate and such right, as, at the time when such land or lot was returned delinquent, was vested in the person in whose name it was returned, his heir, devisee, or other person claiming by, through or under him: save only, that all use, trust and equity of redemption, shall be extinguished by such sale or vesting in the literary fund."

In the act of March 10, 1832 (Acts 1831–32, p. 64), it is provided:

"20. All sales of lands and lots, made in pursuance of this act, and not redeemed within the period aforesaid, shall be good and effectual in law, for passing such estate only as shall be vested in the persons charged with the taxes, for the nonpayment whereof such sale shall be made."

In so far as we are now concerned, the language of the present statute is identical with that in 1 Code 1849, p. 204, Code 1860, p. 221, Code 1873, p. 385, and Code 1887, § 661 (Code 1904, § 661). Throughout this long course of legislation it seems rather clear that the intent has always been that a tax purchaser should obtain such estate in the land as the delinquent had, rather than to provide a shield against adversary possession held by a stranger to the delinquent taxpayer.

Again, if the intent was that a delinquency, followed by a sale and deed to a tax purchaser, should stop the running of the statute of limitations at the date of the delinquency, the language chosen is ill adapted to express such intent. While adversary possession of real estate may defeat the right or title of a delinquent taxpayer, it is not a part of such right or title. If the intent was to shield the tax purchaser against an adversary possession which had not ripened at the commencement of the year of the delinquency, the Legislature would have said that the purchaser should have the title of the delinquent owner, with every right of action which he had on the first day of the year of the first delinquency. It is true that on January 1, 1876, Pearson

had an unbarred right of action against Ratliff, which his successors in interest, if my conclusion is sound, have not. But the words "right or title" in the statute mean here the paper title which Pearson had on that date, and this has been passed on to the plaintiff.

Again, Pearson could have sued Ratliff in ejectment, free from the defense of adversary possession, at any time from January 1, 1876, until January 1, 1879. I can think of no very good reason for assuming a legislative intent to give to a purchaser who stands in Pearson's shoes an exemption from Pearson's negligence, or to visit punishment on a stranger who was not to blame for Pearson's delinquency. It is true that it would make tax titles more salable if the statute means what plaintiff's counsel contend that it means. But such legislation would operate most harshly on actual settlers, and would be inherently unjust, in that it would make an innocent stranger in adverse possession (and, presumably, also, taxed on the land he claims) suffer for the delinquency of the senior title holder. Neither an intent to discourage actual settlement of the thinly inhabited mountain sections of this state, nor an intent to visit punishment for one man's sins on another, can well be derived from the language of the statute. 1 Fed. Stats. Ann. lv.

Another reason for rejecting the construction advocated by plaintiff's counsel—and one of very considerable force—is found in this fact: In none of the very numerous cases reported in this state, in which plaintiffs have relied upon tax titles, has this contention, so far as I have discovered, ever been made. I have said that the plaintiff here stands in the shoes of Pearson. Under statutes such as those of this state the title of the tax purchaser is a derivative title. McDonald v. Hannah (C. C.) 51 Fed. 73, 74; McDonald v. Hannah, 59 Fed. 977, 980, 8 C. C. A. 426. See Blackwell, Tax Titles (1st Ed.) §§ 232, 233, p. 548:

"Where the law requires the land to be listed in the name of the owner of the fee, or of any other interest in the estate, provides for a personal demand of the tax, and, in case of default, authorizes the seizure of the body or goods of the delinquent in satisfaction of the tax, and in terms, or upon a fair construction of the law, permits a sale of the land only when all other remedies have been exhausted, then the sale and conveyance by the officer passes only the interest of him in whose name it was listed, upon whom the demand was made, who had notice of the proceedings, and who alone can be regarded as legally delinquent. In such cases the title is a derivative one, and the tax purchaser can recover in ejectment only such interest as he may prove to have been vested in the defaulter at the time of the assessment."

If the contention of the plaintiff be upheld, we must construe section 661 as being in conflict with section 2915—the statute of limitation:

"No person shall * * * bring an action to recover any land lying west of the Alleghany mountains but within ten years next after the time at which the right * * * to bring such action shall have first accrued to himself or to some person through whom he claims."

But, if section 661 be construed as the defendant contends, this conflict is avoided, and this fact affords a reason of some weight for adopting the construction of section 661 above chosen. 36 Cyc. p. 1146; 26 Am. & Encyc. 616–618; Black, Interp. Law (1st Ed.) pp.

17, 60–61; 1 Fed. Stats. Ann. xciii, 31b; Sutherland, Stat. Constr. (1st Ed.) § 288.

Counsel for plaintiff build up a somewhat plausible argument on the decisions holding that the state's lien for taxes is a paramount lien. It is true that Pearson could not have incumbered the land by any lien, even to the suffering of a judgment lien, either before or after the 1st of January, 1876, which would not have been subordinate to the tax lien, and which would not have been extinguished by the tax sale. It is also true that a sale or devise of the land by Pearson, or a transmission of his title by descent, after the said date, could not affect the validity of the tax sale. But it does not follow that the ripening of Ratliff's title by adversary possession is also nullified by the tax sale. The difference is that all such lienors, vendees, devisees, or heirs acquire their rights through and under Pearson, Ratliff acquired his right in opposition to Pearson. Any one who acquired a lien on the land from Pearson's predecessors in title, and any one who acquired a lien on or the ownership of the land from or under Pearson, are his privies in title. Ratliff is a stranger to the Pearson title.

Counsel ask what would have been the result if the tax sale had been held on January 2, 1879. I think the answer is that the state would in such event have offered a wholly worthless tax title for sale. It is perfectly true that, if the Pearson title was in 1876 a valid title, by assessing him with the taxes for that year the state acquired a valid and valuable lien on the land. But there is certainly no Virginia decision, so far as I know, which holds that delay in foreclosing this lien, accompanied by the ripeninng of an adverse possession of the land by a stranger to the taxpayer, may not make the lien valueless. And I can see no reason why the result should be otherwise. If the position I take be sound, it is entirely true that a well-advised proposing tax purchaser would not buy at a tax sale, where an adverse title had ripened before the tax sale is held, or will ripen so soon after the tax sale that suit cannot be instituted before the adverse title ripens. And it follows that the tax lien is, or may be, in such case valueless. But such should in reason and justice be the result. The law does not provide that a purchaser at a tax sale shall get every one's title to the land sold, but only the title of the person assessed and of those claiming in privity with him. It does not provide for a forfeiture of the rights of strangers, also claiming the land, because the adverse claimant should be, and in practically all cases is, also assessed with taxes levied on the same land. This conclusion finds some support in Reusens v. Lawson, 91 Va. 226, 244, 21 S. E. 347; 1 Cyc. 1018; 2 Corp. Jur. 108; Jordan v. Higgins, 63 Tex. 150; Sellers v. Simpson, 53 Tex. Civ. App. 205, 115 S. W. 888. See, contra, Monroe v. Morris, 7 Ohio, 262, pt. 1.

If the defendant's title to the land in controversy had been lost by failure to pay the taxes assessed against him or his predecessors in title, the plaintiff would assuredly have introduced evidence of such fact. As there was no such evidence, it seems a reasonable conclusion that Ratliff and his successors have always paid the taxes on the land in controversy. If so, it would be difficult to conceive of greater injustice than that the defendant should lose the land claimed by him,

not because Pearson has a better title to it, but because Pearson failed to pay the taxes assessed against Pearson on the same land. It follows that the statute of limitations affords in itself a sufficient reason for rendering judgment for the defendant.

## Facts to be Found Generally.

[120] Section 649, Rev. Stats. (4 Fed. Stats. Ann. 393 and 450 et seq. [Comp. St. 1916, § 1587]), gives the court discretion as to finding the facts either generally or specially. Insurance Co. v. Folsom, 18 Wall. 237, 249, 21 L. Ed. 827. Contrary to my original intention, I must abandon all thought of preparing and entering special findings of the facts. The time at my disposal does not admit of such course. Moreover, neither side has asked for a special finding.

## Prayers for Instructions.

Since writing almost all of the foregoing opinion I have received from counsel prayers for instructions. Some of those submitted by plaintiff's counsel and many of those submitted by counsel for the defendant state the law, as I understand it, with perfect accuracy. I wanted these prayers filed, in order that any error in my conclusions should be certainly preserved for the action of the upper court. It will best subserve this purpose that I reject all of the prayers, and in lieu thereof insert in the final order in this case a very brief statement of the conclusions of law which have been adopted by the court.

It will appear in the final order that exceptions are reserved by each party because of the rejection of its instructions, as well as exceptions to such of the conclusions of law as are adverse to either party.